## UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF GEORGIA ATLANTA DIVISION

NETCHOICE,

*Plaintiff*,

v.

CHRISTOPHER M. CARR, in his official capacity as Attorney General of Georgia,

*Defendant*.

Civil Action No. _____

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

NetChoice brings this civil action against Defendant for declaratory and in-junctive relief and alleges as follows:

### INTRODUCTION

1.     Georgia is attempting to unconstitutionally regulate minors' access to protected online speech—impairing adults' access along the way. The speech restrictions in Georgia Senate Bill 351 ("Act") violate bedrock principles of constitutional law and precedent from across the nation. *See* Ex. 1 (text of Act). As the U.S. Supreme Court has repeatedly held, minors "are entitled to a significant measure of First Amendment protection." *See Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 794 (2011) (quoting *Erznoznik v. Jacksonville*, 422 U.S. 205, 212-13 (1975)). "[T]he state" lacks "power to prevent children from hearing or saying anything *without their parents' prior consent*." *Id.* at 795 n.3 (emphasis in original). And the government

may not impede or chill adults' access to protected speech in its effort to regulate what it deems acceptable for minors. *See Ashcroft v. ACLU*, 542 U.S. 656, 667 (2004); *Reno v. ACLU*, 521 U.S. 844, 882 (1997). These constitutional principles apply with equal force online. Governments cannot "regulate ['social media'] free of the First Amendment's restraints." *Moody v. NetChoice, LLC*, 603 U.S. 707, 726-27 (2024) (citation omitted).

2.    That is why courts nationwide have enjoined enforcement of similar state laws restricting minors' access to online speech. *NetChoice, LLC v. Yost*, 2025 WL 1137485 (S.D. Ohio Apr. 16, 2025) (permanently enjoining parental-consent law); *NetChoice, LLC v. Griffin*, 2025 WL 978607 (W.D. Ark. Mar. 31, 2025) ("*Griffin II*") (permanently enjoining age-verification and parental-consent law); *NetChoice, LLC v. Bonta*, 2025 WL 807961 (N.D. Cal. Mar. 13, 2025) (enjoining broad regulation of online services, including age-estimation requirement); *NetChoice, LLC v. Reyes*, 748 F. Supp. 3d 1105 (D. Utah 2024) (enjoining age-assurance and parental-consent law); *Comput. & Commc'n Indus. Ass'n v. Paxton*, 747 F. Supp. 3d 1011 (W.D. Tex. 2024) ("*CCIA*") (enjoining law requiring filtering and monitoring of certain content-based categories of speech on minors' accounts).

3.      This Court should join those courts and similarly enjoin Defendant's enforcement of this Act, §§ 39-6-1 to -5, both facially and as applied against NetChoice's regulated members.[1]

4.      The websites regulated by the Act allow both minors and adults to "engage in a wide array of . . . activity on topics 'as diverse as human thought'"—all "protected by the First Amendment" from governmental interference. *Griffin II*, 2025 WL 978607, at *3 (quoting *Packingham v. North Carolina*, 582 U.S. 98, 105 (2017)). The Act would fundamentally change that. It would place multiple restrictions on minors' and adults' abilities to access covered websites and, in some cases, block access altogether. Further, the Act actually encourages companies to "not permit minors to use the[ir]" websites by exempting from regulation websites that bar minors' access. § 39-6-1(6)(B). Even for those minors who can access the websites, the Act would directly regulate the speech that companies can disseminate.

5.      Accordingly, the Act—in whole and in part—is unlawful for multiple reasons.

6.      *First*, the Act's requirement that covered websites verify the ages of *all* Georgia account holders, § 39-6-2(a)-(b), violates the First Amendment. *E.g.*, *Griffin*

---

[1] This Complaint refers to all "online service[s], website[s], [and] application[s]," § 39-6-1(6), as "websites." Unless otherwise noted, statutory citations in this Complaint refer to Title 39 of the Georgia Code. This lawsuit only challenges Section 3-1 of the Act (enacting §§ 39-6-1 to-5), and thus all references to "the Act" or "SB351" refer only to the challenged Section 3-1.

*II*, 2025 WL 978607, at *13, *17 (permanently enjoining age-verification require-ment as "maximally burdensome"); *Reyes*, 748 F. Supp. 3d at 1129 n.169 (similar); *see Bonta*, 2025 WL 807961, at *15 (enjoining age-estimation requirement). All in-dividuals, minors and adults alike, must be age-verified, which may include handing over personal information or identification that many are unwilling or unable to pro-vide as a precondition to accessing and engaging in protected speech. Requiring age-verification before disseminating protected speech (as to both minors and adults) impermissibly chills and burdens access to speech. *See, e.g.*, *Ashcroft*, 542 U.S. at 673; *Reno*, 521 U.S. at 882.

7.    *Second*, the Act's requirement that minors must obtain parental consent as a prerequisite to creating accounts (and thus access and engage in protected speech) on covered websites, § 39-6-2(c), (e), violates the First Amendment. *See Yost*, 2025 WL 1137485, at *24 (permanently enjoining parental-consent require-ment to access protected speech); *Griffin II*, 2025 WL 978607 at *13, *17 (same); *see also Reyes*, 748 F. Supp. 3d at 1126 & n.135 (enjoining parental-consent require-ment for minors to speak to certain audiences). The Supreme Court has held that governments may not require minors to secure "*their parents' prior consent*" before accessing protected speech. *Brown*, 564 U.S. at 795 n.3 (emphasis in original).

8.    *Third*, the Act's restrictions on advertisements displayed to minors § 39-6-3(1), as well in certain circumstances the accounts of "all account holders,"

§ 39-6-2(a), both violate the First Amendment and are preempted by 47 U.S.C. § 230. These restrictions affect websites' right to disseminate advertisements, individuals' right to speak, and peoples' right to view advertisements. *E.g.*, *Students Engaged in Advancing Tex. v. Paxton*, 2025 WL 455463, at *13-14 (W.D. Tex. Feb. 7, 2025) ("*SEAT*"). The restrictions are broad and undefined, potentially covering contextual ads—including ads for things like higher-education opportunities, military service, and test preparation. The Act could go so far as to prohibit user-generated promotional content about activities like babysitting services, music lessons, or sports clinics. Moreover, Congress expressly preempted state laws restricting websites' decisions to publish (or not to publish) advertisements and any requirement to monitor for such content. 47 U.S.C. § 230(c)(1), (e)(3).

9.     Because these provisions burden members' ability to disseminate and users' ability to access and engage in protected speech, they independently trigger heightened scrutiny. Moreover, they all trigger strict scrutiny because they rely on the Act's content-based central coverage definition of "[s]ocial media platform." § 39-6-1(6); *see Yost*, 2025 WL 1137485, at *17-20 (holding that law's central coverage definition was facially content-based); *Reyes*, 748 F. Supp. 3d at 1121-23 (similar). None of the Act's provisions can satisfy the demanding requirements of strict scrutiny, or for that matter any level of heightened scrutiny, as they are not appropriately tailored to any substantial or compelling interest.

10.     Finally, the Act's central "[s]ocial media platform" coverage definition, § 39-6-1(6), is also unconstitutionally vague, leaving many websites across the internet uncertain about whether they must shoulder the Act's burdens.

11.     For these reasons and more, this Court should enjoin Defendant from enforcing the Act against Plaintiff's members and declare the Act unlawful.

## PARTIES & STANDING

12.     Plaintiff NetChoice is a District of Columbia nonprofit trade association for internet companies. NetChoice's mission is to promote online commerce and speech and to increase consumer access and options via the internet, while minimizing burdens that could prevent businesses from making the internet more accessible and useful. NetChoice's members are listed at NetChoice, About Us, https://tinyurl.com/4jk6kzbe.

13.     NetChoice has standing to bring its challenges on at least two grounds.

14.     First, NetChoice has associational standing to challenge the Act, because: (1) some of NetChoice's members have individual standing to sue in their own right; (2) challenging the Act is germane to NetChoice's purpose; and (3) members' individual participation is unnecessary in this purely legal challenge. *See Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).

15.     Multiple district courts have held that NetChoice has standing to seek redress for its members'—and their users'—injuries. *E.g.*, *Yost*, 2025 WL 1137485,

at \*8-9; *Reyes*, 748 F. Supp. 3d at 1118-19; *CCIA*, 747 F. Supp. 3d at 1029-31; *NetChoice, LLC v. Griffin*, 2023 WL 5660155, at \*9 (W.D. Ark. Aug. 31, 2023) ("*Griffin I*").

16.    Based on the Act's definition of regulated "social media platform[s]," § 39-6-1(6), the Act regulates, at a minimum, the following NetChoice members: (1) Dreamwidth; (2) Meta, which owns and operates Facebook and Instagram; (3) Nextdoor; (4) Pinterest; (5) Reddit; (6) Snap Inc., which owns and operates Snapchat; (7) X; and (8) YouTube. Although the Act does not regulate all of Plaintiff's members, this Complaint refers to members with services that the Act regulates as "members."

17.    Second, NetChoice has standing to assert the First Amendment rights of members' current and prospective users. *Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 393 (1988); *Yost*, 2025 WL 1137485, at \*9-14; *CCIA*, 747 F. Supp. 3d at 1031; *Griffin I*, 2023 WL 5660155, at \*9-14.[2]

---

[2] This Complaint uses the terms "minor," "adult," "account holder," and "user" to refer only to account holders, users, and minors younger than 16 in Georgia, consistent with the definition of "minor" in the Act. § 39-6-1(3). Likewise, this Complaint generally employs the term "user" to encompass both of what the Act refers to as "user[s]" and "account holder[s]." *See* § 39-6-1(1), (7). Plaintiff and its members reserve the right to argue that their compliance obligations for "users" (under the Act) are different than their compliance obligations for "account holders," and are different from the burdens discussed in this Complaint.

18.    Defendant Christopher M. Carr is the Georgia Attorney General. He is a Georgia resident and is sued in his official capacity. The Georgia Attorney General has "exclusive authority to enforce the provisions of" the Act challenged here. § 39-6-4(a).

## JURISDICTION & VENUE

19.    This Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1343(a). This Court has authority to grant legal and equitable relief under 42 U.S.C. § 1983, injunctive relief under 28 U.S.C. § 1651, and declaratory relief under 28 U.S.C. § 2201(a).

20.    This Court has personal jurisdiction over Defendant because he resides in and/or conducts a substantial proportion of his official business in Georgia. Venue is proper in this District under 28 U.S.C. § 1391(b) because Defendant resides in, and the events giving rise to this civil action occurred in, Georgia.

## BACKGROUND

21.    **NetChoice members' covered websites disseminate, facilitate, and promote speech protected by the First Amendment.** Social media websites such as Plaintiff's members' covered services "engage[] in expression" through their "display" and "compil[ing] and curat[ing]" of protected "third-party speech" (text, audio, images, and video) "created by others." *Moody*, 603 U.S. at 716, 728.

22.    The speech on these websites includes expression at the heart of the First Amendment's protections for art, literature, politics, religion, and "entertain[ment]." *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 501 (1952).

23.    Minors—like adults—use NetChoice members' social media websites to engage in speech protected by the First Amendment from governmental interference. On these websites, minors can "gain access to information and communicate with one another about it on any subject that might come to mind. Users employ these websites to engage in a wide array of protected First Amendment activity on topics as diverse as human thought." *Griffin II*, 2025 WL 978607, at *3 (cleaned up; quoting *Packingham*, 582 U.S. at 107); *see Yost*, 2025 WL 1137485, at *2. For example, Dreamwidth allows users to share their writing, artwork, and innermost thoughts. "On Facebook, . . . users can debate religion and politics with their friends and neighbors or share vacation photos." *Packingham*, 582 U.S. at 104. Instagram allows people to post and view photos and videos, comment on them, learn about and advocate for causes they care about, showcase their art or athletic talent, and hear from their local government officials. On Nextdoor, users can connect with neighbors, share local news, and borrow tools. Pinterest allows its users to explore recipes, home decor, and more. On Reddit, users have access to hundreds of thousands of communities, endless conversation, and authentic human connection—with user-created and user-led communities on all manner of subjects. Snapchat enables

9

users to have digital conversations with friends and family in ways that replicate real-life interactions. On X, "users can petition their elected representatives and otherwise engage with them in a direct manner." *Id.* at 104-05. And YouTube endeavors to show people the world, from travel documentaries to step-by-step cooking instructions.

24.    All of these websites allow their users to create accounts and communicate with other users through posts. § 39-6-1(5)-(6).

25.    Like many other websites, many NetChoice members require users to create an account before they can access some or all of the protected speech—and speech-facilitating functions—available on their websites.

26.    **Existing options for parental control and oversight.** Parents have many existing tools they can choose from to regulate whether and how their minor children use the internet. *See NetChoice, LLC v. Bonta*, 113 F.4th 1101, 1121 (9th Cir. 2024); *Griffin II*, 2025 WL 978607, at *3; *Reyes*, 748 F. Supp. 3d at 1126 n.138.

27.    There are resources that collect all of these parental tools in one place. *E.g.*, Internet Matters, Parental Control Guides, https://perma.cc/9CY9-LGWY.

28.    Parents decide whether and when to let their minor children use computers, tablets, smartphones, and other devices to access the internet. *Griffin II*, 2025 WL 978607, at *3.

29.    Cellular and broadband internet providers offer families tools to block certain online services from certain devices. *See, e.g.*, Verizon, Verizon Smart Family, https://perma.cc/B3AB-LJ6N; AT&T, AT&T Secure Family, https://perma.cc/5DCQ-ZKNP; T-Mobile, Family Controls and Privacy, https://perma.cc/6SBC-EDM8; Comcast Xfinity, Set Up Parental Controls for the Internet, https://perma.cc/JL8C-T7AQ.

30.    Internet browsers also allow parents to control what online services their children may access. *See, e.g.*, Mozilla, Block and Unblock Websites with Parental Controls on Firefox, https://perma.cc/2KDD-KJ9A. For example, some browsers offer a "kids mode" or allow parents to see what online services their children are accessing the most. *See* Google, Safety Center, https://perma.cc/XR57-8KEY; Microsoft, Learn More About Kids Mode in Microsoft Edge, https://perma.cc/R823-VGJQ. Parents can also use widely available third-party browser extensions to reinforce these tools. *E.g.*, Kim Key, *The Best Parental Control Software for 2025*, PCMag (Nov. 15, 2024), https://perma.cc/F9AT-7KCS.

31.    Wireless routers often have settings allowing parents to block particular websites, filter content, monitor internet usage, and control time spent on the internet. *See, e.g.*, Netgear, Smart Parental Controls, https://tinyurl.com/avtm5kaa; tp-link, How to Configure Parental Controls on the Wi-Fi Routers (Case 1), https://perma.cc/Y7L7-WBHU.

32.     Device manufacturers allow parents to limit the time their children spend on the device, curtail the applications that can be used, filter online content, and control privacy settings. *See* Apple, Use Parental Controls on Your Child's iPhone and iPad, https://perma.cc/WL95-JGWH; Google Family Link, Help Keep Your Family Safer Online, https://perma.cc/9MBX-YS48; Microsoft, Getting Started with Microsoft Family Safety, https://perma.cc/72NU-LBDR; Samsung, Parental Controls Available on Your Galaxy Phone or Tablet, https://perma.cc/3Y7K-NCMM.

33.     Many third-party applications also allow parents to control and monitor their children's online activities. *See, e.g.*, Alyson Behr, *The Best Parental Control Apps in 2025, Tested By Our Editors*, CNN underscored (Jan. 2, 2025), https://perma.cc/Q3SF-TBNF.

34.     In addition, NetChoice members provide parents with tools and options to help monitor their minor children's activities. Facebook offers supervision tools that parents and guardians can use to help support their teens. When supervision is set up on Facebook, a parent can see how much time their teen has spent on the Facebook app each day for the last week and their average daily time spent for the week; set scheduled breaks for their teen; see their teen's Facebook friends; see some of their teen's privacy settings and content preferences; and see the people and Pages their teen has blocked. *See, e.g.*, Meta, Supervision on Facebook, https://perma.cc/E5GS-DZKQ. Similarly, Snapchat's "Family Center" allows

parents to see which friends the teen has been recently communicating with on Snap-chat, view their list of friends, restrict sensitive content, and report abuse. *See* Snap-chat Support, What is Family Center, https://perma.cc/2AUN-CKD6. Instagram cur-rently offers supervision features for teens under 18 that allow parents and guardians to set daily time limits or limit use during select days and hours; set reminders to close the app; see the average amount of time their teen has spent on Instagram over the last week and the total time spent on Instagram for each specific day over the last week; see which accounts their teen is following and which accounts are following their teen, which accounts their teen is currently blocking, and their teen's settings for account privacy, messaging, sensitive content, and who can add them to a group chat. *See, e.g.*, Instagram, Help Center, About Supervision on Instagram, https://perma.cc/7AD3-L8J2. Instagram has also announced that minors under 18 will automatically be placed into "Instagram Teen Accounts" which default to the strictest privacy settings and have limitations on who can contact minors, the content minors can see, and the time of day minors can receive notifications. *See, e.g.*, In-stagram, Introducing Instagram Teen Accounts: Built-In Protections for Teens, Peace of Mind for Parents (Sept. 17, 2024), https://perma.cc/8EQB-D3DG. Minors under 16 will need a parent's permission to change any of these Instagram Teen Accounts settings to less strict settings. *Id.* Via Teen Accounts, parents will have added super-vision features, including ways to get insights into who their minors are chatting

with and seeing topics their minor is looking at. *Id.* YouTube offers a "supervised experience" for teens, allowing parents (1) to receive email notifications when a teen uploads a video or starts a livestream; (2) to gain insights into their teen's channel activity (such as uploads, comments, and subscriptions); and (3) an option to link accounts between a parent and teen. YouTube, My Family, https://perma.cc/V4BF-8M64.

35.    All NetChoice members prohibit minors under 13 from creating accounts on their main services (and those regulated here), although some offer separate experiences for users under 13 geared for that age group. For example, YouTube offers two services (YouTube Kids and a "Supervised Experience" on YouTube) for minors younger than 13 with parental consent. *See* YouTube for Families Help, Important Info for Parents About YouTube Kids, https://perma.cc/5PAL-8CE8; YouTube Help, What Is a Supervised Experience on YouTube, https://perma.cc/72X8-DATT. These services allow parents to select content settings, set screen time limits, and otherwise oversee their children's use of the services.

36.    **Advertising on covered websites.** Most members offer free-to-use websites because the websites generate revenue from advertising. Advertising ensures that many online services—and their protected expression—are available to all, regardless of socioeconomic status.

37.     Contextual ads aim to show ads of interest to particular users, while relying on contextual information gained from sources such as a webpage's content, a user's views, or recent browsing history (including search queries)—as compared to a user's stated interests.

38.     Without advertising, many NetChoice members would have no choice but to either charge subscription fees to users, increase the volume of ads, or both. Subscription fees, in particular, restrict less-affluent users' ability to access information and exacerbate the digital divide.

39.     **Covered websites' dedication to beneficial user experiences and user security.** NetChoice's members expend vast resources to improve their services and curate the content on their websites to best ensure that it is appropriate for all users, especially with respect to minors. They restrict the publication of content they consider harmful, like violent and sexual content, bullying, harassment, and content that encourages body shaming or eating disorders. *See, e.g.*, *Moody*, 603 U.S. at 735 (discussing policies about "hate speech, violent or graphic content, child safety"). Conversely, many covered websites promote positive and age-appropriate content, such as content that encourages a healthy self-image.

## GEORGIA SENATE BILL 351

40.    Georgia enacted Senate Bill 351, which places multiple content-based restrictions on certain websites and their users—including parental-consent and age-verification requirements.

41.    The Act takes effect on July 1, 2025.

42.    **Content-based central coverage definition of "social media platform." § 39-6-1(6).** The Act targets an identifiable set of disfavored internet websites under its "social media platform" definition, which contains myriad content-based and speaker-based exclusions. These covered "actors" and "activities," *Moody*, 603 U.S. at 724, include the members and services identified above in ¶ 16.

43.    The Act regulates only "provider[s]" of "social media platform[s]." §§ 39-6-1(6), 39-6-2.

44.    The Act defines "[s]ocial media platform" as "an online forum that allows an account holder to create a profile, upload posts, view and listen to posts, form mutual connections, and interact publicly and privately with other account holders and users." § 39-6-1(6).

45.    A "post" is defined as "content that an account holder makes available on a social media platform for other account holders or users to view or listen to, including text, images, audio, and video." § 39-6-1(5).

46.    This statutory definition of "post" accords with the ordinary meaning of the terms "post" and "posting," which denotes pieces of expressive content submitted to online services for multiple people to see.

47.    For example, a "post" is ordinarily defined as "an electronic message or information that you send to a website in order to allow many people to see it." *Posting*, Cambridge.org Dictionary, https://perma.cc/64Z7-AR73.

48.    In other words, the Act singles out the "kinds" of "social media" websites discussed by the Supreme Court in *Moody*—namely, websites that enable their users to view and engage in speech. Specifically, *Moody* applied full First Amendment protection to websites that work in exactly this way: "allow[ing] users to upload content . . . to share with others" and allowing those "viewing the content . . . [to] react to it, comment on it, or share it themselves." 603 U.S. at 719.

49.    It likewise singles out the kinds of websites that *Packingham* held people have a First Amendment right to "access." 582 U.S. at 108. Otherwise, "foreclosing" such access would "prevent the user from engaging in the legitimate exercise of First Amendment rights." *Id.*

50.    To underscore the Act's scope, the Act exempts a litany of entities and services from its speech restrictions based on content, including any "online service,

website, or application where the predominant or exclusive function is any of the

following":

(A) Email;

(B) A service that, pursuant to its terms of use, does not permit minors to use the platform and utilizes commercially reasonable age assurance mechanisms to deter minors from becoming account holders;

(C) A *streaming service* that provides only licensed media that is not user generated in a continuous flow from the service, website, or application to the end user and does not obtain a license to the media from a user or account holder by agreement to its terms of service;

(D) *News, sports, entertainment,* or other content that is preselected by the provider and not user generated, and any chat, comment, or interactive functionality that is provided incidental to or directly or indirectly related to such content;

(E) Online shopping or ecommerce, if the interaction with other users or account holders is generally limited to the ability to upload a post and comment on reviews, the ability to display lists or collections of goods for sale or wish lists, and other functions that are focused on online shopping or ecommerce rather than interaction between users or account holders;

(F) *Interactive gaming, virtual gaming, or an online service, website, or application that allows the creation and uploading of content for the purpose of interactive gaming, educational entertainment, or associated entertainment*, and communications related to that content;

(G) *Photograph editing* that has an associated photograph hosting service if the interaction with other users or account holders is generally limited to liking or commenting;

(H) Single-purpose *community groups for public safety* if the interaction with other users or account holders is limited to that single purpose and the community group has guidelines or policies against illegal content;

(I) Business-to-business software;

(J) Teleconferencing or videoconferencing services that allow reception and transmission of audio and video signals for real-time communication;

(K) Cloud storage;

(L) Shared document collaboration;

(M) Cloud computing services, which may include cloud storage and shared document collaboration;

(N) Providing access to or interacting with data visualization platforms, libraries, or hubs;

(O) Permitting comments on a *digital news website* if the news content is posted only by the provider of the digital news website;

(P) Providing or obtaining technical support for a platform, product, or service;

(Q) *Academic, scholarly, or genealogical research* where the majority of the content is created or posted by the provider of the online service, website, or application and the ability to chat, comment, or interact with other users is directly related to the provider's content;

(R) Internet access and broadband service;

(S) A *classified advertising service* in which the provider of the online service, website, or application is limited to all of the following:

    (i) Permitting only the sale of goods;

    (ii) Prohibiting the solicitation of personal services;

    (iii) Posting or creating a substantial amount of the content; and

    (iv) Providing the ability to chat, comment, or interact with other users only if it is directly related to the provider's content;

(T) An online service, website, or application *that is used by or under the direction of an educational entity*, including a learning management system, student engagement program, or subject- or skill-specific program, where the majority of the content is created or posted by the provider of the online service, website, or application and the ability to chat, comment, or interact with other users is directly related to the provider's content;

(U) Peer-to-peer payments, provided that interactions among users or account holders are generally limited to the ability to send, receive, or request funds; like or comment on such transactions; or other functions related to sending, receiving, requesting, or settling payments among users or account holders; or

(V) Career development opportunities, including *professional networking*, job skills, learning certifications, and job posting and application services.

§ 39-6-1(6) (emphases added); *see Griffin II*, 2025 WL 978607, at *2, *11-12 (summarizing similar exemptions in a similar law).

51.    Notably, the Act excludes websites that, "pursuant to [their] terms of use, do[] not permit minors to use the platform and utilize[] commercially reasonable age assurance mechanisms to deter minors from becoming account holders." § 39-6-1(6)(B). The Act defines a "[m]inor" as "an individual who resides in this state and is actually known or reasonably believed by a social media platform to be under the age of 16 years." § 39-6-1(3).

52.    In other words, the Act encourages websites to exclude minors younger than 16 altogether: If a website wants to be exempted from the Act's coverage and requirements, it must block such minors from becoming account holders.

53.    Both based on its definition of "social media platform" and the Act's myriad exclusions, the Act excludes the "*kinds* of websites," for which *Moody* questioned whether a different First Amendment analysis might apply when assessing the First Amendment implications of distinct *compelled*-speech laws that may also regulate non-social media services. *See* 603 U.S. at 718, 724-25 (discussing email, online marketplace, peer-to-peer payment, and ride-sharing services).

54.    More generally, the Act excludes the "kinds of websites," *id.* at 718, for which the Supreme Court has held people have a First Amendment right to "access," free from governmental restraint. *Packingham*, 582 U.S. at 108.

55.    The Act's exclusion of "[e]mail," § 39-6-1(6)(A), excludes "email," *Moody*, 603 U.S. at 725.

56.    The Act's exclusion of "[o]nline shopping or ecommerce," § 39-6-1(6)(E), excludes "online marketplace[s] like Etsy" and "payment service[s] like Venmo," *Moody*, 603 U.S. at 725.

57.    The Act's exclusion of websites where the "content . . . is preselected by the provider and not user generated," § 39-6-1(6)(D), excludes "ride-sharing service[s] like Uber," *Moody*, 603 U.S. at 725.

58.    Moreover, the Act does not apply to myriad other "kinds of," *id.* at 718, online services, such as: (1) search engines; (2) Internet home pages; (3) educational services; (4) informative websites; (5) generative AI; (6) news services; (7) streaming services; (8) professional networking; and (9) governmental websites.

59.    Nothing in the Act defines key coverage terms, such as "predominant or exclusive function" or "incidental to." § 39-6-1(6)(D).

60.    **Age verification. § 39-6-2(a)-(b).** The Act requires covered websites to implement age verification as a threshold impediment for their users' access to speech, or else treat all users as if they are minors. § 39-6-2(a).

61.    The Act mandates: "The provider of a social media platform shall make commercially reasonable efforts to verify the age of account holders with a level of certainty appropriate to the risks that arise from the social media platform's information management practices or shall apply the special conditions applied to minors under this chapter to all account holders." *Id.*

62.    These provisions of the Act mean that covered websites must take one of two actions. In either case, the Act would require covered websites to restrict the protected speech rights of their minor *and* adult users.

63.    First, covered websites can "verify" everyone's age. But many people may not—or cannot—provide proof of age or identity to gain access to the covered websites. That will deter people (both minors and adults) from accessing covered websites, thereby chilling their protected speech. And it will chill, or outright prohibit, the dissemination of speech to those users.

64.    Second, covered websites can alternatively treat all account holders on the website as the Act requires minors younger than 16 to be treated. At a minimum, that requires applying the Act's restrictions on advertising and information collection and use, discussed below at (¶¶ 76-79).

65.    For users that this age-verification process determines to be younger than 16, the Act mandates that "[t]he provider of a social media platform shall treat [any such user] as a minor." § 39-6-2(b).

66.    The "commercially reasonable" requirement does not alter which websites the Act covers. Nor does it alleviate the unconstitutional burdens. Rather, it creates uncertainty for covered websites and fails to serve any purported governmental interests.

67.    Nor does the "commercially reasonable" requirement affect the chill that age-verification imposes on users' access to protected speech.

68.    **Parental consent. § 39-6-2(c), (e).** For minors younger than 16, the Act requires parental consent for such minors to create an account—and thus to access and engage in protected speech. § 39-6-2(c). Put another way, the Act requires covered websites to obtain express parental consent as a precondition to disseminating protected speech on covered websites.

69.    Specifically, the Act mandates: "No provider of a social media platform shall permit a minor to be an account holder unless such provider obtains the express consent of such minor's parent or guardian." *Id.*

70.    The Act includes a non-exhaustive list of "[a]cceptable methods of obtaining express consent," including:

(1) Providing a form for the minor's parent or guardian to sign and return to the social media platform by common carrier, facsimile, email, or scanning;
(2) Providing a toll-free telephone number for the minor's parent or guardian to call to consent;
(3) Coordinating a call with the minor's parent or guardian using videoconferencing technology;
(4) Collecting information related to the minor's parent's or guardian's government issued identification or financial or payment card information and deleting such information after confirming the identity of the parent or guardian;
(5) Allowing the minor's parent or guardian to provide consent by responding to an email and taking additional steps to verify the parent's or guardian's identity; and

(6) Any other commercially reasonable method of obtaining consent using available technology.

§ 39-6-2(c).

71.    The Act does not account for the difficulty in verifying a parent-child relationship. *See Griffin I*, 2023 WL 5660155, at \*4 ("[T]he biggest challenge . . . with parental consent is actually establishing . . . the parental relationship."). These difficulties are compounded when, *e.g.*, families are nontraditional (such as foster families), families have differences in last name or address, parents disagree about consent, minors are unsafe at home, or parental rights have been terminated.

72.    As part of this age-verification requirement, the Act mandates that websites disclose certain information to parents: "The provider of a social media platform shall make available, upon the request of a parent or guardian of a minor, a list and description of the features offered by the social media platform related to censoring or moderating content available on the social media platform, including any features that can be disabled or modified by an account holder." § 39-6-2(e).

73.    NetChoice members already publicly disclose the information that Section 39-6-2(e) requires them to disclose to parents.

74.    The "commercially reasonable" requirement does not alter which websites the Act covers. Nor does it alleviate the unconstitutional burdens. Rather, it creates uncertainty for covered websites and fails to serve any purported governmental interests.

75.     Nor does the "commercially reasonable" requirement affect the Act's infringement on minors' First Amendment rights.

76.     **Advertising restrictions. § 39-6-3(1).** The Act also restricts advertisements on minors' accounts: "For a minor account holder, the provider of a social media platform shall prohibit . . . [t]he display of any advertising in the minor account holder's account based on such minor account holder's personal information, except age and location." § 39-6-3(1). And the Act can do so on adults' accounts, too, as in some circumstances the Act requires websites to "apply the special conditions applied to minors under this chapter to all account holders." § 39-6-2(a).

77.     Because the Act does not define "personal information," the restriction on advertising could apply to all manner of advertising, including contextual advertising.

78.     Moreover, the Act's failure to define "advertising" could extend the Act's reach to user-generated promotional content, such as teenagers "advertising" their own services (*e.g.*, babysitting or lawnmowing) to their neighbors.

79.     **Information collection and use. § 39-6-3(2).** The Act also "prohibits" the "collection or use of personal information from the posts, content, messages, text, or usage activities of the minor account holder's account other than what is adequate, relevant, and reasonably necessary for the purposes for which such information is collected, as disclosed to the minor." § 39-6-3(2).

80.    **Enforcement and penalties. § 39-6-4.** Defendant Attorney General has "exclusive authority to enforce the provisions of" the Act challenged here. § 39-6-4(a).

81.    The Act allows the Georgia Attorney General to seek $2,500 per violation in civil penalties: "Subject to the ability to cure an alleged violation under subsection (d) of this Code section, the Attorney General may initiate an action and seek damages for up to $2,500.00 for each violation under this chapter." § 39-6-4(c).

82.    And the Georgia Fair Business Practices Act of 1975 also authorizes the Georgia Attorney General to issue cease-and-desist orders and to pursue actions for injunctive relief. *See* § 10-1-397; § 39-6-4(a) (the Attorney General may "take action pursuant to Part 2 of Article 15 of Chapter 1 of Title 10, the 'Fair Business Practices Act of 1975'").

83.    Before pursuing enforcement actions, the Georgia Attorney General must provide covered websites with 90 days' notice and opportunity to "cure" alleged violations:

> At least 90 days before the day on which the Attorney General initiates an enforcement action against a person or entity that is subject to the requirements of this chapter, the Attorney General shall provide the person or entity with a written notice that identifies each alleged violation and an explanation of the basis for each allegation. The Attorney General shall not initiate an action if the person or entity cures the noticed violation within 90 days of receiving notice from the Attorney General

and provides the Attorney General with a written statement indicating
that the alleged violation is cured.

§ 39-6-4(d).

## CLAIMS

84.    Plaintiff raises both (1) a facial challenge to the Act's provisions challenged in this lawsuit; and (2) a challenge to these provisions as applied to the NetChoice members and services identified in ¶ 16.

85.    For all First Amendment claims, the facial challenge standard asks whether "a substantial number of [the Act's] applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Moody*, 603 U.S. at 723 (citation omitted). At a minimum, the Act is invalid to the extent it regulates "social media" websites, including as applied to Plaintiffs' members' covered services identified in ¶ 16. *See John Doe No. 1 v. Reed*, 561 U.S. 186, 194 (2010) (analyzing First Amendment challenge "to the extent of [the] reach" defined by Plaintiff).

86.    The First Amendment facial challenge here is straightforward "from the face of the law": All aspects of the Act's speech-restricting provisions, "in every application to a covered social media company, raise the same First Amendment issues," so the Court "need not 'speculate about "hypothetical" or "imaginary" cases.'" *X Corp. v. Bonta*, 116 F.4th 888, 899 (9th Cir. 2024) (quoting *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450 (2008)); *CCIA*, 747 F. Supp. 3d at 1038 (facial challenge proper because state law "raises the same First

Amendment issues in every application to a covered business" (quoting *Bonta*,
113 F.4th at 1116 (internal quotation marks omitted))); *Reyes*, 748 F. Supp. 3d at
1121 n.92 (noting that First Amendment facial challenge "questions are easily an-
swered" where "[t]here is no dispute about who and what the Act regulates" or "how
the First Amendment applies to *different* websites or regulatory requirements" (in-
ternal citation omitted)).

87.     There can be "no dispute that users engage in protected speech on all
the platforms that are arguably within the Act's proscription" and "the Act imposes
a platform-wide burden on users' right to engage in that speech," which does not
"differ between the platforms regulated." *Griffin II*, 2025 WL 978607, at *7.

88.     Similarly, for Plaintiff's First and Fourteenth Amendment vagueness
claims, "[s]tandards of permissible statutory vagueness are strict in the area of free
expression." *Wollschlaeger v. Governor of Fla.*, 848 F.3d 1293, 1320 (11th Cir.
2017) (en banc) (citation omitted); *see Kolender v. Lawson*, 461 U.S. 352, 358 n.8
(1983). Here, a facial vagueness challenge is proper because "there is no reason to
believe one social media company is better suited than another to understand [the
Act's] vague terms." *CCIA*, 747 F. Supp. 3d at 1031.

89.     Each First and Fourteenth Amendment challenge raises the rights of
both NetChoice members and those who use or could prospectively use NetChoice
members' websites.

**COUNT I**
**42 U.S.C. § 1983**
**VIOLATION OF THE FIRST AMENDMENT, AS INCORPORATED**
**AGAINST THE STATES BY THE FOURTEENTH AMENDMENT**
**(ALL SPEECH REGULATIONS RELYING ON**
**CENTRAL COVERAGE DEFINITION – § 39-6-1 TO -5)**

90.    Plaintiff incorporates all prior paragraphs as though fully set forth herein.

91.    As incorporated against the States by the Fourteenth Amendment, the First Amendment's Free Speech and Free Press Clauses provide that governments "shall make no Law . . . abridging the Freedom of Speech, or of the Press." U.S. Const. amend. I. The First Amendment protects "publish[ing]," *Reno*, 521 U.S. at 853; "disseminat[ing]," *303 Creative LLC v. Elenis*, 600 U.S. 570, 593 (2023); and "creating, distributing, [and] consuming" protected speech. *Brown*, 564 U.S. at 792 n.1. And those rights apply to "social-media platforms." *Moody*, 603 U.S. at 719. The "speech social media companies engage in when they make decisions about how to construct and operate their platforms . . . is protected speech" under the First Amendment. *Reyes*, 748 F. Supp. 3d at 1120.

92.    "When the Government restricts speech, the Government bears the burden of proving the constitutionality of its actions." *FEC v. Cruz*, 596 U.S. 289, 305 (2022) (citation omitted).

93.    The State cannot demonstrate that the Act's restrictions and burdens on speech satisfy any form of heightened First Amendment scrutiny because the Act's central coverage definition is unconstitutionally content-based.

94.    The "Government's content-based burdens must satisfy the same rigorous scrutiny as its content-based bans." *Sorrell v. IMS Health, Inc.*, 564 U.S. 552, 566 (2011) (citation omitted).

95.    The State lacks a sufficient governmental interest supporting the Act.

96.    Regardless, the Act is not properly tailored to satisfy any form of First Amendment scrutiny.

97.    **The Act triggers strict scrutiny.** The Act triggers strict scrutiny because its definition of regulated "social media platform[s]," § 39-6-1(6), is content-based.

98.    The First Amendment's "most basic" principle is that "government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Brown*, 564 U.S. at 790-91 (citation omitted). A law "is facially content based . . . if it applies to particular speech because of the topic discussed or the idea or message expressed." *City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 596 U.S. 61, 69 (2022) (cleaned up). Government cannot use "subtler forms of discrimination that achieve identical results based on function or purpose." *Id.* at 74.

"Content-based laws . . . are presumptively unconstitutional." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015).

99.    The Act's central coverage definition is content-based because it draws lines based on the subject of the speech on a particular website.

100.    For example, the Act *excludes* a host of websites from regulation based on the subject matter presented on the particular website, such as websites where the "predominant or exclusive function" is: "streaming service[s]," "[n]ews, sports, entertainment," "[o]nline shopping," "[i]nteractive gaming, virtual gaming," "photograph editing" and "associated photograph hosting," "[s]ingle purpose community groups for public safety" (but only "if the interaction with other users or account holders is limited to that single purpose"), "[c]areer development opportunities, including professional networking," "data visualization," "digital news," "technical support," "[a]cademic, scholarly, or genealogical research," "classified advertising service," and websites "used by or under the direction of an educational entity." § 39-6-1(6). "That is about as content-based as it gets." *Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 591 U.S. 610, 619 (2020) (controlling plurality op.) (content-based exceptions trigger strict scrutiny); *see Sorrell v. IMS Health Inc.*, 564 U.S. 552, 564 (2011) (similar); *Yost*, 2025 WL 1137485, at *20; *Griffin II*, 2025 WL 978607, at *8-9; *Reyes*, 748 F. Supp. 3d at 1123.

101.    In addition, the Act's reference to a website's "predominant or exclusive *function*" is a proxy for other content-based restrictions. § 39-6-1(6) (emphasis added). But governments cannot "swap[] an obvious subject-matter distinction for a 'function or purpose' proxy that achieves the same result." *Reagan*, 596 U.S. at 74. The Act violates this precept because it exempts internet websites that allow people to "interact" regarding certain favored content (*e.g.*, sports or gaming) while restricting websites that allow people to "interact" regarding other content (*e.g.*, politics or religion). § 39-6-1(6).

102.    At a minimum, the Act triggers heightened First Amendment scrutiny because the Act's central coverage definition is also speaker-based. The Act discriminates based on who is disseminating speech—regulating covered websites but not others like those whose "predominant or exclusive function" is "[n]ews, sports, [or] entertainment," even if those websites have some similar content.

103.    "[L]aws that single out the press, or certain elements thereof, for special treatment pose a particular danger of abuse by the State, and so are always subject to at least some degree of heightened First Amendment scrutiny." *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 640-41 (1994) (cleaned up). The First Amendment limits state power to enforce "restrictions distinguishing among different speakers, allowing speech by some but not others." *Citizens United v. FEC*, 558 U.S. 310, 340 (2010).

104.   The Act's central coverage definition is speaker-based because it advantages websites that disseminate "content that is preselected" and "generated" by the website and "not" the user, § 39-6-1(6)(D), while burdening similar websites that disseminate user-generated content, even if those websites also post or create their own content (as many websites do).

105.   Because the Act's central coverage definition is both content-based and speaker-based, so too is each provision of the Act restricting speech that relies on this definition. *See Reyes*, 748 F. Supp. 3d at 1120 (finding "persuasive" the argument that "the entire Act facially violates the First Amendment because the Act's operative [speech-restricting] provisions each rely on the Central Coverage Definition" (citation omitted)).

106.   The Act's age-verification requirement, § 39-6-2(a)-(b), regulates and burdens speech by requiring adults and minors to provide personal information to access protected speech.

107.   The Act's parental-consent requirement, § 39-6-2(c), (d), regulates and burdens speech by requiring minors to obtain parental consent to access protected speech.

108.   The Act's advertising restrictions, § 39-6-3(1), regulate and burden speech by restricting the dissemination of ads and requiring covered websites to monitor for ads in user-created content.

109.   The Act's restrictions on information collection and use, § 39-6-3(2), regulate speech by imposing legal duties on covered websites for disseminating speech of a certain type of content.

110.   All of the provisions above rely on the central "social media platform" definition.

111.   Therefore, because each of these provisions of the Act is a "[g]overnment regulation of speech," *Reed*, 576 U.S. at 163, and relies on the Act's content-based and speaker-based central coverage definition, each provision triggers strict scrutiny (or, at a minimum, heightened First Amendment scrutiny).

112.   **The entire Act fails strict scrutiny.** The Act cannot satisfy any form of heightened First Amendment scrutiny.

113.    Under strict scrutiny, the State must demonstrate that the Act is "the least restrictive means of achieving a compelling state interest." *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 607 (2021) (citation omitted).

114.   The Act does not serve any compelling government interest.

115.   Although "a State possesses legitimate power to protect children from harm," "that does not include a free-floating power to restrict the ideas to which children may be exposed." *Brown*, 564 U.S. at 794 (cleaned up).

116.   Under the First Amendment, Defendant has the burden to "specifically identify" how the Act addresses an "actual problem in need of solving." *Id.* at 799

(cleaned up). Strict scrutiny demands that "the curtailment of free speech must be actually necessary to the solution." *Id.* Here, Defendant must demonstrate that there is a problem in need of *governmental* solution, as compared to private, family solutions, and that any such governmental solution is one with the least possible restrictive effect on speech.

117.    Defendant cannot carry either burden. Parents have a wealth of choices to help oversee their minor children online, and those choices provide families more flexibility than the State's one-size-fits-all mandate. The Supreme Court has repeatedly endorsed similar parental controls over governmental intervention. *See, e.g.*, *Ashcroft*, 542 U.S. at 667; *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 826 (2000).

118.    The State has not "specifically identif[ied]" how the Act's scope responds to "an actual problem in need of solving" by government mandate. *Brown*, 564 U.S. at 799 (cleaned up). Nor has it demonstrated why the Georgia Legislature ignored the viable alternatives available to parents. *See, e.g.*, *Bonta*, 113 F.4th at 1121; *Reyes*, 748 F. Supp. 3d at 1126.

119.    There are no legislative findings whatsoever.

120.    The Act is not properly or narrowly tailored to any articulated interest. The "Act is either underinclusive or overinclusive, or both, for all the purported government interests at stake." *Yost*, 2025 WL 1137485, at *22.

121.    The Act's central coverage definition gives the entire Act an arbitrary scope. For example, identical content is treated differently based on whether it appears on a "news" website versus a covered website.

122.    The Act is also overinclusive because it regulates all manner of protected speech, including political and religious speech that lies at the very heart of the First Amendment.

123.    The Act's one-size-fits-all approach of treating all minors at every developmental stage—from websites' youngest users to sixteen-year-olds—alike is also vastly overbroad. *See Reno*, 521 U.S. at 866; *Am. Booksellers Ass'n*, 484 U.S. at 396.

124.    The Act is also underinclusive, because it includes myriad exemptions, some of which result in allowing access to the exact same speech on a different website. The Act permits a 15-year-old to read content on the Atlanta Journal-Constitution's website that she cannot read on Facebook without parental consent; she can watch sports videos on ESPN but cannot share her own softball recruiting highlight videos on Instagram without parental consent; and she can listen to a Taylor Swift song on Spotify but cannot listen to that same song on YouTube without parental consent. These exemptions undermine any contention that the State is addressing a "serious social problem." *See Brown*, 564 U.S. at 802; *Griffin II*, 2025 WL 978607,

at *11 (holding that state law regulating some websites but exempting "interactive gaming websites and platforms" was "not narrowly tailored").

125.  In fact, the Act peculiarly seems to regulate websites that are most likely to offer parental controls and engage in content moderation, while leaving unregulated many websites that lack such oversight.

126.  All of these flaws would render the Act invalid under intermediate First Amendment scrutiny as well.

127.  Even if the Act were to apply to other websites with user-created content, the Act would be facially unlawful as those kinds of websites raise the same First Amendment issues and would render the Act even more improperly tailored.

128.  Laws that "bar access" to both "social media websites" and "websites" like "Washingtonpost.com[] and Webmd.com" raise similar constitutional problems. *Packingham*, 582 U.S. at 106. "It is enough . . . that the law applies . . . to social networking sites." *Id.* (cleaned up).

129.  Regardless, the Act is unconstitutional as applied to NetChoice members' services identified in ¶ 16.

130.  The Act's central coverage definition is integral to the entire Act. Without this central definition, no other provision in the Act could operate. Thus, the entire Act is invalid.

131.   Unless declared invalid and enjoined, the Act will unlawfully deprive Plaintiff's affected members and internet users of their fundamental First Amendment rights and will irreparably harm Plaintiff, its members, and internet users.

## COUNT II
## 42 U.S.C. § 1983
## VOID FOR VAGUENESS UNDER THE FIRST AND FOURTEENTH AMENDMENTS
## (CENTRAL COVERAGE DEFINITION – § 39-6-1(6))

132.   Plaintiff incorporates all prior paragraphs as though fully set forth herein.

133.   The Act's central coverage definition of "social media platform," § 39-6-1(6), is unconstitutionally vague, violating principles of free speech and due process.

134.   "A fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required." *FCC v. Fox TV Stations, Inc.*, 567 U.S. 239, 253 (2012). And a law is unconstitutionally vague if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008). The constitutional standard for vagueness is heightened for speech restrictions under the First Amendment. *FCC*, 567 U.S. at 253-54.

135.    The Act's central coverage definition fails to provide necessary notice. It does not define what it means to exclude websites based on their "predominant or exclusive function." § 39-6-1(6); *see Griffin II*, 2025 WL 978607, at *15 (concluding coverage definition with identical language was unconstitutionally vague). For example, many people use LinkedIn for "[c]areer development opportunities" and "professional networking," § 39-6-1(6)(V), but many others use it for other kinds of interpersonal interaction. The same is true of Slack, which many people and businesses use for business purposes or "[s]hared document collaboration." § 39-6-1(6)(L). It is therefore not clear what the "predominant" function on those services—and others—is.

136.    Moreover, the Act excludes certain websites that provide "chat, comment, or interactive functionality that is provided *incidental to*" certain online services. § 39-6-1(6)(D) (emphasis added). Just like "predominant or exclusive function," "incidental to" is vague.

137.    Many websites will have no way of knowing what these "term[s]" mean, even though they are "critical to determining which entities fall within [the Act]'s scope." *Griffin II*, 2025 WL 978607, at *15. Therefore, "[c]ompanies must choose between risking unpredictable and arbitrary enforcement . . . and implementing the Act's costly . . . requirements. Such ambiguity renders a law unconstitutional." *Id.* at *16; *FCC*, 567 U.S. at 253.

138.   Because of this vagueness, the Act's central coverage definition violates the First Amendment and the Due Process Clause of the Fourteenth Amendment.

139.   The Act's central coverage definition is integral to the entire Act. Without this central definition, no other provision in the Act could operate. Thus, the entire Act is invalid.

140.   Unless declared invalid and enjoined, the Act will unlawfully deprive Plaintiff's affected members and internet users of their fundamental First Amendment and Due Process rights and will irreparably harm Plaintiff, its members, and internet users.

**COUNT III**
**42 U.S.C. § 1983**
**VIOLATION OF THE FIRST AMENDMENT, AS INCORPORATED**
**AGAINST THE STATES BY THE FOURTEENTH AMENDMENT**
**(AGE VERIFICATION – § 39-6-2(A)-(B))**

141.   Plaintiff incorporates all prior paragraphs as though fully set forth herein.

142.   The Act's age-verification requirement, § 39-6-2(a)-(b), is unconstitutional and cannot satisfy any form of First Amendment scrutiny.

143.   Georgia's "imposition of an age-verification requirement for account creation is maximally burdensome. It erects barriers to accessing entire social media platforms" and "hinders adults' ability to speak and receive protected speech online." *Griffin II*, 2025 WL 978607, at *13.

144.    Accordingly, age-verification "burdens social media access for all [Georgians]—both adults and minors whose parents would allow them to use social media." *Id.* at *8.

145.    Governmental demands for people to provide identification or personal information burden and infringe access to protected speech and the ability to engage in protected speech. *See, e.g.*, *id.*; *Ashcroft*, 542 U.S. at 667; *Reno*, 521 U.S. at 874.

146.    "Requiring adult users to produce state-approved documentation to prove their age and/or submit to biometric age-verification testing imposes significant burdens on adult access to constitutionally protected speech and 'discourages users from accessing the regulated sites.'" *Griffin II*, 2025 WL 978607, at *8 (quoting *Reno*, 521 U.S. at 856). So too for minors. Those who are not deterred must "forgo the anonymity otherwise available on the internet" as the state-imposed price of admission. *Id.* (quoting *Am. Booksellers Found. v. Dean*, 342 F.3d 96, 99 (2d Cir. 2003)); *see ACLU v. Mukasey*, 534 F.3d 181, 197 (3rd Cir. 2008) ("relinquish their anonymity to access protected speech").

147.    The age-verification provision triggers strict scrutiny because it relies on the Act's central coverage definition.

148.    The age-verification provision also independently triggers strict scrutiny.

149.   The State cannot demonstrate what purported problem this provision responds to, how the provision is necessary to solve the problem, or why the existing and plentiful choices of private tools available to parents are insufficient to address any purported problem.

150.   The age-verification requirement is also not properly tailored.

151.   The Act's alternative to age-verification—"treat[ing] as a minor any individual such provider verifies to be under the age of 16 years"—does not cure the age-verification requirement's unconstitutionality. § 39-6-2(b). Instead, it impermissibly presents websites with an alternative that would require them to restrict both minors' and adults' access to protected speech.

152.   The Act's age-verification requirement is integral to the entire Act. Without this provision, no other provision in the Act could operate. The age-verification provision is not severable and thus the entire Act is invalid.

153.   Unless declared invalid and enjoined, the Act's age-verification requirement, § 39-6-2(a)-(b), will unlawfully deprive Plaintiff's affected members and internet users of their fundamental First Amendment rights and will irreparably harm Plaintiff, its members, and internet users.

**COUNT IV**
**42 U.S.C. § 1983**
**VIOLATION OF THE FIRST AMENDMENT, AS INCORPORATED**
**AGAINST THE STATES BY THE FOURTEENTH AMENDMENT**
**(PARENTAL CONSENT – § 39-6-2(C), (E))**

154.   Plaintiff incorporates all prior paragraphs as though fully set forth herein.

155.   The Act's parental-consent requirement, § 39-6-2(c), (e), is unconstitutional and cannot satisfy any form of First Amendment scrutiny.

156.   Minors have robust First Amendment rights to access and engage in speech, and websites that publish and disseminate speech have the right to publish and disseminate speech to minors absent governmental restraint. Although States have power to protect minors, that power "does not include a free-floating power to restrict the ideas to which children may be exposed." *Brown*, 564 U.S. at 794.

157.   The Act requires covered websites and users to secure parental consent before allowing users to create or maintain an account and, therefore, before they can access protected speech. § 39-6-2(c). But the Supreme Court has held that laws requiring parental consent for minors to access or engage in protected speech are unconstitutional. *Brown*, 564 U.S. at 795 & n.3, 804-05.

158.   These First Amendment protections apply with special force to the covered websites here, which the Supreme Court has repeatedly recognized disseminate and facilitate a broad range of protected and valuable speech. *Moody*, 603 U.S. at

716-17, 726-28, 730-31; *Packingham*, 582 U.S. at 105. That, in part, is why courts have held that parental-consent requirements for minors to use "social media" websites violate the First Amendment. *Yost*, 2025 WL 1137485, at *20; *Griffin II*, 2025 WL 978607, at *8.

159.   The parental-consent requirement triggers strict scrutiny because it relies on the Act's central coverage definition.

160.   The parental-consent requirement also independently triggers strict scrutiny. *Yost*, 2025 WL 1137485, at *20.

161.   The State cannot demonstrate what purported problem this provision responds to, how the provision is necessary to solve the problem, or why the existing and plentiful choices of private tools available to parents are insufficient to address any purported problem.

162.   The parental-consent requirement is also not properly tailored.

163.   For example, the Act is underinclusive because if the government is concerned about minors accessing social media websites due to particular purported risks or harms of doing so, then allowing minors to be exposed to such alleged harms so long as they have a single parent's consent fails entirely to address those purported risks. *See Brown*, 564 U.S. at 802; *Yost*, 2025 WL 1137485, at *22; *Griffin II*, 2023 WL 5660155, at *13.

164.   Unless declared invalid and enjoined, the Act's parental-consent re-
quirement, § 39-6-2(c), (e), will unlawfully deprive Plaintiff's affected members and
internet users of their fundamental First Amendment rights and will irreparably harm
Plaintiff, its members, and internet users.

**COUNT V**
**42 U.S.C. § 1983**
**VIOLATION OF THE FIRST AMENDMENT, AS INCORPORATED**
**AGAINST THE STATES BY THE FOURTEENTH AMENDMENT**
**(ADVERTISING RESTRICTIONS – § 39-6-3(1))**

165.   Plaintiff incorporates all prior paragraphs as though fully set forth
herein.

166.   The Act's restrictions on advertising, § 39-6-3(1), are unconstitutional
and cannot survive any form of First Amendment scrutiny.

167.   The "selection of" an "advertisement for inclusion" in a "compilation
of speech" "fall[s] squarely within the core of First Amendment security." *Hurley v.
Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 570 (1995). More
generally, the "choice of material to go into a" publication "constitute[s] the exercise
of editorial control and judgment" protected by the First Amendment. *Tornillo*, 418
U.S. at 258; *accord Moody*, 603 U.S. at 738.

168.   There is no "philosophical or historical basis for asserting that 'com-
mercial' speech is of 'lower value' than 'noncommercial' speech." *44 Liquormart,
Inc. v. Rhode Island*, 517 U.S. 484, 522 (1996) (Thomas, J., concurring in part and

concurring in the judgment) (citation omitted). Thus, restrictions on advertisements should face the same rigorous scrutiny as bans on other speech.

169.    This provision triggers strict scrutiny because it relies on the Act's central coverage definition.

170.    This provision independently triggers and fails strict scrutiny. *See SEAT*, 2025 WL 455463, at *13-14.

171.    Regardless, this provision fails intermediate scrutiny or whatever level of scrutiny may apply under the commercial-speech doctrine.

172.    Georgia does not have a "free-floating" interest in preventing minors from seeing protected speech. *Brown*, 564 U.S. at 794. Advertisements that "accurately inform the public about lawful activity" are protected speech. *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York*, 447 U.S. 557, 563 (1980). Assuming for the sake of argument that regulating websites' editorial decisions is subject to only intermediate scrutiny, this provision requires *at least* "a substantial interest." *Id.* at 564. Yet the Act does not contain any legislative findings of fact (or even a statement of purpose) identifying such an interest.

173.    "[T]here may exist a compelling state interest in promoting teen mental health by limiting teens' exposure to certain advertising, but" the State lacks a "specific interest articulated for removing teens' access to targeted advertising of all kinds, much less a compelling one, as is required." *SEAT*, 2025 WL 455463, at *13.

174. The Act's restrictions on advertising to minors are also not properly tailored.

175. The State cannot demonstrate what purported problem these restrictions respond to, how they are necessary to solve the purported problem, or why the existing and plentiful choices of private tools available to parents are insufficient to address any purported problem.

176. "The targeted advertising requirements do nothing to distinguish between potentially harmful advertising and advertising that is not harmful, or that could be beneficial, to minors." *Id.*

177. Many forms of advertising, including contextual ads, are common across many websites on the internet that minors visit. The same is true of user-generated promotional content. Thus, the Act's application to just a handful of websites is not properly tailored.

178. The Act is not limited to advertisements that are inappropriate for minors.

179. The Act is not limited to the use of particularly sensitive personal information.

180. To the contrary, the Act would restrict the use of innocuous information about user interests—or even contextual information—to disseminate valuable advertisements to users.

181.   Unless declared invalid and enjoined, the Act's advertising restrictions, § 39-6-3(1), will unlawfully deprive Plaintiff's affected members and internet users of their fundamental First Amendment rights and will irreparably harm Plaintiff, its members, and internet users.

**COUNT VI**
**42 U.S.C. § 1983**
**FEDERAL STATUTORY PREEMPTION UNDER 47 U.S.C. § 230,**
**42 U.S.C. § 1983, AND *EX PARTE YOUNG***
**EQUITABLE CAUSE OF ACTION**
**(ADVERTISING RESTRICTIONS – § 39-6-3(1))**

182.   Plaintiff incorporates all prior paragraphs as though fully set forth herein.

183.   Plaintiff may assert federal preemption under 42 U.S.C. § 1983 and *Ex parte Young*, 209 U.S. 123 (1908).

184.   47 U.S.C. § 230 preempts the Act's restrictions on advertising to minors. § 39-6-3(1).

185.   Covered websites are "interactive computer services" and disseminate "information provided by another information content provider." 47 U.S.C. § 230(c)(1), (f)(2).

186.   Congress enacted Section 230 to provide all websites with protections from liability for the user-generated speech on their websites: "No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." *Id.* § 230(c)(1). To

remove any doubt, Section 230 expressly preempts state law to the contrary. *Id.* § 230(e)(3).

187.    The "majority of federal circuits have interpreted the CDA to establish broad federal immunity to any cause of action that would make service providers liable for information originating with [a] third party." *McCall v. Zotos*, 2023 WL 3946827, at *2 (11th Cir. June 12, 2023) (internal citation omitted).

188.    Third-party advertisements are "information provided by another information content provider." 47 U.S.C. § 230(c)(1).

189.    Section 230 protects websites' decisions to publish third-party advertisements—whether those ads are paid content placements or user-generated content. It would be "inconsistent" with Section 230(c)(1), *id.* § 230(e)(3), to impose liability on websites for "display[ing]" third-party advertisements to minors, § 39-6-3(1); *see, e.g.*, *Calise v. Meta Platforms, Inc.*, 2022 WL 1240860, at *4 (N.D. Cal. Apr. 27, 2022) (dismissing suit under Section 230 where "claims [we]re premised on . . . publication of the third-party advertisements").

190.    Moreover, Section 230 preempts requirements to proactively "monitor third-party content," including to verify whether that content includes advertising. *HomeAway.com, Inc. v. City of Santa Monica*, 918 F.3d 676, 682 (9th Cir. 2019); *Airbnb, Inc. v. City of Boston*, 386 F. Supp. 3d 113, 123 n.11 (D. Mass. 2019) (similar). And thus laws that mandate monitoring for third-party content would

unlawfully "treat[]" websites "as the publisher or speaker of . . . information provided by another information content provider." 47 U.S.C. § 230(c)(1).

191.    Unless declared invalid and enjoined, the Act's advertising restrictions, § 39-6-3(1), will unlawfully deprive Plaintiff's members and internet users of their rights and will irreparably harm Plaintiff, its members, and internet users.

## COUNT VII
## EQUITABLE RELIEF

192.    Plaintiff incorporates all prior paragraphs as though fully set forth herein.

193.    The Act as a whole, § 39-6-1 to -5, and individual challenged provisions of the Act violate federal law and deprive Plaintiff, its members, and its members' users of enforceable federal rights. Federal courts have the power to enjoin unlawful actions by state officials. *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326 (2015).

194.    This Court can and should exercise its equitable power to enter an injunction prohibiting Defendant from enforcing the Act and all the challenged provisions of the Act against Plaintiff and its members.

## COUNT VIII
## 42 U.S.C. § 1983 AND 28 U.S.C. § 2201
## DECLARATORY RELIEF

195.    Plaintiff incorporates all prior paragraphs as though fully set forth herein.

196.   The Act violates the First Amendment and Due Process Clause of the Fourteenth Amendment to the Constitution and thereby deprives Plaintiff, its covered members, and internet users of enforceable rights. The Act is unlawful and unenforceable because the entire Act relies on an unconstitutional central coverage definition of covered "[s]ocial media platform[s]." § 39-6-1(6).

197.   Sections § 39-6-2 and § 39-6-3 are unlawful and unenforceable, together and separately, because they violate the First Amendment to the Constitution and thereby deprive Plaintiff, its covered members, and internet users of enforceable rights.

198.   Section 39-6-1(6) and all operative provisions of the Act are unlawful and unenforceable because § 39-6-1(6) is unconstitutionally vague in violation of the First Amendment and Due Process Clause of the Fourteenth Amendment to the Constitution and thereby deprive Plaintiff, its covered members, and internet users of enforceable rights.

199.   Section 39-6-3(1) is unlawful and unenforceable because it is preempted by federal law.

200.   The unlawful portions of the Act are not severable from the rest of the Act. The entire Act is therefore unlawful and unenforceable.

201.   With exceptions not relevant here, in any "case of actual controversy within [their] jurisdiction," federal courts have the power to "declare the rights and

other legal relations of any interested party seeking such declaration." 28 U.S.C.

§ 2201(a).

202.   This Court can and should exercise its equitable power to enter a declaration that the entire Act is unconstitutional and otherwise unlawful.

203.   This Court can and should exercise its equitable power to enter a declaration that each of the Act's challenged provisions is unconstitutional and otherwise unlawful.

## PRAYER FOR RELIEF

Plaintiff requests an order and judgment:

a.   declaring that O.C.G.A. §§ 39-6-1 to -5 are unlawful;

b.   declaring that O.C.G.A. §§ 39-6-1 to -5 violate the First Amendment to the Constitution, as incorporated by the Fourteenth Amendment, both facially and as applied to NetChoice's regulated members;

c.   declaring that O.C.G.A. §§ 39-6-1 to -5 are void for vagueness under the First Amendment and the Due Process Clause of the Fourteenth Amendment to the Constitution;

d.   declaring that O.C.G.A. §§ 39-6-1(a)-(c), (e), 39-6-3(1) violate the First Amendment to the Constitution, as incorporated by the Fourteenth Amendment, both facially and as applied to NetChoice's regulated members;

e.   declaring that O.C.G.A. § 39-6-3(1) is preempted by federal law;

f.   enjoining Defendant and his agents, employees, and all persons acting under his direction or control from taking any action to enforce O.C.G.A. §§ 39-6-1 to -5 against Plaintiff or its members;

g.   entering judgment in favor of Plaintiff;

h.   awarding Plaintiff its attorneys' fees and costs incurred in bringing this action, including attorneys' fees and costs under 42 U.S.C. § 1988(b) for successful 42 U.S.C. § 1983 claims against state officials; and

i.   awarding Plaintiff all other such relief as the Court deems proper and just.

Dated: May 1, 2025

Steven P. Lehotsky* (MA 655908)
Scott A. Keller* (DC 1632053)
Jeremy Evan Maltz* (DC 155451)
Shannon G. Denmark* (DC 1617283)
LEHOTSKY KELLER COHN LLP
200 Massachusetts Avenue, NW,
  Suite 700
Washington, DC 20001
(512) 693-8350
steve@lkcfirm.com
scott@lkcfirm.com
jeremy@lkcfirm.com
shannon@lkcfirm.com

Respectfully submitted,

*/s/ Jared B. Magnuson*

Jared B. Magnuson (GA 131189)
LEHOTSKY KELLER COHN LLP
3280 Peachtree Road NE
Atlanta, GA 30305
(512) 693-8350
jared@lkcfirm.com

Joshua P. Morrow* (TX 24106345)
LEHOTSKY KELLER COHN LLP
408 W. 11th Street, 5th Floor
Austin, TX 78701
(512) 693-8350
josh@lkcfirm.com

*pro hac vice forthcoming*

*Attorneys for Plaintiff NetChoice*