## UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| NETCHOICE, | |
| *Plaintiff*, | |
| v. | Civil Action No. _____ |
| CHRISTOPHER M. CARR, in his official capacity as Attorney General of Georgia, | |
| *Defendant*. | |

## PLAINTIFF NETCHOICE'S MEMORANDUM IN SUPPORT OF
## <u>MOTION FOR PRELIMINARY INJUNCTION</u>

# Table of Authorities

## Cases

*44 Liquormart, Inc. v. Rhode Island*,
  517 U.S. 484 (1996) ...........................................................................21

*A.B. v. Salesforce, Inc.*,
  123 F.4th 788 (5th Cir. 2024)......................................................33, 34

*ACLU v. Mukasey*,
  534 F.3d 181 (3d Cir. 2008) ..............................................................14

*Ala. Ass'n of Realtors v. HHS*,
  594 U.S. 758 (2021) ...........................................................................35

*Am. Booksellers Found. v. Dean*,
  342 F.3d 96 (2d Cir. 2003)...........................................................14, 31

*Ams. for Prosperity Found. v. Bonta*,
  594 U.S. 595 (2021) ......................................................................26, 28

*Ashcroft v. ACLU*,
  542 U.S. 656 (2004) ........................................2, 3, 13, 14, 27, 30

*Brown v. Ent. Merchs. Ass'n*,
  564 U.S. 786 (2011) ...........................2, 3, 13, 16, 18, 22, 23, 26, 27, 28, 29, 31

*Butler v. Michigan*,
  352 U.S. 380 (1957) ...........................................................................30

*Calise v. Meta Platforms, Inc.*,
  103 F.4th 732 (9th Cir. 2024)............................................................34

*Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*,
  447 U.S. 557 (1980) ...........................................................................22

*City of Austin v. Reagan Nat'l Advert. of Austin, LLC*,
  596 U.S. 61 (2022) .............................................................................24

*Comput. & Commc'n Indus. Ass'n v. Paxton*,
  747 F. Supp. 3d 1011 (W.D. Tex. 2024)......................................1, 11, 24, 28, 29

*Doe v. Grindr Inc.*,
128 F.4th 1148 (9th Cir. 2025)...........................................................34

*Edenfield v. Fane*,
507 U.S. 761 (1993) ..........................................................................22

*Erznoznik v. City of Jacksonville*,
422 U.S. 205 (U.S. 1975)...................................................................27

*FCC v. Fox Television Stations, Inc.*,
567 U.S. 239 (2012) ..........................................................................32

*FEC v. Cruz*,
596 U.S. 289 (2022) ..........................................................................13

*FTC v. Match Grp., Inc.*,
2022 WL 877107 (N.D. Tex. Mar. 24, 2022) ....................................34

*HomeAway.com, Inc. v. City of Santa Monica*,
918 F.3d 676 (9th Cir. 2019)..............................................................34

*Honeyfund.com, Inc. v. Governor*,
94 F.4th 1272 (11th Cir. 2024)...........................................................34

*Hurley v. Irish-American Gay, Lesbian Bisexual Group*,
515 U.S. 557 (1995) ....................................................................19, 21

*John Doe No. 1 v. Reed*,
561 U.S. 186 (2010) ..........................................................................12

*M.P. by & through Pinckney v. Meta Platforms Inc.*,
127 F.4th 516 (4th Cir. 2025)..............................................................33

*Miami Herald Pub. Co. v. Tornillo*,
418 U.S. 241 (1974) ....................................................................19, 21

*Minneapolis Star & Tribune Co. v. Minnesota Commissioner of Revenue*,
460 U.S. 575 (1983) ..........................................................................15

*Moody v. NetChoice, LLC*,
603 U.S. 707 (2024) ..................................2, 3, 4, 6, 7, 8, 9, 11, 18

*NetChoice, LLC v. Bonta*,
  113 F.4th 1111 (9th Cir. 2024) ................................................................. 11, 28

*NetChoice, LLC v. Bonta*,
  2025 WL 807961 (N.D. Cal. Mar. 13, 2025) ........................... 1, 3, 11, 15, 25, 30

*NetChoice, LLC v. Griffin*,
  2023 WL 5660155 (W.D. Ark. Aug. 31, 2023) .............................. 11, 17, 18, 30

*NetChoice, LLC v. Griffin*,
  2025 WL 978607 (W.D. Ark. Mar. 31, 2025)
  .................................... 1, 3, 5, 6, 12, 13, 14, 15, 16, 17, 23, 24, 26, 28, 29, 31, 33

*NetChoice, LLC v. Reyes*,
  748 F. Supp. 3d 1105 (D. Utah 2024) .......................... 1, 3, 11, 15, 16, 25, 28, 29

*NetChoice, LLC v. Yost*,
  2025 WL 1137485 (S.D. Ohio Apr. 16, 2025)
  .................................................................. 1, 3, 11, 15, 16, 24, 28, 31

*Nken v. Holder*,
  556 U.S. 418 (2009) ............................................................................. 35

*Otto v. City of Boca Raton*,
  981 F.3d 854 (11th Cir. 2020) ................................................................ 10, 35

*Packingham v. North Carolina*,
  582 U.S. 98 (2017) ................................................................ 2, 7, 12, 13, 23, 26

*Reed v. Town of Gilbert*,
  576 U.S. 155 (2015) ........................................................................ 13, 23, 25

*Reno v. ACLU*,
  521 U.S. 844 (1997) .............................................................. 2, 3, 13, 14, 30, 31

*Roman Catholic Diocese of Brooklyn v. Cuomo*,
  592 U.S. 14 (2020) ............................................................................... 35

*Rubin v. Coors Brewing Co.*,
  514 U.S. 476 (1995) .............................................................................. 22

*S. River Watershed All., Inc. v. Dekalb Cnty.*,
  69 F.4th 809 (11th Cir. 2023) .................................................................. 10

*Sorrell v. IMS Health Inc.*,
    564 U.S. 552 (2011) ...............................................3, 19, 20, 21, 22, 23, 29, 31, 32

*Students Engaged in Advancing Tex. v. Paxton*,
    2025 WL 455463 (W.D. Tex. Feb. 7, 2025) ......................................3, 20, 21, 31

*Turner Broad. Sys. v. FCC*,
    512 U.S. 622 (1994) ...............................................................................25

*United States v. Playboy Ent. Grp., Inc.*,
    529 U.S. 803 (2000) ........................................................23, 27, 28, 29

*United States v. Williams*,
    553 U.S. 285 (2008) ...............................................................................32

*Virginia v. Am. Booksellers Ass'n*,
    484 U.S. 383 (1988) ...........................................................................11, 31

*Wollschlaeger v. Governor of Fla.*,
    848 F.3d 1293 (11th Cir. 2017).......................................................32

*X Corp. v. Bonta*,
    116 F.4th 888 (9th Cir. 2024).......................................................8, 11

**Statutes**

47 U.S.C. § 230 ...............................................................................3, 33, 34

Cal. Civ. Code § 1798.140 ...............................................................32

O.C.G.A. § 10-1-397 ...............................................................................10

O.C.G.A. § 39-6-1 ................................3, 4, 6, 7, 8, 9, 22, 24, 25, 30, 31, 32, 33, 35

O.C.G.A. § 39-6-2 ........................1, 2, 3, 9, 12, 13, 14, 15, 18, 25, 30

O.C.G.A. § 39-6-3 ................................1, 3, 9, 10, 13, 18, 20, 25, 31, 33

O.C.G.A. § 39-6-4 ...............................................................................10

O.C.G.A. § 39-6-5 ...............................................................................1, 35

iv

## Table of Contents

Table of Authorities ...........................................................................................i

Introduction ....................................................................................................1

Background .....................................................................................................4

    A. Factual background ..................................................................................4

        1. NetChoice-member websites disseminate protected speech. .....4

        2. Parents have many tools to oversee how their children use
           the internet. ................................................................................5

        3. Many websites advertise to make their services available
           for free. .......................................................................................6

    B. Georgia Senate Bill 351 .........................................................................6

Argument.......................................................................................................10

    I.   NetChoice is likely to succeed on the merits of its claim that the Act's
        speech regulations violate the First Amendment. .......................................12

    A. The Act's speech regulations trigger strict First Amendment scrutiny. ..12

        1. The Act's age-verification requirement to access protected
           speech, for both minors and adults, violates the First
           Amendment (§ 39-6-2(a)-(b))....................................................13

        2. The Act's parental-consent requirement for minors to
           access speech violates the First Amendment (§ 39-6-2(c),
           (e)). ...........................................................................................15

        3. The Act's restriction on certain advertisements on minors'
           accounts violates the First Amendment (§ 39-6-3(1))..............18

        4. All of the Act's speech regulations are content-based,
           triggering First Amendment strict scrutiny. ............................22

    B. All of the Act's speech regulations fail strict scrutiny and any other
        form of heightened First Amendment scrutiny.......................................26

        1. The State lacks a sufficient governmental interest in
           restricting adults' and minors' access to protected speech.......26

        2. The Act's speech regulations are not properly tailored............28

           a. The Act is not the least restrictive means to accomplish
              any governmental interest and it is improperly tailored......28

b.  The age-verification, parental-consent, and advertising provisions have independent tailoring flaws. ......................30

II.   NetChoice is likely to succeed on the merits of its claim that the central "social media company" coverage definition is unconstitutionally vague. ...................................................................................................32

III.   NetChoice is likely to succeed on the merits of its claim that the Act's restrictions on certain advertising are preempted by 47 U.S.C. § 230. .......33

IV.   NetChoice meets all the remaining factors for a preliminary injunction. ...34

Conclusion...............................................................................................................35

Certification of Compliance ....................................................................................37

Certification of Service ...........................................................................................38

## Introduction

Georgia Senate Bill 351 ("Act") is the latest in a long line of attempts to unconstitutionally restrict new forms of protected expression. Using content-based coverage definitions to target disfavored websites, the Act restricts protected First Amendment activity. It imposes three primary restrictions on protected speech: (1) age verification for *all* users to access social media websites, § 39-6-2(a)-(b); (2) parental consent for minors to access those websites, § 39-6-2(c), (e); and (3) restrictions on certain advertising practices, § 39-6-3(1).[1] Courts nationwide have enjoined enforcement of similar laws. *E.g.*, *NetChoice, LLC v. Yost*, 2025 WL 1137485 (S.D. Ohio Apr. 16, 2025); *NetChoice, LLC v. Griffin*, 2025 WL 978607 (W.D. Ark. Mar. 31, 2025) ("*Griffin II*"); *NetChoice, LLC v. Bonta*, 2025 WL 807961 (N.D. Cal. Mar. 13, 2025); *NetChoice, LLC v. Reyes*, 748 F. Supp. 3d 1105 (D. Utah 2024); *Comput. & Commc'n Indus. Ass'n v. Paxton*, 747 F. Supp. 3d 1011 (W.D. Tex. 2024) ("*CCIA*"). NetChoice requests that this Court enjoin Defendant's enforcement of the Act against NetChoice's covered members, §§ 39-6-1 to -5, before the Act takes effect on July 1, 2025.

"Minors are entitled to a significant measure of First Amendment protection,"

---

[1] This Motion uses "websites" to refer to all websites and applications and "covered websites" to refer to all digital services the Act covers. Unless otherwise noted, statutory citations in this Motion refer to the Georgia Code.

and the State's power to protect children "does not include a free-floating power to restrict the ideas to which children may be exposed." *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 794 (2011) (citation omitted). The State thus lacks "power to prevent children from hearing or saying anything *without their parents' prior consent*." *Id.* at 795 n.3. So heightened First Amendment scrutiny applies when government age-gates protected speech. *Id.* And requiring age-verification before disseminating protected speech significantly chills and burdens access to speech. *See, e.g.*, *Ashcroft v. ACLU*, 542 U.S. 656, 667 (2004); *Reno v. ACLU*, 521 U.S. 844, 882 (1997).

These constitutional principles apply with equal force online. Restricting "access to social media . . . prevent[s] the user from engaging in the legitimate exercise of First Amendment rights." *Packingham v. North Carolina*, 582 U.S. 98, 108 (2017). On these websites, people can "gain access to information and communicate with one another on any subject that might come to mind." *Id.* at 99. That speech often takes place on Plaintiff NetChoice members' websites, which offer "capacity for communication of all kinds." *Id.* at 105 (citation omitted). These websites disseminate a "staggering amount" of protected speech to adults and minors. *Moody v. NetChoice, LLC*, 603 U.S. 707, 719 (2024). So the State cannot "regulate ['social media'] free of the First Amendment's restraints." *Id.* at 726-27 (citation omitted).

The Act's provisions stifle protected speech and violate the First Amendment:

- First, the Act's age-verification requirement, § 39-6-2(a)-(b), is unconstitutional because it forces all users to verify their ages before

2

accessing vast amounts of protected speech. *E.g.*, *Ashcroft*, 542 U.S. at 667 (invalidating age-verification requirement); *Reno*, 521 U.S. at 882 (same); *Griffin II*, 2025 WL 978607, at *13, *17 (same); *Reyes*, 748 F. Supp. 3d at 1129 n.169 (same); *see Bonta*, 2025 WL 807961, at *15 (enjoining age-estimation requirement).

- Second, the Act's parental-consent requirement, § 39-6-2(c), (e), infringes minors' right to access protected speech "*without their parents' prior consent.*" *Brown*, 564 U.S. at 795 n.3; *see Yost*, 2025 WL 1137485, at *24 (permanently enjoining parental-consent requirement); *Griffin II*, 2025 WL 978607, at *13, *17 (same); *see also Reyes*, 748 F. Supp. 3d at 1126 & n.135.

- Third, the Act's prohibitions on advertisements based on most "personal information" on minors' accounts, § 39-6-3(1), as well in certain circumstances the accounts of "all account holders," § 39-6-2(a), restricts websites' use of information in disseminating speech and their editorial control over the arrangement and presentation of third-party speech. *See Moody*, 603 U.S. at 728; *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 570 (2011); *Students Engaged in Advancing Tex. v. Paxton*, 2025 WL 455463, at *13-14 (W.D. Tex. Feb. 7, 2025) ("*SEAT*"). The Act's advertising restrictions are also preempted by 47 U.S.C. § 230 ("§ 230").

Compounding these constitutional flaws, the Act selectively targets disfavored websites through a content-based and impermissibly vague coverage definition of "[s]ocial media platform." § 39-6-1(6). This discriminatory approach independently subjects the Act's speech regulations to strict scrutiny. The Act's illogical coverage exposes its constitutional failures. YouTube must comply with the Act, but Hulu is exempted. § 39-6-1(6)(C). Nextdoor is covered, but not if it limits discussion to "public safety." § 39-6-1(6)(H). Minors must secure parental consent to engage in "interactive gaming" on Facebook, but not on websites like Roblox "where the

predominant or exclusive function is . . . interactive gaming." § 39-6-1(6)(F). All jobseekers must jump through these hoops on covered websites, but not on websites "where the predominant or exclusive function is . . . [c]areer development opportunities." § 39-6-1(6)(V). The First Amendment tolerates none of this.

## Background

### A. Factual background

#### 1. NetChoice-member websites disseminate protected speech.

NetChoice is an internet trade association. Cleland Decl. ¶¶ 3-4. Based on the Act's definitions, the Act regulates some websites operated by NetChoice members, including: (1) Meta (Facebook and Instagram); (2) Nextdoor; (3) Pinterest; (4) Reddit; (5) Snap Inc. (Snapchat); (6) X; and (7) YouTube. *See id.* ¶¶ 13-19. These websites "engage[] in expression" by "display[ing]," "compil[ing,] and curat[ing]," protected speech (text, audio, images, and video) "created by others." *Moody*, 603 U.S. at 716, 728; *e.g.*, Davis Decl. ¶¶ 10-13.[2] On these services, users must have an account to access some or all of the protected speech and speech-enabling functions. Cleland Decl. ¶¶ 20, 25; Davis Decl. ¶ 9; Paolucci Decl. ¶ 9. Creating accounts on these websites allows users to engage in valuable communications with others about

---

[2] This Motion uses the term "user" to encompass what the Act calls "users" and "account holders." § 39-6-1(1), (7). When discussing the Act's requirements, this Motion also uses the terms "minor," "adult," "account holder," and "user" to refer only to such account holders, users, and minors under 16 in Georgia.

4

news, politics, sports, extracurriculars, educational opportunities, and career information, among many other things. Cleland Decl. ¶¶ 6-8; Davis Decl. ¶¶ 14-30; Veitch Decl. ¶ 8.

**2.  Parents have many tools to oversee how their children use the internet.**

"[P]arents may rightly decide to regulate their child's use of social media— including restricting the amount of time they spend on it, the content they may access, or even those they chat with. And many tools exist to help parents with this endeavor." *Griffin II*, 2025 WL 978607, at *3 (collecting evidence).

To start, parents control minors' access to *devices*. Cleland Decl. ¶ 10. Not all devices are internet-enabled. And devices come with parental-control options, including the ability to lock or limit specific apps, limit content, limit access to only approved websites, and set overall or time-of-day usage limits. *Id.*

Parents also control the *networks* that minors use. Wireless routers allow parents to manage which network a minor connects to and to set up rules defining which internet websites minors can use (and at what times). *Id.* ¶ 10.a. Many internet service providers offer similar controls. *Id.*

Parents also control *software*. Web browsers offer parental controls. *Id.* ¶ 10.c. And third-party parental control software is available for many devices. *Id.* ¶ 10.b.

In addition, many members have also developed their own suite of parental controls and other protections for minors on their services. *E.g.*, *id.* ¶¶ 9.a-b, 10.d;

Davis Decl. ¶¶ 31-40; Paolucci Decl. ¶ 11; Veitch Decl. ¶¶ 11-19. These controls supplement the resources that members spend crafting and enforcing "content moderation" policies that aim to prevent harmful or objectionable speech from reaching users. *E.g.*, Cleland Decl. ¶ 9.c; Davis Decl. ¶¶ 41-53; Paolucci Decl. ¶¶ 23-29; Veitch Decl. ¶¶ 20-28; *Griffin II*, 2025 WL 978607, at *3 (collecting evidence). These members' efforts have been successful. Cleland Decl. ¶ 9.c; Veitch Decl. ¶¶ 24-26.

### 3.  Many websites advertise to make their services available for free.

Most covered websites depend on ads to remain freely available to the public. Cleland Decl. ¶ 27.d; Davis Decl. ¶ 6. Personalized and contextual advertising helps advertisers display their ads to users who are most likely to be interested, rather than blanketing all users indiscriminately. Cleland Decl. ¶ 27.a. For example, a user who visits a National Park's social media account might see ads for camping equipment on that page. This spares users from seeing ads for products or services that have no or little interest to them. Account holders use websites for advertising, too, for everything from fundraisers and bake sales to babysitting services. *Id.* ¶ 27.b.

## B. Georgia Senate Bill 351

### 1. Covered actors and activities. § 39-6-1(6). The Act's speech regulations

apply to a subset of internet "actors" and "activities," *Moody*, 603 U.S. at 724, discriminating based on content. The Act regulates "[s]ocial media platform[s]." § 39-6-1(6). These websites "allow users to upload content . . . to share with others," and

those "viewing the content can" "react to it, comment on it, or share it themselves." *Moody*, 603 U.S. at 719.

The Act defines "[s]ocial media platform" as "an online forum that allows an account holder to create a profile, upload posts, view and listen to posts, form mutual connections, and interact publicly and privately with other[s]." § 36-6-1(6).[3]

So the Act covers the kinds of "social media" websites addressed by the Supreme Court in *Moody* and *Packingham*. It regulates websites that "allow users to upload content . . . to share with others" and allowing those "viewing the content . . . [to] react to it, comment on it, or share it themselves." *Moody*, 603 U.S. at 719. As a result, covered websites "allow[] users to gain access to information and communicate with one another about it on any subject that might come to mind." *Packingham*, 582 U.S. at 107. And the Act regulates the kinds of websites that the Supreme Court has expressly held the First Amendment protects users' right to "access," free from governmental restraint. *Id.* at 108. This includes covered members' services identified above at p.4. In fact, multiple members have been used by the Court as examples of services protected by the First Amendment: "Facebook," "Twitter" (now X), and "YouTube." *See id.* at 106-07; *Moody*, 603 U.S. at 719.

---

[3] A "post" is defined as "content that an account holder makes available on a social media platform for other account holders or users to view or listen to, including text, images, audio, and video." § 39-6-1(5).

The Act excludes websites based on their content. The Act excludes websites with the following "predominant or exclusive function[s]": "streaming service[s]," "[n]ews, sports, entertainment," "online shopping," "[i]nteractive gaming, virtual gaming," "[p]hotograph editing" and "associated photograph hosting," "[s]ingle purpose community groups for public safety," "[c]areer development opportunities, including professional networking," "data visualization," "digital news," "technical support," "[a]cademic, scholarly, or genealogical research," "classified advertising," and websites "used by or under the direction of an educational entity." § 36-6-1(6).

The Act also encourages websites to exclude minors, as it does not apply to any website that "pursuant to its terms of use, does not permit minors to use the platform and utilizes commercially reasonable age assurance mechanisms to deter minors from becoming account holders." § 39-6-1(6)(B). A "[m]inor" is "an individual who resides in this state and is actually known or reasonably believed by a social media platform to be under the age of 16 years." § 39-6-1(3).

Because the Act targets "social media" websites, this Court "need not speculate" about "hypothetical or imaginary cases." *X Corp. v. Bonta*, 116 F.4th 888, 899 (9th Cir. 2024) (cleaned up). The Act excludes services for which *Moody* questioned whether a different First Amendment analysis might apply (in the context of *compelled*-speech laws). 603 U.S. at 724-25. The Act's exclusion of "[e]mail," § 39-6-1(6)(A), excludes "email," *Moody*, 603 U.S. at 725. The Act's exclusion of "[o]nline

8

shopping or ecommerce," § 39-6-1(6)(E), excludes "payment service[s]" and "online marketplace[s]," *Moody*, 603 U.S. at 725. The Act's exclusion of websites where the "content . . . is preselected by the provider and not user generated," § 39-6-1(6)(D), excludes "ride-sharing service[s] like Uber," *Moody*, 603 U.S. at 725.

**2. The Act's speech regulations.** The Act regulates speech in multiple ways.

*Age-verification. § 39-6-2(a)-(b).* Covered websites "shall make commercially reasonable efforts to verify the age of account holders with a level of certainty appropriate to the risks that arise from the [website's] information management practices." § 39-6-2(a). If they do not, covered websites must treat all users if they were minors for purposes of the Act. § 39-6-2(b).

*Parental-consent. § 39-6-2(c), (e).* Covered websites "shall" not "permit a minor to be an account holder unless" the minor "obtains the express consent of such minor's parent or guardian." § 36-6-2(c). The Act provides five enumerated "[a]cceptable methods of obtaining express consent" and one catch-all for "[a]ny other commercially reasonable method of obtaining consent using available technology." § 36-6-2(c)(6). For minors that have parental consent, the Act requires covered websites to provide parents "upon request" with certain information, including about "features . . . related to" content moderation. § 39-6-2(e).

*Certain ads. § 39-6-3(1).* "For a minor account holder," covered websites "shall prohibit . . . [t]he display of any advertising . . . based on such minor account

holder's personal information, except age and location." § 39-6-3(1). The Act's failure to define "personal information" and "advertising" could extend the Act's reach to contextual advertising and even user-created promotional content.

*Limitation on information collection and use.* § 39-6-3(2). The Act also "prohibits" the "collection or use of personal information from the posts, content, messages, text, or usage activities of the minor account holder's account other than what is adequate, relevant, and reasonably necessary for the purposes for which such information is collected, as disclosed to the minor." § 39-6-3(2).

*Investigation, enforcement, and penalties.* The Act gives Defendant "exclusive" enforcement authority over the Act. § 39-6-4(a). Defendant may seek $2,500 per violation in civil penalties, § 39-6-4(c), and may issue cease-and-desist orders and pursue actions for injunctive relief, §§ 10-1-397, 39-6-4(a).

## Argument

NetChoice is entitled to a preliminary injunction because it can demonstrate: (1) "likelihood of success on the merits"; (2) "irreparable injury"; (3) the balance of the equities; and (4) "the public interest." *Otto v. City of Boca Raton*, 981 F.3d 854, 860 (11th Cir. 2020).

NetChoice has associational standing to assert its members' rights. *S. River*

*Watershed All., Inc. v. Dekalb Cnty.*, 69 F.4th 809, 819 (11th Cir. 2023).[4] NetChoice also has standing to assert the First Amendment rights of its members' users. *E.g.*, *Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 392-93 (1988).[5]

NetChoice raises both facial challenges and challenges to the Act's provisions as applied to the members and services listed at p.4. Facial relief is appropriate on Plaintiff's First Amendment claims, and Act is properly "struck down in its entirety" because its "unconstitutional applications substantially outweigh its constitutional ones . . . judged in relation to the statute's plainly legitimate sweep." *Moody*, 603 U.S. at 723-24 (citation omitted). This inquiry "first" asks what "actors" and "activities" the Act regulates. *Id.* at 724; *see supra* pp.4-10. It "next" compares the Act's unconstitutional applications to any constitutional ones, asking whether the former "substantially outweigh" the latter. *Moody*, 603 U.S. at 24.

Here, that inquiry is plain "from the face of the law": All aspects of the Act's speech regulations, "in every application to a covered social media company, raise the same First Amendment issues." *X Corp.*, 116 F.4th at 899 (citation omitted); *NetChoice, LLC v. Bonta*, 113 F.4th 1111, 1116 (9th Cir. 2024); *Bonta*, 2025 WL

---

[4] *See Yost*, 2025 WL 1137485, at *8-9; *Reyes*, 748 F. Supp. 3d at 1118-19; *CCIA*, 747 F. Supp. 3d at 1029-31; *NetChoice, LLC v. Griffin*, 2023 WL 5660155, at *9-10 (W.D. Ark. Aug. 31, 2023) ("*Griffin I*").

[5] *See Yost*, 2025 WL 1137485, at *9-14; *CCIA*, 747 F. Supp. 3d at 1031; *Griffin I*, 2023 WL 5660155, at *11-12.

807961, at *12. There can be "no dispute that users engage in protected speech on all the platforms that are arguably within the Act's proscription" and "the Act imposes a platform-wide burden on users' right to engage in that speech" that does not "differ between the platforms regulated." *Griffin II*, 2025 WL 978607, at *7. No "factual development would help illuminate the scope of users' First Amendment interest in accessing regulated platforms." *Id.* "By barring access to all content on regulated platforms, including that which is neither unprotected nor harmful, based on the content and speakers represented on those platforms, the Act is unconstitutional in all conceivable applications." *Id.* at *14.[6]

At a minimum, the Act is invalid as applied to members' regulated services. *See John Doe No. 1 v. Reed*, 561 U.S. 186, 194 (2010) (analyzing First Amendment challenge "to the extent of [the] reach" defined by plaintiff).

**I.    NetChoice is likely to succeed on the merits of its claim that the Act's speech regulations violate the First Amendment.**

**A.    The Act's speech regulations trigger strict First Amendment scrutiny.**

The Act's age-verification, § 39-6-2(a)-(b); parental-consent, § 39-6-2(c), (e);

---

[6] Even if the Act applied more broadly than explained above at pp.7-9, the Act would be unconstitutional. Laws that "bar access" to both "social media websites" and "websites" like "Washingtonpost.com[] and Webmd.com" raise similar constitutional problems. *Packingham*, 582 U.S. at 106. "It is enough . . . that the law applies . . . to social networking sites." *Id.* (cleaned up).

advertising, § 39-6-3(1); and information-collection provisions, § 39-6-3(2); trigger strict scrutiny. "When the Government restricts speech, the Government bears the burden of proving the constitutionality of its actions." *FEC v. Cruz*, 596 U.S. 289, 305 (2022). Laws restricting access to protected speech based on content are subject to strict scrutiny. *Reed v. Town of Gilbert*, 576 U.S. 155, 163-64 (2015).

1.      **The Act's age-verification requirement to access protected speech, for both minors and adults, violates the First Amendment (§ 39-6-2(a)-(b)).**

The Act violates the First Amendment by requiring *all* users to "verify the[ir] age[s]" to be "account holders" on covered websites. § 39-6-2(a). Heightened First Amendment scrutiny applies when government age-gates protected speech. *Brown*, 564 U.S. at 795 n.3; *Ashcroft*, 542 U.S. at 667; *Reno*, 521 U.S. at 882.

Georgia's "imposition of an age-verification requirement for account creation is maximally burdensome." *Griffin II*, 2025 WL 978607, at *13. It imposes an impermissible hurdle for all users to access and engage in protected speech. Minors and adults would need to provide documentation before discussing their faith on a forum dedicated to religion, "petition[ing] their elected representatives" on X, "shar[ing] vacation photos . . . with their friends and neighbors" on Facebook, looking for work around the neighborhood on Nextdoor, learning how to solve math problems on YouTube, and otherwise creating or receiving protected speech. *Packingham*, 582 U.S. at 104-05. In all, "the age-verification requirement will deter

13

adults from speaking or receiving protected speech on social media." *Griffin II*, 2025 WL 978607, at \*8. It will do the same for minors.

The First Amendment does not tolerate this burden to access protected speech. The Act's age-verification requirement unlawfully bars access to speech entirely for those unwilling or unable to provide the requisite documentation. *E.g.*, *Reno*, 521 U.S. at 856. And even those who are willing to comply with the requirements must "forgo the anonymity otherwise available on the internet." *Griffin II*, 2025 WL 978607, at \*8 (quoting *Am. Booksellers Found. v. Dean*, 342 F.3d 96, 99 (2d Cir. 2003)); *ACLU v. Mukasey*, 534 F.3d 181, 197 (3d Cir. 2008) (similar); *see* Davis Decl. ¶ 64; Paolucci Decl. ¶¶ 14-18. The Supreme Court has held that requiring adults or minors to provide personal information or documentation—such as "iden-tif[ication]" or "credit card information"—burdens access to speech. *Ashcroft*, 542 U.S. at 667; *Reno*, 521 U.S. at 882. And under the Act, covered websites must place *all* content—billions of posts with fully protected speech—behind an age-verifica-tion system. §39-6-2(a). That is much broader than the law held unconstitutional in *Ashcroft*, which regulated "sexually explicit materials"—speech *unprotected* for mi-nors. 542 U.S. at 659.

Just recently, *Griffin* permanently enjoined enforcement of Arkansas's similar age-verification requirement, concluding it "burdens social media access for all Ar-kansans—both adults and minors whose parents would allow them to use social

14

media." *Griffin II*, 2025 WL 978607, at *8. "Requiring" users to "to produce state-approved documentation to prove their age and/or submit to biometric age-verification testing imposes significant burdens on adult access to constitutionally protected speech and discourages users from accessing the regulated sites." *Id.* (cleaned up); *see* Veitch Decl. ¶¶ 45, 47. Other courts have applied the same principles to enjoin enforcement of similar requirements. *E.g.*, *Reyes*, 748 F. Supp. 3d at 1129 n.169; *see Bonta*, 2025 WL 807961, at *22 (facially enjoining age-estimation requirement because it "intrud[es] into user privacy, thereby chilling publication of and access to protected speech").

None of these First Amendment flaws are saved by the Act requiring "commercially reasonable" age verification. § 39-6-2(a). Governments cannot restrict speech simply because a publisher can afford it. *E.g.*, *Minneapolis Star & Tribune Co. v. Minnesota Commissioner of Revenue*, 460 U.S. 575, 592 (1983) (speech restriction invalid even if larger entities are "better able to bear the burden"); *Griffin II*, 2025 WL 978607, at *14. Plus not every website *will* be able to afford it. *E.g.*, Paolucci Decl. ¶ 13. And any age verification would restrict *users'* access to speech.

### 2.    The Act's parental-consent requirement for minors to access speech violates the First Amendment (§ 39-6-2(c), (e)).

The Act violates the First Amendment by requiring minors to secure "express parental consent" to "be an account holder"—to access and engage in protected speech—on covered websites. § 39-6-2(c); *see Yost*, 2025 WL 1137485, at *20

15

("[L]aws that require parental consent for children to access constitutionally protected, non-obscene content, are subject to strict scrutiny.").

Minors have the "right to speak or be spoken to without their parents' consent," and "the state" lacks "power to prevent children from hearing or saying anything *without their parents' prior consent*." *Brown*, 564 U.S. at 795 n.3. *Brown* invalidated a law prohibiting the sale or rental of "violent video games" to minors, while permitting minors to play such games with parental consent. *Id.* at 802. Any other result would allow States to bar minors from "political rall[ies]" or "religious" services without parental consent. *Id.* at 795 n.3. The Court rejected that idea. *Id.*

Following *Brown*, courts have repeatedly enjoined enforcement of parental-consent requirements for minors to access and engage in protected speech on websites operated by NetChoice's members. Again, *Griffin* permanently enjoined enforcement of a nearly identical requirement in Arkansas. *Griffin II*, 2025 WL 978607, at *8. *Yost*, likewise, permanently enjoined Ohio's parental-consent requirement to access social media websites. *See* 2025 WL 1137485, at *20, 24. And *Reyes* rejected Utah's parental-consent requirement for minors to speak to certain audiences on "social media service[s]." 748 F. Supp. 3d at 1126 n.135.

The Act's materially identical parental-consent requirement violates the First Amendment for the same reasons. It would impose a substantial hurdle between minors and enormous amounts of protected speech—"foreclos[ing] access to social

16

media altogether for those minors whose parents do not consent to the minor's use of social media." *Griffin II*, 2025 WL 978607, at \*8; Davis Decl. ¶ 65. "Minors, who cannot vote for the lawmakers that represent them, can use social media to make their voices heard on issues that affect them." *Griffin II*, 2025 WL 978607, at \*13. Under the Act, however, minors who wish to exchange information about their religious or political views could not do so unless their parents approve.

That problem is exacerbated because the Act does not account for the difficulty in verifying a parent-child relationship for purposes of processing parental consent. *Griffin I* credited the *State's* expert testimony that "the biggest challenge you have with parental consent is actually establishing . . . the parental relationship." 2023 WL 5660155, at \*4. These difficulties are compounded when, *e.g.*, families are nontraditional (such as foster families), families have different last names or addresses, parents disagree about consent, minors are unsafe at home, or parental rights have been terminated. *See* Cleland Decl. ¶ 26; Veitch Decl. ¶¶ 49, 51. "Disputes about the identity of an account holder, their age, or the legal relationship between them and the person claiming to be their parent are complex, time-consuming, costly to investigate and resolve, and unfortunately common." Paolucci Decl. ¶ 22; *see* Veitch Decl. ¶ 49. Facing liability, covered websites are likely to "err on the side of caution and require detailed proof of the parental relationship." *Griffin I*, 2023 WL 5660155, at \*15. Thus, "parents and guardians who otherwise would have freely

17

given consent . . . will be dissuaded by the red tape." *Id.* Those obstacles will drive them to "refuse consent—which will unnecessarily burden minors' access to constitutionally protected speech." *Id.*

As above at p.15, these First Amendment flaws are not saved by the Act requiring "commercially reasonable" parental-consent mechanisms, § 36-6-2(c)(6). *Brown* would not have come out differently had California asked only for "commercially reasonable" parental consent. *Cf. Brown*, 564 U.S. at 801.

### 3. The Act's restriction on certain advertisements on minors' accounts violates the First Amendment (§ 39-6-3(1)).

The Act further violates the First Amendment by prohibiting the "display of any advertising" on minors' accounts based on "personal information, except age and location." § 39-6-3(1). The First Amendment prohibits the State from dictating how private entities choose which lawful ads to publish—and what lawfully obtained information they use to make that choice.

**a.** The Act impermissibly restricts core editorial functions protected by the First Amendment. The Supreme Court has repeatedly recognized that decisions about what content to publish and how to arrange it lie at the heart of the First Amendment's protections. In *Moody*, the Court emphasized that "choice of material to go into a" publication "constitute[s] the exercise of editorial control and judgment." 603 U.S. at 738. These protections extend to "advertisements." *Id.* at 734. The "selection of" an "advertisement for inclusion" in a "compilation of speech"

18

"fall[s] squarely within the core of First Amendment security." *Hurley v. Irish-American Gay, Lesbian Bisexual Group*, 515 U.S. 557, 570 (1995).

The Act's advertising restrictions directly infringe this protected editorial discretion. By dictating how covered websites can select, arrange, and present advertisements, the Act "intru[des] into the function of editors" and interferes with the "exercise of editorial control and judgment." *Miami Herald Pub. Co. v. Tornillo*, 418 U.S. 241, 258 (1974). It is akin to telling the Atlanta Journal-Constitution that it may not rely on market research to place ads.

**b.** The Act also unconstitutionally restricts the use of lawfully obtained information for protected expression. An "individual's right to speak is implicated when information he or she possesses is subjected to restraints on the way in which the information might be used." *Sorrell*, 564 U.S. at 568 (citation omitted). *Sorrell* invalidated a law prohibiting the use of "prescriber-identifying information" for purposes of pharmaceutical marketing by pharmaceutical manufacturers. *Id.* at 564. The Court rejected the idea that "use of . . . information [is] conduct" unprotected by the First Amendment. *Id.* at 570. The prescriber-identifying information was akin to "cookbooks, laboratory results, or train schedules"—all "facts" protected by the First Amendment. *Id.* And restrictions on using particular facts to engage in "protected expression" trigger First Amendment scrutiny. *Id.* at 565. The law in *Sorrell* "burden[ed] disfavored speech by disfavored speakers" and violated any level of

19

heightened First Amendment scrutiny *Id.* at 564, 574.

Like the law in *Sorrell*, the Act restricts the use of lawfully obtained information—here, "personal information" beyond "age and location"—for protected expressive activities. § 39-6-3(1). So the Act similarly fails any level of First Amendment scrutiny. Federal courts have recognized the constitutional infirmities in nearly identical provisions. In *SEAT*, for example, the Western District of Texas enjoined enforcement of Texas's similar prohibition on using personal information for advertising to minors. 2025 WL 455463, at *13-14. Such provisions do not target purportedly problematic advertisements or regulate advertisers directly—instead, they regulate decisions about what information covered websites use when deciding how (and to whom) to display ads on their services. This violates the First Amendment.

**c.** The Act's constitutional problems are exacerbated by its scope. The undefined term "personal information" sweeps in a vast array of information that could inform ad placement decisions, including entirely innocuous information like a user's interests in sports, music, or academic subjects. Likewise, the Act's undefined term "advertising" potentially encompasses both commercial advertisements and also user-generated promotional content. This could include everything from announcements about school fundraisers and local concerts to small business promotions and educational opportunities. Thus, compliance with the Act would require covered websites to monitor all user posts to determine whether they constitute

"advertisements" and whether their display to users is based on "personal infor-mation." Assuming such unprecedented monitoring were possible (which is un-likely, Cleland Decl. ¶ 27.b), this would chill protected speech. Out of an abundance of caution, websites would be forced to remove or limit a wide range of posts with protected speech.

**D.** The Act's advertising restrictions trigger strict scrutiny and would fail even intermediate scrutiny. Because the Act singles out content-based categories of "per-sonal information" that websites cannot use to make protected decisions about the display of speech, it is analogous to the law invalidated in *Sorrell*, 564 U.S. at 563. And because it targets websites' "editorial control and judgment," it must satisfy strict scrutiny. *Tornillo*, 418 U.S. at 258; *see Hurley*, 515 U.S. at 570. This provision could reach all manner of "advertisements" that do not "propose a commercial trans-action," so these "advertising requirements are not commercial speech; strict scru-tiny applies to them equally." *SEAT*, 2025 WL 455463, at *10.

Even if construed as a regulation of commercial speech, the Act's "purpose to suppress speech and its unjustified burdens on expression would render it unconsti-tutional." *Sorrell*, 564 U.S. at 566. There is no "philosophical or historical basis for asserting that 'commercial' speech is of 'lower value' than 'noncommercial' speech." *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 522 (1996) (Thomas, J., concurring in part and concurring in the judgment). Even so, this provision also

fails intermediate scrutiny currently applied to commercial speech. *See Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 570 (1980). Ads that "accurately inform the public about lawful activity" are protected. *See id.* at 563. This Act does not attempt to regulate false or misleading commercial speech.

Under intermediate scrutiny, the government must demonstrate a "substantial interest," that the Act "directly advances" that interest, and "is not more extensive than is necessary." *Id.* at 564, 566. The State "must demonstrate that the harms it recites are real." *Rubin v. Coors Brewing Co.*, 514 U.S. 476, 487 (1995) (cleaned up). Otherwise, "a State could with ease restrict commercial speech in the service of other objectives that could not themselves justify a burden on commercial expression." *Edenfield v. Fane*, 507 U.S. 761, 771 (1993). The State has no legitimate interest in "suppress[ing] [speech] solely to protect the young from ideas or images that a legislative body thinks unsuitable." *Brown*, 564 U.S. at 795. That includes ads. Nor may the State prohibit certain ads because they are considered "persuasive." *Sorrell*, 564 U.S. at 578. Additionally, prohibiting such advertising on only a handful of websites is an insurmountable tailoring problem. *Id.* at 573-75.

### 4.    All of the Act's speech regulations are content-based, triggering First Amendment strict scrutiny.

The Act's "[s]ocial media platform" definition, § 39-6-1(6), is content-based, subjecting all of the Act's speech regulations depending on this definition to strict scrutiny. This definition also is speaker-based, which triggers heightened First

Amendment scrutiny. Even if strict scrutiny did not apply, governmental restrictions on "access to" social media websites raise heightened First Amendment scrutiny. *Packingham*, 582 U.S. at 105. "Government's content-based burdens must satisfy the same rigorous scrutiny as its content-based bans." *Sorrell*, 564 U.S. at 566 (citing *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 812 (2000)).

*Content-based distinctions.* The First Amendment's "most basic" principle is that "government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Brown*, 564 U.S. at 790-91 (citation omitted). "Content-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves" it satisfies "strict scrutiny." *Reed*, 576 U.S. at 163-64. Here, a "website operating in [Georgia], an enforcement official, a court, or a jury applying the Act, cannot determine whether the website is regulated without looking to the content posted on that website." *Griffin II*, 2025 WL 978607, at *9.

The Act's central coverage definition is content-based, rendering all of the Act's speech regulations content-based. *Sorrell*, 564 U.S. at 566. Specifically, the Act both defines the scope of covered websites and excludes numerous other websites from its onerous regulations based on their "subject matter" and thus their "content." *Reed*, 576 U.S. at 163; *see Sorrell*, 564 U.S. at 563-64 (content-based exceptions render statute content-based).

23

The Act's coverage definition turns on a website's "predominant or exclusive function[s]." § 39-6-1(6). The Act's reference to "function" is a proxy for other content-based restrictions. Governments cannot "swap[] an obvious subject-matter distinction for a 'function or purpose' proxy that achieves the same result." *City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 596 U.S. 61, 74 (2022).

The Act outright exempts the State's favored entities based on the content they feature—*e.g.*, "[n]ews, sports, entertainment," "interactive gaming," "public safety," "professional networking," and "[a]cademic, scholarly, or genealogical research" websites. § 39-6-1(6). Consequently, users may access those websites that disseminate or devote themselves to these state-preferred topics without hurdles. "The elevation of news, sports, commerce, and provider-generated content over user-generated content is a content-based regulation." *CCIA*, 747 F. Supp. 3d at 1032; *see Griffin II*, 2025 WL 978607, at *9; *Yost*, 2025 WL 1137485, at *23. But websites—including NetChoice members—that disseminate a different or broader mix of content face significant regulation. Although a 15-year-old may discuss public safety in a single-purpose community group, he cannot discuss that same issue on Nextdoor without parental consent. Likewise, a professor may sign up for a scholarly research forum, but she cannot sign up for an account on Facebook without verifying her age.

*Speaker-based distinctions.* The Act triggers heightened First Amendment scrutiny because the Act's central coverage definition is speaker-based. "[L]aws that

24

single out the press, or certain elements thereof . . . are always subject to at least some degree of heightened First Amendment scrutiny." *Turner Broad. Sys. v. FCC*, 512 U.S. 622, 640-41 (1994) (citation omitted).

The Act's central coverage definition is speaker-based because it favors websites that include "content that is preselected" and "not user generated." § 39-6-1(6)(D). In contrast, the Act burdens similar websites that disseminate user-generated content, even if those websites also post or create their own content.

Because this central coverage definition is both content-based and speaker-based, so too is each provision of the Act regulating speech that depends on this coverage definition. "[I]f a statute's gateway coverage definition is content-based, the statute as a whole is subject to strict scrutiny because the coverage definition applies in all applications of the statute." *Bonta*, 2025 WL 807961, at *12; *see Reyes*, 748 F. Supp. 3d at 1120. The Act's following speech regulations each depend on this coverage definition and are thus content-based and speaker-based: age verification, § 39-6-2(a)-(b); the parental-consent provisions, § 39-6-2(c), (e); advertising restrictions, § 39-6-3(1); and data-collection and -use limitations, § 39-6-3(2).[7]

---

[7] The information-collection and information-use limitation is a "[g]overnment regulation of speech" because it imposes legal duties on covered websites if they disseminate speech of a certain type of "content." *Reed*, 576 U.S. at 163.

25

**B.    All of the Act's speech regulations fail strict scrutiny and any other form of heightened First Amendment scrutiny.**

Because the Act "is a content-based restriction, the State bears the burden of showing the Act meets strict scrutiny," "and a content-based restriction, insufficiently tailored to target a compelling government interest, is presumptively unconstitutional in all applications." *Griffin II*, 2025 WL 978607, at *14. Defendant must demonstrate that the State has "[1] adopt[ed] the least restrictive means of [2] achieving a compelling state interest." *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 607 (2021) ("*AFP*") (citation omitted). Neither the Act nor any of its individual provisions can satisfy this demanding standard. Nor could they satisfy even intermediate scrutiny, because they are not "narrowly tailored to serve a significant governmental interest." *Packingham*, 582 U.S. at 105-06 (citation omitted).

**1.    The State lacks a sufficient governmental interest in restricting adults' and minors' access to protected speech.**

To satisfy First Amendment scrutiny, Georgia must "specifically identify an actual problem in need of solving." *Brown*, 564 U.S. at 799 (cleaned up). "[A]mbiguous proof will not suffice." *Id.* at 800. Nor will a government's mere "predictive judgment[s]" about harm. *Id.* at 799. The problem identified must be in need of a *governmental* solution, as compared to a *private* one. Here, Georgia lacks a sufficient governmental interest in regulating access to protected speech.

*Preventing harms to minors.* Although, "a State possesses legitimate power to

26

protect children from harm, . . . that does not include a free-floating power to restrict the ideas to which children may be exposed." *Id.* at 794. And the government may not "protect the young from ideas or images that a legislative body thinks unsuitable." *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 213 (U.S. 1975).

Here, parents have many ways to oversee their minor children online. *See supra* pp.5-6. Those are precisely the kinds of private parental tools that the Supreme Court has endorsed over governmental intervention. *See, e.g.*, *Ashcroft*, 542 U.S. at 667; *Playboy*, 529 U.S. at 826. Whatever "modest gap in concerned parents' control" those tools leave open (if any), filling it "can hardly be a compelling state interest." *Brown*, 564 U.S. at 803.

*Parental authority.* The Supreme Court has rejected a governmental interest "in aid of parental authority" to restrict minors' access to protected speech by default. *Id.* at 802. Such restrictions "do not enforce parental authority over [minors'] speech"—they "impose *governmental* authority." *Id.* at 795 n.3. The Supreme Court has "note[d]" its "doubts that punishing third parties for conveying protected speech to children *just in case* their parents disapprove of that speech is a proper governmental means of aiding parental authority." *Id.* at 802. Accepting that argument "would largely vitiate the rule that 'only in relatively narrow and well-defined circumstances may government bar public dissemination of protected materials to [minors].'" *Id.* (quoting *Erznoznik*, 422 U.S. at 212-13).

27

### 2. The Act's speech regulations are not properly tailored.

The Act's speech regulations are not the "least restrictive means" of pursuing any governmental interest. *AFP*, 594 U.S. at 607 (citation omitted). Rather, the Act is both "seriously underinclusive" and "seriously overinclusive." *Brown*, 564 U.S. at 805. Because these "requirements are overbroad, overly restrictive, and underinclusive, they are properly enjoined on their face." *CCIA*, 747 F. Supp. 3d at 1038.

### a. The Act is not the least restrictive means to accomplish any governmental interest and it is improperly tailored.

None of the Act's speech restrictions is the "least restrictive" way to accomplish any goals that the State might assert. *AFP*, 594 U.S. at 607 (citation omitted). Parents already have many options to oversee their children online. "Most minors cannot access social media without a parent-funded device and internet connection, and 'parents who care about the matter' have many tools at their disposal to restrict and monitor their children's internet use." *Griffin II*, 2025 WL 978607, at *14 (quoting *Brown*, 564 U.S. at 803). Georgia could alternatively give "parents the information needed to engage in active supervision" over children's internet access. *Playboy*, 529 U.S. at 826; *accord Bonta*, 113 F.4th at 1121; *Yost*, 2025 WL 1137485, at *22; *Reyes*, 748 F. Supp. 3d at 1127. The government could publicize the diverse supervisory technologies widely available or "encourage the use of filters" that private companies already make available. *Griffin II*, 2025 WL 978607, at *13; *see supra* pp.5-6. Georgia ignored these options. "It is no response that [these tools]

28

require[] a consumer to take action, or may be inconvenient, or may not go perfectly every time." *Playboy*, 529 U.S. at 824.

Furthermore, members' self-regulation is extensive, as covered websites already engage in content moderation and provide parental controls and other tools. *See supra* p.5-6. The Supreme Court has recognized that "voluntary" self-regulatory efforts are preferable to government intervention. *Brown*, 564 U.S. at 803.

The Act also is vastly overinclusive. It does not purport to identify websites that are harmful to minors or even likely to be accessed by minors. Paolucci Decl. ¶ 10. Rather, it targets websites that disseminate a broad range of protected speech. *See, e.g.*, *Reyes*, 748 F. Supp. 3d at 1129. And the Act restricts users' access to *all* speech on those websites, including core protected speech. So the Act "not only hinders adults' ability to speak and receive protected speech online, it excludes minors whose parents do not consent (or cannot prove their consent) from the vast democratic forums of the Internet." *Griffin II*, 2025 WL 978607, at *13 (citation omitted).

The Act's coverage is also "seriously underinclusive." *Brown*, 564 U.S. at 805. The Act's central definition and its many exclusions create gaps in the State's regulatory regime. *Sorrell*, 564 U.S. at 573 (regulation requires "coherent policy"); *see, e.g.*, *Griffin II*, 2025 WL 978607, at *11-12; *Reyes*, 748 F. Supp. 3d at 1128; *CCIA*, 747 F. Supp. 3d at 1037-38. If the State is attempting to regulate particular online interactions by minors, that will be ineffective. For example, the Act restricts

minor users from using covered websites to engage in conversations about gaming but does not do so for *the same conversation* that takes place on a website where "gaming" is the "predominant or exclusive function," § 39-6-1(6)(D).

      **b.**    **The age-verification, parental-consent, and advertising provisions have independent tailoring flaws.**

Specific provisions have still more tailoring flaws.

*Age verification. § 39-6-2(a)-(b).* Age-verification is only a means to effectuate the Act's other age-based restrictions, such as the parental-consent requirement. Because those other provisions are unconstitutional, age-verification serves no standalone governmental interest. *See, e.g.*, *Griffin I*, 2023 WL 5660155, at *18-21.

Furthermore, the Act is overinclusive as to any governmental interest that focuses only on minors. All users, *adults* included, must undergo age verification to engage with or in protected political, religious, artistic, or other protected speech on covered websites. And for the websites that cannot verify the ages of their users, those websites must treat all adults on the websites as minors. *See supra* p.9. That would unconstitutionally "reduce the adult population . . . to reading only what is fit for children." *Butler v. Michigan*, 352 U.S. 380, 383 (1957); *see Bonta*, 2025 WL 807961, at *22. Whatever the statutory method, impeding adults' access to protected speech in an effort to regulate minors' access to speech is enough to render the Act insufficiently tailored. *Ashcroft*, 542 U.S. at 667; *Reno*, 521 U.S. at 882.

*Parental consent. § 39-6-2(c), (e).* The parental-consent requirement is

improperly tailored. Like other parental-consent barriers to engaging in protected speech, the Act's requirement is underinclusive. If covered websites are genuinely "dangerous," it is unclear why the State would allow to minors to access them "so long as one parent . . . says it's OK." *Brown*, 564 U.S. at 802; *see Griffin II*, 2025 WL 978607, at *10; *Yost*, 2025 WL 1137485, at *21.

Furthermore, the Act fails to "take into account juveniles' differing ages and levels of maturity." *Am. Booksellers*, 484 U.S. at 396. Its one-size-fits-all approach requires express parental consent for all minors at every developmental stage—from websites' youngest users to 16-year-olds. *Id.*; *see Reno*, 521 U.S. at 865-66.

*Restriction on certain advertising on minors' accounts. § 36-6-3(1).* The Act's restriction on disseminating ads based on "personal information" is not properly tailored to further any governmental interest. This restriction is "seriously underinclusive." *Brown*, 564 U.S. at 805. The "statute allows . . . information to be used" for advertising "by all but a narrow class of disfavored speakers." *Sorrell*, 564 U.S. at 573; *id.* at 574-75. Minors will encounter personal-information-based ads on "gaming" websites, "[n]ews, sports, entertainment" websites, and websites without user-generated content. § 39-6-1(6)(D), (F). "Why . . . can a teenager view a targeted advertisement on a sports or shopping website but not on a social platform?" *SEAT*, 2025 WL 455463, at *14. This restriction also permits the dissemination of potentially inappropriate ads on all manner of websites. *Id.* The only conceivable

justification that leaves the State is an impermissible interest in preventing speech "the State finds [] too persuasive." *Sorrell*, 564 U.S. at 578.

This provision also is overinclusive. Leaving "personal data" undefined restricts a broad range of ads. For instance, the Act is not limited to things like "sensitive personal information," regulated by other States. Cal. Civ. Code § 1798.140(ae). It does not serve any governmental interest to prohibit websites from publishing ads based on, *e.g.*, a user's search for tutoring services or college admissions. Finally, the Act is not limited to paid advertisements and could extend to any number of user-created promotions for pet-sitting, sports camps, or concerts—if that content is presented to users through personalization.

## II.    NetChoice is likely to succeed on the merits of its claim that the central "social media company" coverage definition is unconstitutionally vague.

The Act's "[s]ocial media platform" definition is unconstitutionally vague. § 39-6-1(6). Laws must "give fair notice of conduct that is forbidden or required." *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012). They cannot be "so standardless that [they] authorize[] or encourage[] seriously discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008). "[S]tandards of permissible statutory vagueness are strict in the area of free expression" and thus do not require statutes to be vague in all applications. *Wollschlaeger v. Governor of Fla.*, 848 F.3d 1293, 1320 (11th Cir. 2017) (en banc) (citation omitted).

A website's "predominant or exclusive function" must be examined to

32

determine if the Act applies. § 39-6-1(6). *Griffin II* enjoined as vague a law relying on identical terms. 2025 WL 978607, at *15-16. Here too, "predominant or exclusive function" is undefined, although the phrase is "critical to determining which entities fall within [the Act]'s scope." *Id.* at *15. For example, many people use LinkedIn for "professional networking," § 39-6-1(6)(V), but others use it for social interaction. So "[c]ompanies must choose between risking unpredictable and arbitrary enforcement . . . and implementing the Act's costly . . . requirements." *Griffin II*, 2025 WL 978607, at *16. This "ambiguity renders a law unconstitutional." *Id.*

## III. NetChoice is likely to succeed on the merits of its claim that the Act's restrictions on certain advertising are preempted by 47 U.S.C. § 230.

The Act's restriction on disseminating third-party ads on minors' accounts, § 39-6-3(1), is unlawful for another reason. It is preempted by 47 U.S.C. § 230, because it would penalize covered websites for disseminating third-party content.

Websites have "broad immunity" for "all claims stemming from their *publication of information created by third parties*." *A.B. v. Salesforce, Inc.*, 123 F.4th 788, 794 (5th Cir. 2024) (cleaned up). This precludes States from penalizing websites for exercising "editorial functions" over third-party content, such as "decisions relating to the monitoring, screening, and deletion of content." *Id.* at 793, 798 (citation omitted). Likewise, "acts of arranging and sorting content are integral to the function of publishing." *M.P. by & through Pinckney v. Meta Platforms Inc.*, 127 F.4th 516, 526 (4th Cir. 2025). "No [website] shall be treated as the publisher or

33

speaker of any information provided by" someone else. 47 U.S.C. § 230(c)(1).[8] "No cause of action may be brought and no liability may be imposed . . . that is inconsistent with" § 230. *Id.* § 230(e)(3).

Here, § 230 preempts the restriction on ads displayed to minors' accounts. The Act would impermissibly subject covered websites to "cause[s] of action" and "liability," *id.*, for publishing third-party-generated ads. Courts have concluded that § 230 protects websites' decisions to disseminate ads. *See, e.g.*, *Calise*, 103 F.4th at 744; *FTC v. Match Grp., Inc.*, 2022 WL 877107, at *10 (N.D. Tex. Mar. 24, 2022).

Moreover, § 230 preempts requirements to "monitor third-party content," including to verify whether that content contains advertising. *HomeAway.com, Inc. v. City of Santa Monica*, 918 F.3d 676, 682 (9th Cir. 2019); *Doe v. Grindr Inc.*, 128 F.4th 1148, 1153 (9th Cir. 2025) ("monitor third-party content"). Section 230 protects "decisions relating to the monitoring" and "screening" of content. *Salesforce*, 123 F.4th at 793 (citation omitted). Similarly, § 230 protects websites from liability for third-party content that they (purportedly) do not moderate. *Id.*

## IV. NetChoice meets all the remaining factors for a preliminary injunction.

NetChoice's "likelihood of success on the merits" means "the remaining requirements necessarily follow." *See Honeyfund.com, Inc. v. Governor*,

---

[8] Covered member websites qualify as "interactive computer service[s]" under § 230(f)(2). *E.g.*, *Calise v. Meta Platforms, Inc.*, 103 F.4th 732, 744 (9th Cir. 2024).

94 F.4th 1272, 1283 (11th Cir. 2024).

The Act will cause NetChoice members and their users irreparable harm. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Roman Catholic Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020) (citation omitted). The Act's $2,500 per violation penalties magnify the harms. *See supra* p.10. Some NetChoice members have stopped serving minors when other States' laws were not enjoined before they became effective. *See* ECF 48 at 3, *NetChoice v. Skrmetti*, No. 3:24-cv-01191 (M.D. Tenn. Jan. 16, 2025).

And the Act imposes compliance costs "with no guarantee of . . . recovery." *Ala. Ass'n of Realtors v. HHS*, 594 U.S. 758, 765 (2021). Websites must adopt age-verification and parental-consent systems and alter their ad publication. Davis Decl. ¶¶ 67-68; Veitch Decl. ¶¶ 46, 50, 54. For some, compliance is "far in excess of [the] available budget," if not "impossible." Paolucci Decl. ¶¶ 13, 30; *id.* ¶¶ 19-22.

The last factors—harm to Defendant and the public interest—"merge" in suits against the government. *Nken v. Holder*, 556 U.S. 418, 435 (2009). "Neither the government nor the public has any legitimate interest in enforcing an unconstitutional" law. *Otto*, 981 F.3d at 870.

### Conclusion

Plaintiff requests that this Court enjoin Defendant from enforcing §§ 39-6-1 to -5 against NetChoice's members before the Act takes effect on July 1, 2025.

Dated: May 1, 2025                     Respectfully submitted,

                                       /s/ Jared B. Magnuson
Steven P. Lehotsky* (MA 655908)        Jared B. Magnuson (GA 131189)
Scott A. Keller* (DC 1632053)          LEHOTSKY KELLER COHN LLP
Jeremy Evan Maltz* (DC 155451)         3280 Peachtree Road NE
Shannon G. Denmark* (DC                Atlanta, GA 30305
1617283)                               (512) 693-8350
LEHOTSKY KELLER COHN LLP               jared@lkcfirm.com
200 Massachusetts Avenue, NW,
  Suite 700                            Joshua P. Morrow* (TX 24106345)
Washington, DC 20001                   LEHOTSKY KELLER COHN LLP
(512) 693-8350                         408 W. 11th Street, 5th Floor
steve@lkcfirm.com                      Austin, TX 78701
scott@lkcfirm.com                      (512) 693-8350
jeremy@lkcfirm.com                     josh@lkcfirm.com
shannon@lkcfirm.com
                                       *pro hac vice forthcoming

                  Attorneys for Plaintiff NetChoice

36

**Certification of Compliance**

The undersigned hereby certifies that this memorandum has been prepared using Microsoft Office version 2501 (2025) and Times New Roman 14-point font in accordance with Local Civil Rules 5.1(C) and 7.1(D).

Dated: May 1, 2025                    Respectfully submitted,

*/s/ Jared B. Magnuson*
Jared B. Magnuson (GA 131189)
LEHOTSKY KELLER COHN LLP
3280 Peachtree Road NE
Atlanta, GA 30305
(512) 693-8350
jared@lkcfirm.com

**Certification of Service**

The undersigned hereby certifies that the foregoing was filed electronically via the Court's CM/ECF system, and that on May 1, 2025, Plaintiff caused the foregoing to be served via process server and email to:

> Wright Banks
> Chief Deputy Attorney General
> Office of the Attorney General
> 40 Capitol Square, SW
> Atlanta, Georgia 30334
> wbanks@law.ga.gov

Dated: May 1, 2025                    Respectfully submitted,

                                      */s/ Jared B. Magnuson*
                                      Jared B. Magnuson (GA 131189)
                                      LEHOTSKY KELLER COHN LLP
                                      3280 Peachtree Road NE
                                      Atlanta, GA 30305
                                      (512) 693-8350
                                      jared@lkcfirm.com