**UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

NETCHOICE,

*Plaintiff*,

v.

CHRISTOPHER M. CARR, in his official capacity as Attorney General of Georgia,

*Defendant*.

Civil Action No. ________________

**DECLARATION OF DENISE PAOLUCCI IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

I, Denise Paolucci, declare:

1. I am the co-owner of Dreamwidth Studios, LLC, which operates the website dreamwidth.org. I have co-owned and operated Dreamwidth since the site's inception and have worked in multiple roles for the website, including as the head of the Trust and Safety team, which handles reports of abuse and violations of policy on the site, and head of product development. I make this declaration from personal knowledge and a review of Dreamwidth's records kept in the ordinary course of business.

2. I submit this declaration in support of Plaintiff's Motion for Preliminary Injunction. I am over the age of 18 and am competent to make the statements herein. I have personal knowledge of the facts set forth in this declaration and, if called and sworn as a witness, could and would competently testify to them.

3. ***About Dreamwidth.*** Dreamwidth is an open source social networking, content management, and personal publishing website, in operation since 2009.

4. Registering an account requires an account holder to choose a username, provide an email address, and explicitly agree to the provisions of our Terms of Service. Dreamwidth's registered account holders can: (1) create public profiles; (2) post content to their "Journal" and comment on others 'posts; (3) create, join, and post content in "Communities" that function as Journals intended to focus on a specific discussion topic to which multiple account holders can contribute;

(4) send direct messages to account holders in accordance with the privacy settings those account holders have chosen; (5) post and comment in shared community forums; and (6) construct, populate, and browse a feed that presents the account holder with aggregated content posted by other account holders they have chosen to follow.

5. Dreamwidth operates according to a set of Guiding Principles and a Diversity Statement that encapsulate our business philosophy. *See* https://www.dreamwidth.org/legal/principles; https://www.dreamwidth.org/legal/diversity.

6. Dreamwidth provides a number of privacy, security, and content-control features, allowing our account holders a high degree of control over their own data and their own online experience. Our account holders can choose who sees their content, restrict access to their content in multiple ways, and control the visibility of everything they post to the site.

7. ***Business model, data sharing, and data usage.*** Dreamwidth does not accept any form of advertising and does not engage in the sale, trade, or brokering of account holders' data. Our revenue comes entirely from our "freemium" model, where approximately 20% of our account holders pay a fee to access extra services and fund the site for the approximately 80% of our active account holders who use the site on an unpaid basis. We do not accept payment to promote posts, change the

order or priority of content, or target content or posts to a subset of account holders. In fact, we do not offer any algorithmic sorting or display of timelines that adjusts the display of content based on a prediction that a particular account holder will be more or less interested in a particular piece of content, and we do not collect or store the data about account holder behavior that would allow us to make those predictions. Our Privacy Policy (https://www.dreamwidth.org/legal/privacy) and Guiding Principles promise account holders that we will collect the minimum amount of personally identifying data about them that is necessary in order to operate the service.

8. Dreamwidth.org has approximately 4 million registered accounts, and has approximately 2 million unique visitors annually. We operate on an extremely limited budget, and are staffed by myself and the company's other co-owner, two part-time employees, and approximately 200 volunteers.

9. Creating an account is necessary to use most of the website's speech-facilitating functionality and to view much of the content, although we do not require visitors to the site to create an account. Primarily, individuals must create an account to *post* content and to share their expression with an audience of their choosing. Viewing content is more mixed. For example, searching for individual posts that contain certain phrases or keywords is limited to registered account holders only. But account holders have significant control over who sees and can interact with

their content. In accordance with our principles regarding individual control over account settings and content, individual account holders can choose to restrict the visibility of their content only to specific account holders they have affirmatively granted access to the content, on a per-post basis. Account holders can choose to restrict the visibility of contact information on their profile only to registered account holders, to specific account holders they have affirmatively granted access to the contact information, or to no one at all. Account holders can choose who can comment on their posts, with the options being all site visitors (including those who do not have a site account), registered account holders only, specific account holders they have affirmatively granted access to comment to their posts, or no one at all. In addition to the public and private post settings, the owner of a Community can also choose to restrict posts only to members of the Community, and can also either allow any registered account holder to join the Community to see the content posted to it or only allow registered account holders they have affirmatively granted access to join the Community. Visitors to the site who have not created an account can read public posts made by specific account holders, access an aggregate feed of the most recent public posts made to the site (sorted in reverse-chronological order based on time of posting), look up account holders who have indicated that they are interested in certain topics or keywords, or ask to be shown a random active account. The default settings for content visibility and access permissions—which apply unless

an account holder overrides them for a particular post or for their account as a whole—are for posts to be visible to every site visitor, for registered account holders only to be able to comment in reply to a post, and for profile contact information to be visible only to registered account holders. The majority of our account holders use the ability to change post privacy settings in their account on a per-post basis, and post a mixture of publicly available and visibility-restricted content. There is no single prevailing configuration for Community accounts: our account holders have found a wide range of settings beneficial depending on the purpose of the Community. In any use case, whether a Journal or a Community, visitors to the site who haven't registered an account are only able to access a limited subset of the speech available on the site and are only able to contribute to a small subset of discussions happening on the site.

10. Dreamwidth does not deliberately target minors as an audience, and our intended audience is adults looking for a social media service that will respect their privacy. However, in order to ensure compliance with the Children's Online Privacy Protection Act (COPPA), we do collect a date of birth from all account holders at registration. When an account holder signs up for a Dreamwidth account, they must enter a username, an email address that can be verified through an automatic email link, a password, and a birthdate. The birthdate field displays a notice that "This information is required by law" and "You must enter your real birthdate". In

accordance with COPPA, we have chosen not to create a system that will attempt to verify parental consent for children under the age of 13 to maintain an account on the service. Therefore, we do not accept registration from individuals whose birthdate provided at registration indicates they are under 13 years old.

11. Accounts held by users whose birthdate indicates they are under the age of 18 have further restrictions placed on those accounts for the purposes of user safety, such as the inability to view any post or account that an account holder or Dreamwidth itself has marked as inappropriate for viewing by minors, and restricted visibility in some search results.

12. Dreamwidth does not collect address or location data of our account holders, at the time of account registration, login, or posting. We utilize a limited form of our network provider's geolocation service to block connections from certain countries that have been the source of elevated levels of network abuse, but we do not associate that geolocation data with specific accounts, and this geolocation and blocking happens before the connection even reaches us. Account holders are able to voluntarily provide their location information if they choose to do so in order to display it on their profile. Approximately 4800 Dreamwidth account holders have chosen to voluntarily identify themselves as residents of Georgia, and at least five of those account holders have provided birthdates indicating they are teenagers under the age of 16 as of the date execution of this declaration. Because we do not

store our upstream provider's geolocation data, associate it with individual user accounts, or perform geolocation on our account holders or site visitors once their connection reaches our site, this figure does not count account holders who may be located in Georgia but have not chosen to provide their location information. There is no way for us to identify how many additional account holders may be located in Georgia but have chosen not to provide their location information.

13. Because we have account holders located in Georgia and because we meet the definitions of "social media platform" as set forth in Georgia Senate Bill 351 ("the Act"), it is my understanding that Dreamwidth will be required to comply with the Act. We cannot comply with the Act without making significant, sweeping changes to the site that we do not have the resources to make and without collecting additional personally identifying data about each account that we do not currently collect. The changes the Act would require us to make to the software that runs our site would take months, if not years, of work at our current development capacity. The ongoing support burden the Act would impose upon us would also be impossible for us to meet at our current level of staffing, and we do not have the financial capabilities to add more staff.

14. ***Age Verification.*** To the best of my knowledge, there is no currently available technology available to a site with Dreamwidth's limited resources that can identify account holders who are under the age of 16. The only method that can

determine an account holder's age to a sufficient degree of confidence is to require every person who registers an account, no matter what age they claim to be, to upload government-issued identification, deanonymizing themselves and jeopardizing their privacy. There is no age-verification system that is not also a deanonymization and identity-verification system.

15. Because we do not perform geolocation on our account holders, we are unable to determine which of our account holders are located in Georgia. To identify which of our account holders are located in Georgia and whose age we must establish, we must either (a) begin performing and storing geolocation data lookups on every individual registered account to determine which account holders' connections to the site originate from Georgia, whom we must therefore presume to be residents of Georgia who must undergo deanonymization and identity verification; (b) deanonymize and perform identity verification on all account holders, no matter where their connection originates; or (c) utilize our network provider's geolocation service to prevent *any* connection originating in the state of Georgia from reaching our servers to avoid the potential that the person using that connection is under the age of 16.

16. The obligations imposed upon an online service provider in section 39-6-2 of the Act to establish whether an account holder is under the age of 16 and resident in Georgia are not limited to a one-time identity and age verification at the

time of account registration, but apply to all account holders resident in Georgia under the age of 16 at all times. Because people can move at any time and can travel to states they don't reside in, a single deanonymization and identity verification at the time of account creation would be insufficient to comply with the Act. To protect against the possibility that someone under the age of 16 had moved to Georgia after creating an account, or the possibility that someone under the age of 16 residing in Georgia was creating an account while on vacation to another state or by using a location-concealing VPN service to enhance their online privacy, we would need to perform regular deanonymization and identity verification checks of all users. This would place a significant burden and chilling effect on the speech of every person who uses Dreamwidth's services, not only people under the age of 16 in Georgia or even only on adult Georgia residents.

17. Dreamwidth's account holders are extremely privacy-conscious. Our account holders frequently cite our business practices, our commitment to refrain from selling or sharing their personal data, and our refusal to even gather any data that is not directly necessary to provide our services as the reason they've chosen to use our website. For Georgia to force us to begin collecting account-level geolocation data alone, much less to perform deanonymization and identity verification on every account, would alienate our account holders, violate the promises we have made to them, and be contrary to our principles. We do not want

to be forced to collect this data, and our account holders do not want to be forced to provide it to us.

18. Because of our strong commitment to privacy and anonymity, a large percentage of our account holders consists of marginalized people who experience heightened personal security concerns online. A nonexhaustive list of these groups include: (a) Russian or Chinese activists protesting their government's human rights abuses, who are comfortable using our site because we do not cooperate with their government's mandated censorship and do not require them to provide us personally identifying information that may be discoverable by their government; (b) disabled people who are looking for community or seeking to share information on their conditions, who are comfortable using our site because we do not require them to provide us personally identifying information that may be used against them by doctors, insurance companies, employers, etc., and because we employ significant effort to make sure the site is accessible to multiple conflicting disability access needs; (c) blind people who can use our site easily because of the significant effort we employ to ensure the site is one of the most screenreader-accessible products on the internet and because we minimize the steps it takes to create an account; and (d) people of marginalized genders and sexualities, who are comfortable using our site because we don't accept advertising and therefore are not affected by companies who are more likely to treat LGBTQ content as age-inappropriate while heterosexual

content is treated as acceptable. These groups and many others rely on our promise of privacy and anonymity to feel comfortable engaging in online speech. If Dreamwidth is forced to impose an age- or identity-verification requirement, it will have a significant chilling effect on these groups' willingness to engage in online speech. Our account holders frequently cite our commitment to preserving and defending their ability to speak anonymously and our refusal to engage in data brokering practices as a primary reason they use Dreamwidth rather than any other service.

19. ***Compliance burdens.*** Dreamwidth does not have any full-time employees. In addition to myself and my co-owner, both of whom operate Dreamwidth in our spare time, we have two part-time employees. We depend on a pool of approximately 200 volunteers, all of whom donate their time to make programmatic improvements to the site, provide technical support on a peer-to-peer basis, and protect the community from spam and malicious traffic. We do not have the resources to add more employees: because we are funded only by the account holders who choose to pay us, not by advertising, our budget is severely constrained and we are unable to absorb additional expenses. We do not have the capacity to build identity-verification or parental-consent systems. Likewise, we both do not have the financial resources to engage a third-party service to do it on our behalf,

and also object to that practice because it inherently involves the transfer of account holder data to a third party, something that is against our Guiding Principles.

20. From my twenty-two year career in online Trust and Safety, both at Dreamwidth and at prior jobs, I know that confirming a parent-child relationship is significantly complicated, difficult to do accurately, and prone to multiple forms of "social engineering" attempts by unrelated third parties to coerce a site into disclosing protected account holder information or forcing account holders out of a community. For instance, because COPPA governs a website's ability to collect data on minors under the age of 13, a relatively common social engineering vector adopted by parties who maliciously wish to fool a website into closing an individual's account is to write to the website and falsely claim the account holder is under the age of 13 and does not have parental consent to hold an account, even though the account holder is actually over the age of majority. Likewise, a relatively common social engineering vector adopted by parties who maliciously wish to obtain nonpublic information about an individual's account is to write to the website and falsely claim to be the account holder's parent, requesting access to nonpublic data about the account. The provisions of the Act codify these tactics into law, and will provide malicious third parties unrelated to a user the ability to presumptively challenge the age and identity of any account holder. This not only creates a "heckler's veto" over any speech that proves unpopular or socially disfavored,

allowing anyone the ability to force us to deanonymize any account holder whose speech offends someone and force them to prove that they are an adult, but will dramatically increase our support burden necessary to create and administer the system for these age challenges. We do not have the capacity to accept this additional support burden, nor do we have the financial resources necessary to increase staffing to increase that capacity. Because of that, the Act threatens our ability to continue operating.

21. From my twenty-two year career in online Trust and Safety, I know that familial relationships are often complicated, and identifying which person is a minor's parent or guardian with legal decision-making authority is often a complex task. For instance, if a minor has two divorced parents who disagree about whether their minor child should be permitted to hold an account on a website, the website must confirm the legal relationship between the parties and the minor involved, and determine which of the people at hand has the legal decision-making authority to provide sufficient parental consent. In a particularly contentious divorce, this can require a website to review divorce decrees, examine legal paperwork, and determine the authenticity and provenance of the documents supplied to them. Because someone who lives in Georgia may have obtained their divorce from any one of the thousands of courts across the United States, or even from another country, before moving to Georgia, this would require us to become experts in

authenticating and interpreting court documents from anywhere in the world to verify which parent has legal authority to provide parental consent. We do not have the capacity to perform this authentication, nor do we have the financial resources necessary to increase staffing to increase that capacity. For this reason, too, the Act threatens our ability to continue operating.

22. There is no national identity database that allows someone to verify a minor's identity, the legal relationship between a parent and a minor, or which parent has the authority to make binding decisions for a minor. There is no way to verify a user's identity beyond requiring the upload of government-issued identifying documents with corroborating photo or video confirmation, and many minors do not have photo ID. There is no way for a website to authenticate or verify that the documents uploaded for age- or identity-verification purposes belong to the person who is uploading them, that the person who controls the account is the same person who provided the identifying documents, or that the documents are legitimate and not a forgery. Disputes about the identity of an account holder, their age, or the legal relationship between them and the person claiming to be their parent are complex, time-consuming, costly to investigate and resolve, and unfortunately common. The Act would only increase their number. We do not have the capacity to accept this additional support burden, nor do we have the financial resources necessary to increase staffing to increase that capacity.

23. ***Vagueness of definitions.*** Section 39-6-2(e) would require us to make available upon request "a list and description of the features offered by the social media platform related to censoring or moderating content available on the social media platform, including any features that can be disabled or modified by an account holder." Like every social media service, we use a wide range of tools to prevent the abuse of our service, but the Act provides no useful definitions for which of those tools must be included in this mandated disclosure.

24. For instance, our Trust and Safety department has the ability to "suspend" any individual post, preventing it from being visible to anyone but the account holder. Likewise, it can suspend an individual account, preventing any content ever created by the account (posts or comments, whether made in the account's Journal or another Journal or Community) from being visible to anyone but the account holder. This allows us to prevent violations of the Terms of Service from being visible. In the case of egregious violations of the Terms of Service, the content will remain suspended and may be eligible for permanent deletion, while in the case of minor violations of the Terms of Service that are a small fraction of a larger post, we may afford the account holder the chance to edit out the violating content in order to have the post restored to visibility. This would, presumptively, qualify as a "feature . . . related to censoring or moderating content" for the purpose of the Act.

25. However, because of our focus on privacy and security, we provide our account holders a wide range of content moderation tools for their individual Journals. For instance, an account holder has the ability to prevent specific other account holders from contacting them on the site, to "screen" comments posted to their posts (make them visible only to the account holder and the author of the comment, not to any third party viewing the post's comments), to delete comments posted to their posts (remove the comment entirely), and to restrict who is permitted to comment on their posts. All of these settings can be changed at any time, whether at the time of posting or afterwards, and they are controlled by individual account holders. Because we provide these tools to account holders, but do not control them ourselves, I do not know if this would qualify as a "feature[] . . . related to censoring or moderating content" for the purpose of the Act.

26. Like every social media platform, we use a wide variety of automated and semi-automated tools to identify spam, inauthentic accounts, network abuse, and other forms of platform manipulation. For instance, we have tools that allow us to: (1) identify and automatically remove accounts that post URLs we have identified as likely to be included in a post or comment for the purposes of search engine reputation manipulation rather than authentic participation; (2) block account registration from countries and locations that are the source of elevated levels of network abuse; (3) block access from network connections that request a large

number of pages in such a short period of time that they are unlikely to be an actual human browsing the site but rather an automated program; (4) require individuals connecting to the site from individual network connections that have been the source of high volumes of network abuse in the past to complete a "human test" before proceeding to view the site or that block those network connections from accessing the site altogether; and (5) attempt to identify extreme changes in on-site behavior (such as a rapid increase in the number of comments that account holders have identified as spam in a short period of time) as potential indicators that an account may have been compromised by a malicious actor obtaining the password to the account. Some of these tools are content-neutral and look only at patterns of behavior; some of these tools begin with identifying a pattern of behavior and then having a member of the Trust and Safety team examine the content posted to determine whether or not the content is abusive. Because these tools are not user-facing, but do and can affect whether an account holder's account or network connection is restricted in connecting to the site and do and can result in account suspension if the account or network connection is engaging in abusive behavior, I do not know which, if any, of these tools would qualify as "features . . . related to censoring or moderating content" for the purpose of the Act.

27. Some of these automated and semi-automated tools are provided by our network providers, who analyze the reputational history and past behavior of

network connections, both content-based and non-content-based, across all of the properties they host, not only Dreamwidth. We do not have full control over whether not our network providers restrict certain network connections from accessing the site completely or force a person currently using that network connection to perform additional verification such as completing a "human test" before proceeding to the site. Because these tools can and do restrict individuals from creating an account on the site or viewing content on the site, but we are not the origin of the restrictions, I do not know which, if any, of these tools would qualify as "features . . . related to censoring or moderating content" for the purpose of the Act.

28. The Act requires us to provide "a list and description" of these features, but does not specify the level of detail we must provide. The effective enforcement of our Terms of Service and our efforts to prevent automated network abuse depend on not providing malicious actors the exact details of the methods by which we identify and take action on content that violates our Terms of Service and on content and account behavior that consists of network abuse. From my twenty-two year career in online Trust and Safety, I know that malicious actors monitor statements that sites make about their detection capabilities and the tools they use, and continually and rapidly alter their malicious behavior in ways to evade those detection capabilities. The forced disclosure of the tools and detection capabilities we use in any level of detail beyond extremely high-level descriptions would harm

our ability to detect and remove malicious behavior and to prevent malicious actors from registering accounts on the service for the purpose of abusive behavior. It would also increase the speed at which malicious actors iterate their abusive tactics, which would increase our engineering burden by forcing us to iterate our detection and removal tools more rapidly to address those new methods of abuse.

29. Network abuse is a significant issue for any site. Before we began more aggressively addressing the problem several years ago, on average 80% of our account registration daily consisted of inauthentic accounts created for the purpose of network abuse and spam. Through aggressive use of detection and moderation tools, both automated and human-guided, we have been able to lower that percentage to between 10-15% daily. To maintain that progress requires significant human labor and constant iteration of our detection and moderation tools. The existing speed of iteration of abusive tactics is already fast enough that it is a significant engineering burden, and any increase would likely exceed our current capacity to properly address the issue.

30. Because of the uncertainty and vagueness of the Act, the lack of useful definitions for many of its provisions, the impossibility of determining to any degree of certainty which account holders are residents of Georgia without collecting additional personal data we do not currently collect, the impossibility of determining which account holders are under the age of 16 without deanonymizing and forcibly

identifying every account holder of our site, and the severe degree of technical difficulty inherent in implementing the provisions of the Act, the Act will force us to err on the side of caution; require us to restrict access to the site beyond the restrictions we wish to place; require us to spend money far in excess of our available budget attempting to comply with the Act's burdensome and expensive dictates; require us to force our account holders to provide us significantly more personally identifying data than we want to collect or they want us to have; generally require us to place significant burdens on the speech, conduct, and anonymity of both adults and minors; and jeopardize our ability to continue offering the service at all.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this 28 day of Apr, 2025, in Baltimore, MD.

Denise Paolucci
Co-Owner, Dreamwidth Studios, LLC