**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | | |
|---|---|---|
| NETCHOICE, LLC | * | |
| *Plaintiff,* | * | CIVIL ACTION |
| | * | 1:25-CV-02422-AT |
| v. | * | |
| | * | |
| CHRISTOPHER M. CARR, | * | |
| in his official capacity as | * | |
| Attorney General of Georgia, | * | |
| *Defendant.* | * | |

**Defendant's Opposition to
<u>Plaintiff's Motion for Preliminary Injunction</u>**

# TABLE OF CONTENTS

**Page**

Table of Authorities.................................................................................iii

Introduction .................................................................................. 1

Background................................................................................... 5

   A.  Social media poses harm to children............................................ 5

   B.  Georgia enacts SB 351............................................................. 8

Argument..................................................................................... 9

   I.  NetChoice does not have standing............................................... 9

   II.  NetChoice is unlikely to succeed on the merits of its claims. ........ 14

      A.  NetChoice is unlikely to show a First Amendment violation. .. 14

         1.  SB 351's age verification and parental consent provisions do not violate the First Amendment. .................................... 15

         2.  SB 351's ad provision permissibly regulates commercial speech. .................................................................... 25

         3.  SB 351 is not unconstitutionally vague. ........................... 28

      B.  NetChoice cannot prove entitlement to a facial remedy for what are, at bottom, fact-specific, as-applied claims. ..................... 30

   III.  NetChoice cannot show that it will be irreparably harmed............ 33

   IV.  The balance of equities weigh against granting an injunction........ 34

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aaron Private Clinic Mgmt. LLC v. Berry*,
  912 F.3d 1330 (11th Cir. 2019) ............................................. 3, 12

*Abbott v. Perez*,
  585 U.S. 579 (2018) ................................................... 35

*Benisek v. Lamone*,
  585 U.S. 155 (2018) ................................................... 35

*Central Hudson Gas & Electric Corporation v. Public
  Service Commission*,
  447 U.S. 557 (1980) ................................................... 26

*Citibank, N.A. v. Citytrust*,
  756 F.2d 273 (2d Cir. 1985)...................................... 34

*City of Austin v. Reagan Nat'l Advert. of Austin, LLC*,
  596 U.S. 61 (2022) ..............................................19, 20

*FCC v. Fox Television Stations, Inc.*,
  567 U.S. 239 (2012) ................................................... 28

*Free Speech Coal., Inc. v. Skrmetti*,
  No. 24-6158, 2025 U.S. App. LEXIS 771 (6th Cir.
  Jan. 13, 2025) ........................................................ 32

*Free Speech Coal. v. Att'y Gen.*,
  974 F.3d 408 (3d Cir. 2020)...................................... 11

*Ga. Cemetery Ass'n v. Cox*,
  353 F.3d 1319 (11th Cir. 2003) ................................. 10

*Grayned v. City of Rockford*,
  408 U.S. 104 (1972) ...................................................................... 29

*Hotchkiss v. Cedar Rapids Community Sch. Dist.*,
  115 F4th 889 (8th Cir. 2024).................................................... 34

*Hunt v. Wash. State Apple Advert. Comm'n*,
  432 U.S. 333 (1977) .............................................................. 3, 10

*Indigo Room, Inc. v. City of Fort Myers*,
  710 F.3d 1294 (2013) ..........................................................16, 17

*J.D.B. v. North Carolina*,
  564 U.S. 261 (2011) ................................................................. 16

*Kohls v. Ellison*,
  Case No. 24-cv-3754, 2025 WL 66765 (D. Minn. Jan.
  25, 2025) ................................................................................ 34

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992) ................................................................. 10

*M.H. v. Omegle.com*,
  122 F.4th 1266 (11th Cir. 2024)................................................ 5

*Maryland v. King*,
  567 U.S. 1301 (2012) (Roberts, C.J., in chambers).................. 35

*Moody v. NetChoice*,
  LLC, 603 U.S. 707 (2024)..................................................*passim*

*Murthy v. Missouri*,
  603 U.S. 43 (2024) ............................................................... 9, 10

*NetChoice v. Bonta*,
  2024 WL 5264045 (N.D. Cal. Dec. 31, 2024) ........................... 11

*NetChoice, L.L.C. v. Fitch*,
  134 F.4th 799 (5th Cir. 2025)................................................... 32

*NetChoice, LLC v. Attorney General of Florida*,
    34 F.4th 1196 (11th Cir. 2022), *partially vacated on
    other grounds*, *Moody*, 603 U.S., SB 351's ................................. 26

*NetChoice, LLC v. Bonta*,
    2025 U.S. Dist. LEXIS 46406 (N.D. Cal. Mar. 13,
    2025) ...................................................................................... 22

*NetChoice, LLC v. Fitch*,
    738 F. Supp. 3d 753 (S.D. Miss. 2024) (noting that
    Mississippi's similar law was signed April 30, 2024
    and challenged June 7, 2024) (vacated on other
    grounds) .................................................................................. 35

*NetChoice, LLC v. Griffin*,
    2025 U.S. Dist. LEXIS 61278 (W.D. Ark. Mar. 31,
    2025) ...................................................................................22, 28

*NetChoice, LLC v. Yost*,
    2025 U.S. Dist. LEXIS 72372 (S.D. Ohio Apr. 16,
    2025) ...................................................................................... 22

*Northeastern Florida Chapter of Ass'n of General
    Contractors v. Jacksonville*,
    896 F.2d 1283 (11th Cir. 1990) ................................................ 33

*Otto v. City of Boca Raton*,
    981 F.3d 854 (11th Cir. 2020) ............................................. 9, 35

*TikTok, Inc. v. Garland*,
    145 S. Ct. 57 (2024) .............................................................20, 22

*United States v. Hansen*,
    599 U.S. 762 (2023) .................................................................. 29

*United States v. Jefferson Cnty.*,
    720 F.2d 1511 (11th Cir. 1983) .................................................. 9

*United States v. Ostrander,*
    114 F.4th 1348 (2024) ............................................................... 34

*United States v. Woodson,*
    30 F.4th 1295 (11th Cir. 2022) .................................................. 5

*Virginia v. Am. Booksellers Ass'n,*
    484 U.S. 383 (1988) ...........................................................4, 13, 14

*Wacko's Too, Inc. v. City of Jacksonville,*
    --- F.4th ----, 2025 WL 1174659 (11th Cir. Apr. 23,
    2025) .......................................................................................... 16

*Ward v. Rock Against Racism,*
    491 U.S. 781 (1989) .................................................................. 22

*Winter v. NRCD,*
    555 U.S. 7 (2008) ........................................................................ 9

*Wreal, LLC v. Amazon.com,*
    840 F.3d 1244 (11th Cir. 2016) ......................................3, 33, 34

**Statutes**

47 U.S.C. § 230.......................................................................... 30

Ark. Code Ann. § 4-88-1401....................................................... 29

2024 Ga. Laws 298, § 4-2......................................................... 8, 33

Miss. Code Ann. § 45-38-13 ....................................................... 25

O.C.G.A. § 39-6-1 ......................................................17, 18, 19, 29

O.C.G.A. § 39-6-2 ......................................................... 8, 15, 31

O.C.G.A. § 39-6-3 ..............................................................*passim*

O.C.G.A. § 39-6-4 ...................................................................... 25

# Other Authorities

Brett Cruz, *50% of American Parents Think a TikTok Ban Would Make Kids Safer Online* (Feb. 4, 2025),................. 12

Carter A. Augustine & Matt J. Morton, Education, 41 Ga. St. U.L. Rev. 209, 223–24 .................................................... 21

*New Protections to Give Teens More Age-Appropriate Experiences on Our Apps,* Meta (Jan. 9, 2024), .......................... 7

*A Toolkit Addressing the Pressure to be Perfect Perfect,* Meta...................................................................................... 8, 13

Sue Halpern*, Instagram for Kids and What Facebook Knows About the Effects of Social Media, New Yorker Social Media*, New Yorker (Sept. 30, 2021), ................... 7

*Strangers, New Study Finds*, New York Society for the Prevention of Cruelty to Children (Dec. 6, 2023) ..................... 12

## INTRODUCTION

The people of the United States did not, in 1791, give up the right to protect their children from harmful, addictive social media platforms. And even if there can be a dispute about that, this Court should not preliminarily enjoin a minimally burdensome law that produces extensive benefits, on the basis of a rushed emergency posture, where Plaintiff NetChoice waited *over a year* to file suit. Put another way, NetChoice is wrong about almost everything: it lacks standing, it lacks third-party standing, it lacks associational standing, most of what is regulated is not even speech, a facial challenge is inappropriate, and even if the State had to justify its choices under heightened First Amendment scrutiny, it could. But the Court need not decide anything more than: NetChoice cannot sit on its hands for a year and then declare "emergency" and obtain a preliminary injunction.

In 2024, the State of Georgia joined a host of other states in recognizing the unique risk that many social media platforms pose to children. Georgia also recognizes that parents—not the State and not multinational social media companies—are best able to determine what is in the interest of their children. To address these concerns, Georgia enacted SB 351, the "Protecting Georgia's Children on Social Media Act of 2024," which devised the sensible solution of requiring social media platforms to obtain parental consent for children under 16 before allowing them to become account holders.

Virtually everyone recognizes the "unprecedented dangers" of social-media platforms. *Moody v. NetChoice,* LLC, 603 U.S. 707, 716 (2024). SB 351 takes minimally burdensome steps to counter those dangers: it does not prohibit minors from accessing publicly available information or from expressing themselves, and it does not draw lines based on the content of any expression. Instead, it simply recognizes that 14- and 15-year old children should obtain their parent's consent before entering *binding contracts with multinational technology companies*, especially where it allows them to access a platform that poses real threats. SB 351 is not an attack on the First Amendment; it's common-sense and constitutional legislation to aid parents in protecting children.

SB 351 does not regulate speech—it regulates the extent to which children can contract to become account holders on social media platforms. At most, it provides content-neutral rules that satisfy intermediate scrutiny. But NetChoice's attack on SB 351 contains even more fundamental flaws that are fatal to its efforts to obtain preliminary relief.

First, NetChoice demands this Court act on an expedited basis because of the alleged "irreparable harm" that its members will suffer if 14- and 15-year olds have to ask their parents before signing up for a social media account. SB 351 was passed in March *2024*, and Governor Kemp signed the legislation on April 23, 2024—over a year before NetChoice filed suit. "A delay in seeking a preliminary injunction of even only a few months …

militates against a finding of irreparable harm." *Wreal, LLC v. Amazon.com*, 840 F.3d 1244, 1248 (11th Cir. 2016). A delay of over a *year*, from a trade group backed by the wealthiest and most powerful corporations on the planet, is dispositive. The effective date of the law is July 1, 2025. If NetChoice had filed suit when it should have, the litigation could, by this point, have been through discovery, dispositive motions, and any hearing required. This Court should not reward NetChoice's dilatory (or strategic) behavior.

Second, NetChoice is not entitled to a facial injunction, preliminary or no. NetChoice lacks standing, for many and obvious reasons. To start, NetChoice is not the real party in interest here, its *members* are. And its members—among the wealthiest and most powerful companies in the world—cannot hide behind NetChoice for the fact-specific relief they are requesting. NetChoice cannot demonstrate associational standing where individualized determinations dominate how this law interacts with the many different entities NetChoice wishes to represent. *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977) (associational standing only if individual member participation not required).

Moreover, even the social media giants themselves lack standing because the parental consent and age verification requirements *do not affect their speech*. NetChoice is really trying to stand in the stead of children and parents who might (or might not) like these requirements, but NetChoice can't assert their rights. *Aaron Private Clinic Mgmt. LLC v. Berry*, 912 F.3d 1330, 1339

(11th Cir. 2019) (third-party standing only if close identity of interests and hindrance to third party asserting rights). NetChoice is adverse to many of the parents who want requirements like this. And even for those parents or children who might challenge these requirements, they are perfectly capable of doing so themselves, obliterating any argument for third-party standing.

Combining these two points, NetChoice really wants *fourth-party* standing, and this Court should reject that artificial construction. As NetChoice is fond of doing, it throws all its eggs into the basket of *Virginia v. American Booksellers*, 484 U.S. 383 (1987), but the standing analysis there doesn't remotely map onto this case. There, the Supreme Court was concerned with the rights of book buyers who might never *see* the restricted content and had hindrances to their ability to sue. Here, by definition, parents and children *must* come across age verification and they have *no* impediments to sue.

The merits are no better for NetChoice. Most obviously, they fail because the age verification and parental consent requirements simply do not burden *their* speech. And even if we assume that they ever-so-slightly burden (and it is hard to imagine a slighter burden) users' speech, it would be a content-neutral, indirect burden on speech, subject to, at most, intermediate scrutiny, which the law easily satisfies. The benefits of this law are immense and widespread, the burden is tiny and has, at most, a completely indirect, content-neutral effect on any access to speech.

The Court should deny the motion.

## BACKGROUND

### A.   Social media poses harm to children.

There is little debate that social media poses real and immediate risks to children. *Moody*, 603 U.S. at 732 ("[S]ocial media pose dangers not seen earlier."); *M.H. v. Omegle.com,* 122 F.4th 1266, 1268 (11th Cir. 2024) ("[T]he internet in general and social media in particular pose grave risks to children"). Experts in child and clinical psychology have established that social media use in children and adolescents leads to increased depression, self-harm, anxiety, body-image problems, and mental illnesses, including psychosomatic illnesses like Dissociative Identity Disorder. *E.g.*, K. Kaliebe Decl. ¶¶ 75–80 (depression), 93–109 (bullying, sex crimes, exploitation), 115–20 (anxiety); 140 (technology-induced psychosomatic illnesses), attached as Exhibit A. There has been a "drastic increase in teen mental illness since 2010." Kaliebe Decl. ¶ 75. And that increase "occurred precisely at the time adolescents were acquiring a smartphone and more than 70% of high school students view[ed] social media every day." Kaliebe Decl. ¶ 154.

One need look no further than the federal reporter to find horrifying examples of sexual and other abuse that originates on social media platforms. *See, e.g., United States v. Woodson*, 30 F.4th 1295 (11th Cir. 2022) ("Over the course of a few hours, [the 14-year-old victim] sent Woodson several videos and more than 50 pictures, hoping with each one she sent that the extortion would end."). And that doesn't even reach the less acute but no less

catastrophic harms of children addicted to platforms that cause all manner of ill-being. In 2022, teenagers spent eight to nine hours *per day* on social media sites. Kaliebe Decl. ¶ 57. That time "displaces real-world experiences such as sleep, play, exercise, studying, reading, and in-person socialization," all of which are "critical for healthy development." *Id.* ¶ 53.

At the same time, social media companies are some of the largest and most profitable entities in the world. Meta, the parent company of Facebook, had revenue of over $164 *billion* in 2024. YouTube has over two billion users. *Moody*, 603 U.S. at 713. And nearly universally, those companies require account holders to agree to lengthy contracts that address everything from commercial (or other use) of data to choice of law/venue provisions in the event of disputes. T. Allen Decl. ¶ 16, attached as Exhibit B. Facebook, for example, requires all account holders to contractually agree that when "you share, post, or upload content . . . you grant us a non-exclusive, transferable, sub-licensable, royalty-free, and worldwide license to host, use, distribute, modify, run, copy, publicly perform or display, translate, and create derivative works of your content." Terms of Service, attached to Decl. of B. Nelson, attached as Exhibit C-1.  Similarly, Reddit contractually requires account holders to submit to exclusive jurisdiction in California. *Id.* at C-8. These contracts address substantive rights of children in Georgia, and virtually every account holder is required to agree to those contracts to create a social media account. *See* Allen Decl. ¶ 16.

These companies are aware of the unique risks their platforms pose to children. Instagram knows that many of its youngest users "felt addicted to the app and lacked the wherewithal to limit their use of it." Sue Halpern, *Instagram for Kids and What Facebook Knows About the Effects of Social Media*, New Yorker (Sept. 30, 2021), https://tinyurl.com/y3vrehyh. And Meta knows that one third of female adolescent Instagram users developed body-image issues. *Id.*; Kaliebe Decl. ¶ 121. It acknowledges multiple studies showing significant numbers of minors report negative mental and social effects from social media. Doc. 5-4 at 11–12; Kaliebe Decl. ¶ 120. And it knows minors access "age-inappropriate content." *See* Doc. 5-4 at 24.

NetChoice members' existing policies implicitly acknowledge those risks too. All NetChoice members prohibit minors under 13 from using their services. Doc. 5-3 at 6. Meta "regularly consult[s] with experts in adolescent development, psychology and mental health to help make our platforms safe and age-appropriate for young people." *New Protections to Give Teens More Age-Appropriate Experiences on Our Apps*, Meta (Jan. 9, 2024), https://tinyurl.com/342ekxrh. One of YouTube's five guiding principles for moderating minors' online experience is that "[t]he privacy, physical safety, mental health, and wellbeing of children and teenagers require special protection online." Doc. 5-5 at 4. And Instagram created a thirty-eight-page guide, the "Pressure to be Perfect Toolkit," to help young users combat "the pressure of thinking [they] need to conform to a certain set of standards" and

"mov[e] from a mindset of comparing [themselves] with others." *A Toolkit Addressing the Pressure to be Perfect*, Meta, https://tinyurl.com/5n876s9k (last accessed May 14, 2025).

### B. Georgia enacts SB 351.

Recognizing the risk posed by social media, along with the complex contractual requirements for account holders, Georgia enacted SB 351 to require social media platforms to "make commercially reasonable efforts to verify the age of account holders with a level of certainty appropriate to the risks that arise from the social media platform's information management practices or shall apply the special conditions applied to minors under this chapter to all account holders." O.C.G.A. § 39-6-2(a). It also prohibits social media platforms from permitting a child under 16 to become an account holder without parental consent. O.C.G.A. § 39-6-2(c). Finally, SB 351 limits the data that can be collected from a minor account holder's posts and prohibits the display of advertisements that are based on the minor's personal information, other than age and location. O.C.G.A. § 39-6-3.

Governor Kemp signed this legislation April 23, 2024, with an effective date of July 1, 2025. 2024 Ga. Laws 298, § 4-2 at 317. More than a year later, NetChoice filed this suit, along with their motion for preliminary injunction.

# ARGUMENT

A preliminary injunction is "an extraordinary remedy never awarded as of right." *Winter v. NRCD*, 555 U.S. 7, 24 (2008). When considering a motion for preliminary injunction, courts must "pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Id*. NetChoice has not carried its burden because it does not satisfy any of the factors: (1) "likelihood of success on the merits"; (2) "irreparable injury"; (3) the balance of the equities; and (4) "the public interest." *Otto v. City of Boca Raton*, 981 F.3d 854, 860 (11th Cir. 2020); *United States v. Jefferson Cnty.*, 720 F.2d 1511, 1519 (11th Cir. 1983) (concluding preliminary injunction is an "extraordinary and drastic remedy" that may only be granted if "the movant clearly carries the burden of persuasion as to the four prerequisites."). NetChoice almost certainly lacks standing, it will not succeed on the merits, and the equities weigh heavily against it.

## I.    NetChoice does not have standing.

A plaintiff has the burden to establish standing at the commencement of its lawsuit. *Murthy v. Missouri,* 603 U.S. 43, 56–58 (2024). At the preliminary injunction stage, the plaintiff must make a clear showing that it is likely to establish each element of standing. *Id*. NetChoice cannot carry this burden. NetChoice itself is not regulated by SB 351 and claims no injuries. Instead, NetChoice provides a Rube-Goldberg-esque theory of standing. It can assert the rights of its members, and its members can assert the rights of users and

potential users of their platforms. Compl. at ¶¶ 13–17.  Neither of these steps works and at the very least they do not work together. There is no such thing as fourth-party standing.

**A.** An associational plaintiff must show that: (1) at least one of its members would have standing to sue in its own right; (2) the interests the suit seeks to protect are germane to the organization's purpose; and, (3) neither the claim asserted nor the relief requested requires the participation of individual members. *Hunt*, 432 U.S. at 343. They must make all three showings for each claim, remedy, and part of the law it challenges. *Missouri*, 603 U.S. at 44. As always, showing the individual member would have standing to sue requires that: (1) the member has suffered an injury in fact that is; (2) fairly traceable to the defendant; and that (3) can likely be redressed by a favorable ruling. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992).

NetChoice has not explained how it can proceed without the participation of any of its individual members. *Hunt*, 432 U.S. at 343; *Ga. Cemetery Ass'n v. Cox*, 353 F.3d 1319, 1322 (11th Cir. 2003). If SB 351 is as broad as NetChoice claims, covering members as diverse as Snapchat and Pinterest, Mot. at 4, it cannot proceed without those members' participation. Assuming SB 351 does apply to both platforms, along with various other NetChoice members, it certainly doesn't apply to each member in the same way. Without individual members' participation, the Court would necessarily be guessing as to how SB 351 harms those members (if at all). Without their

participation, there is no way to balance SB 351's lawful applications against its purported unlawful applications. *See Moody*, 603 U.S. at 725.

And even if SB 351 were unconstitutional as to some NetChoice members (although it's not), there would be no way to properly tailor relief to redress that theoretical harm. It would be speculation all the way down, and a "court cannot invalidate the challenged laws if it has to speculate about their applications." *See Moody*, 603 U.S. at 788–93 (Alito, J., concurring). Because individual members are necessary to reach the merits and would be necessary to fashion any appropriate relief, NetChoice cannot prove associational standing. *See NetChoice v. Bonta*, 2024 WL 5264045, at *21–22 (N.D. Cal. Dec. 31, 2024) (rejecting NetChoice's argument that "further factual development would not be helpful" and concluding that California's "age assurance provisions is not fit for judicial review"); *see also Free Speech Coal. v. Att'y Gen.*, 974 F.3d 408, 421 (3d Cir. 2020) ("[C]onferring associational standing is improper for claims requiring a fact intensive-individual inquiry.").

**B.** But even assume, for the moment, that NetChoice had associational standing in the abstract: it has the separate problem of trying to raise the purported speech rights of third parties, not its own members. But third-party standing is, as a general matter, forbidden. A plaintiff can assert a non-party's rights only if the plaintiff's injury-in-fact gives it a "sufficiently concrete interest" in the dispute, the plaintiff has a "close relationship" with the non-

11

party, and there is a hindrance to the non-party's ability to protect their own rights. *Aaron Private Clinic Mgmt.*, 912 F.3d at 1339.

Again, assuming that associational standing satisfies the first requirement (though it should not), NetChoice can't clear either of the remaining requirements, either. NetChoice has not shown that its members have a close relationship with the users in the relevant sense of that term. To the contrary, NetChoice's members are *adverse* to the users in many instances. Most parents, for example, prefer greater ability to protect their children from social media.[1] So far from *representing* these persons, NetChoice's members are in conflict with them. On top of that, many of the "users" NetChoice seeks to represent are actually *potential* users—i.e., those who are not even using the platform yet but might and therefore would have to age verify. NetChoice's members have no relationship with these not-yet-users.

And it gets worse when you remember that *NetChoice*, not its members, is the Plaintiff. Whatever commonality a social media company's interests

---

[1] *See, e.g.*, Brett Cruz, *50% of American Parents Think a TikTok Ban Would Make Kids Safer Online*, security.org (Feb. 4, 2025), https://tinyurl.com/y6dfer6c (finding 86% of parents support laws requiring children under 18 to obtain parental consent before using social media); *Parents Voicing Ever Stronger Concerns About Risks to Children's Safety Online, From Social Media to Artificial Intelligence to Strangers, New Study Finds*, New York Society for the Prevention of Cruelty to Children (Dec. 6, 2023), https://tinyurl.com/m45tw6aw (73% of surveyed parents think federal government needs to require social media companies to provide more online safeguards for minors; 65% say existing parental controls inadequate).

might have with its users' interests, there's even less of an overlap between NetChoice's interests and that of its members' users. NetChoice exists to pursue whatever is best for its members, many among the largest and wealthiest companies in the world. Compl. at ¶ 12. And those companies know their products are in many ways harming children. *See A Toolkit Addressing the Pressure to be Perfect*, Meta, https://tinyurl.com/5n876s9k (last accessed May 14, 2025). Their interests hardly align with those of the teenagers who report mental health crises after using Instagram. Kaliebe Decl. ¶ 121. Even less so for the trade association that exists to lobby and litigate on those companies' behalf. NetChoice will, understandably, do what's best for its members. But NetChoice cannot pretend that it's fighting for the interests of its members' users.

Next, NetChoice hasn't shown that there's anything hindering those users from asserting their own rights. If an actual or prospective user doesn't want to have to verify their age to access a covered platform, nothing is stopping them from suing. Same for a minor who would like to access a covered platform without parental consent. There aren't any legal barriers, knowledge barriers, or the risk of stigma for users challenging SB 351.

NetChoice relies heavily on *American Booksellers*, but that decision gets them nowhere. Br. at 11. The plaintiffs in *Booksellers* included actual booksellers, not just an association. 484 U.S. at 388 n.3. Thus, unlike the social media platforms hiding behind NetChoice, the booksellers themselves

13

were not hiding from court. Just as important, in *American Booksellers*, the potential book buyers *couldn't* protect their own rights. Because booksellers were required to hide their adult content, buyers might not even know about it. And even if they knew about it, there was a stigmatic concern associated with taking steps (like litigation) to more easily obtain it. *See id.* at 389, 392–93.[2] No one here is worried about any stigma, and *every* user or potential user to come across the age-verification requirement will know it—in fact, that is the whole point.

## II. NetChoice is unlikely to succeed on the merits of its claims.

### A. NetChoice is unlikely to show a First Amendment violation.

Georgia's strong interest in protecting its children and its narrow law mean that NetChoice is unlikely to succeed on the merits of its First Amendment challenge. At most, SB 351 is subject to intermediate scrutiny as a content-neutral regulation—which it would pass with flying colors. And its

---

[2] Another point: after a full evidentiary hearing, the trial court found that the statute, which criminalized the display of material that is obscene or "harmful to children," impacted "between 5 and 25 percent of a typical bookseller's inventory." *Id.* at 391. In contrast, NetChoice acknowledges that its members already prohibit children younger than 13 from becoming account holders. Compl. at ¶ 35. Thus, at most, SB 351 simply prevents children between 13 and 15 from becoming an account holder, and then only without their parents' consent. O.C.G.A. § 39-6-3. This is hardly the "5 to 25 percent" of inventory at issue in *American Booksellers*.

limitation on how covered platforms use minor account holders' data for advertising is, at most, a permissible regulation of commercial speech.

### 1. SB 351's age verification and parental consent provisions do not violate the First Amendment.

NetChoice argues that because its members are technology companies, they receive special First Amendment protections not offered to brick-and-mortar establishments that pose risks to children. But just because NetChoice and its members have websites does not mean the State is without regulatory authority. The State can regulate industries for whom expression is integral without infringing on the First Amendment, especially when that regulation doesn't restrict speech. "[A] First Amendment claim will not succeed when the entity objecting … is not itself engaged in expression." *Moody*, 603 U.S. at 731.

**a.** Contrary to NetChoice's repeated protestations, *e.g.*, Mot. at 1, SB 351 does not affect—much less infringe—protected expression. It requires covered platforms to make "commercially reasonable efforts" to verify their users' ages. O.C.G.A. § 39-6-2(a). It prohibits those platforms from providing accounts to children under 16 absent parental consent. *Id.* § 39-6-2(c). And it limits what covered platforms can do with minors' personal information. O.C.G.A. § 39-6-3. In other words, it is a minor gate-keeping provision for contracts between the most powerful companies in the world *and children*.

SB 351 limits where children can go and with whom they can contract without parental consent. *Id.*; s*ee also J.D.B. v. North Carolina*, 564 U.S. 261, 273 (2011) ("The law has historically reflected the same assumption that children characteristically lack the capacity to exercise mature judgment and possess only an incomplete ability to understand the world around them."). That is not a restriction on speech any more than building codes are a restriction on speech because they apply to the New York Times.

SB 351 has nothing to do with the content of any speech, and NetChoice implicitly acknowledges as much in its complaint: "the Act permits a 15-year-old to read content on the Atlanta-Journal Constitution's website that she cannot read on Facebook without parental consent . . . and she can listen to a Taylor Swift song on Spotify but cannot listen to that same song on Youtube without parental consent." Compl. at ¶ 124. SB 351 does not make content decisions—it doesn't prohibit minors from reading the AJC or listening to Taylor Swift, or, for that matter, watching sexually-graphic or violent content. Instead, SB 351 simply recognizes that unique features of social media platforms pose serious risk to children. Just like governments can prevent children from working at strip clubs or entering places that serve alcohol, Georgia is able to limit where children can go on the internet without parental consent. *See generally Indigo Room, Inc. v. City of Fort Myers*, 710 F.3d 1294 (2013); *Wacko's Too, Inc. v. City of Jacksonville*, --- F.4th ----, 2025 WL

1174659 (11th Cir. Apr. 23, 2025). It's silent on NetChoice's speech, its members' speech, and users' speech.

Precedent makes that clear. In *Indigo Room Inc. v. City of Fort Myers*, 710 F.3d 1294 (11th Cir. 2013), Fort Myers had an ordinance that prohibited, subject to criminal penalties, individuals under 21 from entering certain establishments that served alcohol without being accompanied by a parent. *Id.* at 1298. One of those establishments, the Indigo Room, held a political event in which it solicited signatures for a petition. *Id.* at 1297. One unaccompanied nineteen-year-old was issued a citation and challenged the ordinance on First Amendment grounds. The Eleventh Circuit noted that the "text of the Ordinance does not regulate speech at all. Instead, the Ordinance regulates, among other things, the admittance of underage individuals into alcoholic beverage establishment where alcohol is being served or sold to the public." *Id.* at 1300. So too with SB 351, which simply limits minors' "admittance" to social media platforms with certain functions.

**b.** Even assuming SB 351 did implicate the First Amendment, any effect on expression would be content-neutral and subject only to intermediate scrutiny. The platforms it covers are identified without reference to the content they host or provide. Those platforms "allow[] … account holder[s] to create a profile," upload and view posts, and connect and interact with other users. O.C.G.A. § 39-6-1(6). That's true whether those users and their posts typically address politics or religion or share memes.

Further, the exemptions are content neutral because they are not based on the types of content the exempt platforms provide. Rather, the exemptions are based on the "predominant or exclusive *function*" of the platforms, *id.*— limiting young Georgians' ability to provide personal information, images, and content to an unlimited number of strangers online without their parents' knowledge. SB 351 excludes certain types of online forums based on *how* they present information to users, not the subject matter or content of that information. O.C.G.A. 39-6-1(6). For example, one exception excludes from the definition of social media platforms any "online service, website, or application" that, *inter alia*, presents "[n]ews, sports, entertainment, *or other content that is preselected by the provider.*" O.C.G.A. 39-6-1(6)(D) (emphasis added). How the content is selected matters; what that content is does not.

A comparison of the cases relied on by NetChoice illustrates this distinction. In *Moody*, for example, a Texas statute prohibited a subset of social media platforms from "censoring" a user or user's expression because of viewpoint. 603 U.S. at 721. This "content moderation" infringes upon a social media platform's ability to decide "what will be included or excluded from a compilation" and generally poses insurmountable First Amendment problems. *Id.* at 731. By interfering with the *content* of what a platform wants to include or exclude, a State is making content-based decisions. *Id.* Those concerns are not present here because SB 351 does not moderate NetChoice or its members' (or their users') content. So the "the kind of editorial

judgments" the Supreme Court has traditionally been concerned with are just not present here, "including compiling and curating other's speech" or presenting an "edited compilation of speech generated by other persons." *Id*.

The other cases are no more help to NetChoice. In *Ashcroft*, the Supreme Court invalidated a statute that made it a crime to post content on the internet that is "harmful to minors," which included sexually explicit *content*. *Ashcroft*, 542 U.S. at 698. And *Brown* is wholly inapposite. It addressed a facially content-based restriction requiring parental consent for minors to access violent video games. That is nothing like SB 351, which prohibits minors from forming an account on certain sites that, by their nature—not their content—pose substantial risks. *See* Kalibe Decl. ¶ 69. Requiring parental consent to access specific services, regardless of the content those services provide, is a world apart from placing specific *content* off limits.

NetChoice argues that neither a court nor the State can determine whether a website is subject to SB 351 without looking to the content of the website. Br. at 23. Ignoring the fact that the Supreme Court has explicitly "reject[ed] … the view that any examination of speech or expression inherently triggers heightened First Amendment" scrutiny, *City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 596 U.S. 61, 73 (2022), it's just not true here. SB 351 defines "social media platform" based on *how* a platform enables users to interact with each other.  O.C.G.A. § 39-6-1(6). At least some of the social media platform's terms of use match that definition. *See* Nelson Aff. at

5, 20-21, (Facebook Terms of Service state "We help you find and connect with people, groups, businesses, organizations, and others that matter to you across the Meta Products you use.) (Snapchat Terms of Service state "Many of our Services let you create, upload, post, send, receive, and store content."). NetChoice's argument is akin to saying that regulation of how to ship blank newspaper sheets is content-based because they will eventually be used to print content. That is obviously wrong.

NetChoice relies heavily on the exemptions, but its own examples disprove it. Br. at 24. NetChoice points to the "news, sports, entertainment" exemption, but omits the critical point that it covers "other content" as well—in other words, the point is the *form*, not the content itself. Again, *City of Austin* specifically held that merely having to examine content does not mean a restriction is content-based. *Reagan Nat'l*, 596 U.S. at 73. But under this statute, NetChoice hasn't even explained how one would have to examine the content of nearly any exemption.

**c.** Applying intermediate scrutiny, SB 351 passes muster. SB 351 must further a "substantial government interest that is unrelated to the suppression of expression," *Moody*, 603 U.S. at 740, and "does not burden substantially more speech than necessary to further" that interest, *TikTok, Inc. v. Garland*, 145 S. Ct. 57, 67 (2024). Georgia's interest in protecting minors online—from mental health crises, physical harm, and myriad other types of exploitation, *Supra* at 5-6—is nothing short of compelling. It is certainly "substantial" and

has nothing to do with limiting anyone's expression. *See Moody*, 603 U.S. at 740. Plus, age-gating social media platforms (regardless of the content they host) is necessary to protect minors online and imposes no more than a negligible burden on any expression.

Few interests are more compelling than the well-being of Georgia's children. The Supreme Court has acknowledged the "unprecedented dangers" that social-media platforms and other websites present. *Moody*, 603 U.S. at 716. The Georgia General Assembly and Governor made the State's interest known. *See, e.g.*, Carter A. Augustine & Matt J. Morton, Education, 41 Ga. St. U.L. Rev. 209, 223–24 ("We cannot continue to sit by and do nothing as young Georgians develop addictions and disorders, and suffer at the hands of online antagonists."). Experts—and NetChoice members themselves—have become increasingly alarmed at both the acute dangers (e.g., sexual or other abuse) and chronic dangers (e.g., mental disorders) that social-media presents to children. *E.g.*, Kaliebe Decl. ¶¶ 55–80, 93–102; *supra* at 5-6.

NetChoice contends that Georgia does not have a sufficiently strong interest. Br. at 26–27. But NetChoice seems to conflate the State's interest with whether SB 351 is the least restrictive means (while making the assumption that strict scrutiny applies) or, at a minimum, sets up straw men regarding the States's interests. *See* Br. at 27 ("parents have many ways to oversee their minor children online"); *see also id.* (arguing "parental authority" has been rejected as a compelling interest). In other words,

NetChoice does not contest the State's interest in protecting children from, for example, sexual or other abuse and mental disorders. Indeed, only one of the decisions NetChoice cites as enjoining allegedly similar laws relied on the State's failure to show a compelling interest, and two concluded the state had a compelling interest and a third suggested they "very well may" have shown a compelling interest. *See e.g., NetChoice, LLC v. Yost*, 2025 U.S. Dist. LEXIS 72372, at *64 (S.D. Ohio Apr. 16, 2025) (Ohio's interest in protecting children "very well may be" a compelling interest); *NetChoice, LLC v. Griffin*, 2025 U.S. Dist. LEXIS 61278, at *30 (W.D. Ark. Mar. 31, 2025) ("The Court does not doubt the reality, well supported by the record, that unfettered social media access can and does harm minors. And the State 'has a compelling interest in protecting minor children.'") (quotation omitted); *NetChoice, LLC v. Bonta*, 2025 U.S. Dist. LEXIS 46406, at *44-45 (N.D. Cal. Mar. 13, 2025) (same). The State's strong interest is undeniable.

Given that interest, a content-neutral law statute like SB 351 need only avoid burdening substantially more speech than necessary to serve an important governmental interest. *TikTok*, 145 S. Ct. at 67. It need not be the least restrictive means of achieving the government's interest. *Ward v. Rock Against Racism,* 491 U.S. 781, 798-99 (1989).

SB 351's age and parental consent provisions satisfy that standard, as they don't directly regulate speech at all and impose the most miniscule of burdens on users. *Supra* at 21. The law ensures that social media platforms

are taking reasonable steps to verify that young children have parental okay. In practice, those requirements are minor procedural burdens to access certain platforms generally. They do not restrict the actual speech on those platforms, so the maximum burden on expression is an extra step to share or access all speech through a particular medium[3]. That is certainly not broader than necessary.

Nor will the implementation of such technological tools unnecessarily or substantially burden the companies hosting these sites and applications.[4] Allen Decl. ¶ 76. Indeed, all Netchoice members prohibit accounts for children under 13. Compl. ¶ 35. Others require parental permission for those under 18 before agreeing to the terms. Nelson Decl. C-5 and C-7 (Youtube and Pinterest require parental consent for users under the age of 18). Nextdoor does not allow users under the age of 18 regardless of parental consent. *Id.* at C-8. Of course, this point does not really matter because it is not the social media giants whose speech is at issue.

_____

[3] Furthermore, SB 351 only regulates platforms in regards to "account holders." Platforms are free to make *all* content and speech available to non-account holders without the requirement of age-verification. SB 351 merely regulates these companies' ability to contract with children to collect their data and personal information without their parental consent.

[4] Indeed, many of NetChoice's members *already* provide services to users in countries with these age verification laws in place, suggesting a minimal burden on these companies to implement these same technological tools it already uses in countries with similar age-verification requirements. Allen Decl. ¶ 23.

NetChoice counters with *Ashcroft*, but that case applied *strict* scrutiny. *E.g.*, Br. at 14, 27. The Supreme Court rejected the limitations there because they were not proven to be the least restrictive means of protecting children. But Georgia need not prove the same here.

Regardless, there is ample evidence to show that the available "parental tools," Br. at 27, are woefully insufficient in protecting children from the harms of social media. For example, technology is changing so rapidly that parents cannot keep up with the new and innovative ways that technology engages with children. Kaliebe Decl. ¶ 167.  Even parents who want to monitor and restrict their children's access to harmful social media are ill-equipped to do so because, amongst other reasons, young people have grown up immersed in electronics and are adept at evading filters, blocking devices, setting up hidden accounts, and figuring out new and innovative ways to access online services their parents would prefer to restrict. Kaliebe Decl. ¶ 167. Further, young people have access to many sources of connectivity outside of their parents' control, such as public Wifi, school Wifi, and friends' networks. Kaliebe Decl. ¶ 168. Indeed, the Act is in direct response to the growing deleterious effects social media is having on our children *in spite of* those parental tools. *See generally* Kaliebe Decl.

NetChoice risibly asserts that SB 351 is overinclusive as to "any governmental interest that focuses only on minors" because "[a]ll users, adults included, must undergo age verification." Mot. at 30. That's how age

verification works. If there were a way to magically age-gate only minors, the law would mandate that instead. But in the real world, this is simply necessary and therefore not overinclusive.

SB 351 is even more narrowly tailored than other states' laws. For example, the Act only requires parental consent for account holders under the age of 16. In contrast, other States have sought to enact laws restricting anyone under 18.[5] And where the Attorney General alone enforces SB 351, O.C.G.A. § 39-6-4, other states authorize private enforcement against covered social media platforms, Miss. Code Ann. § 45-38-13. Likewise, where SB 351 mandates time for a covered platform to cure any violation, O.C.G.A. § 39-6-4(d), other states permit immediate enforcement, *see* Miss. Code Ann. § 45-38-13. SB 351 easily satisfies intermediate scrutiny.

### 2. SB 351's ad provision permissibly regulates commercial speech.

In addition to its age verification provisions, SB 351 prohibits social media platforms from displaying advertising directed at a minor user based on that user's personal information besides their age and location. O.C.G.A. § 39-6-3(1).[6] At most, that data and advertisement regulation is subject to the

---

[5] *See, e.g.,* Arizona H. B. 2661; Mississippi H. B. 1126; Texas H. B. 18.

[6] This section also prohibits those platforms from collecting or using personal information from minor users' content and account usage except what is reasonably necessary to the purpose for which that information is collected. O.C.G.A. § 39-6-3(2). Like the data access requirement in *NetChoice, LLC v. Attorney General of Florida*, 34 F.4th 1196, 1223 (11th Cir. 2022),

commercial speech test from *Central Hudson Gas & Electric Corporation v. Public Service Commission*, 447 U.S. 557, 566 (1980). That test considers whether: (1) the speech concerns lawful activity and isn't misleading; (2) the regulation serves a substantial government interest; (3) the regulation directly and materially advances that substantial interest; and (4) the regulation is no more extensive than necessary. 447 U.S. at 566. Limiting how social media platforms collect minor users' information to target them with advertisements satisfies that standard.

The advertising provision applies to all ads that are targeted to a minor user and based on that user's personal information besides their age and location. O.C.G.A. § 39-6-3(1). So it includes *some* advertising that is both lawful and truthful. But that's not fatal to the advertising provision because the other *Central Hudson* factors favor the State.

Again, the State's interest in protecting minors from online harm is paramount. *Supra* at 21. Like other social media platform features posing special risks for minors, targeted advertising plays on minors' increased susceptibility to manipulation. It exploits their inability to fully understand and consent to data collection practices. It may expose them to materials that exacerbate body image and self-esteem issues or that "encourag[es] suicide,

---

*partially vacated on other grounds*, *Moody*, 603 U.S. at 726, SB 351's data collection and use requirement in no way affects anyone's speech. It doesn't trigger First Amendment scrutiny.

self-injury, or eating disorders." Doc. 5-4 at 19. And it may expose them to a wealth of age-inappropriate content, like content celebrating "human exploitation, adult nudity or sexual activity, [and] bullying and harassment." *Id.* Mitigating that harm is a quintessential state interest, hardly outweighed by social media platforms' desire to profit from targeted advertising.

And SB 351's advertising provision directly and materially advances the State's interest in protecting minors online. It affirmatively allows targeted advertising based on some information (age and location). But it prohibits targeted advertising based on minors' other personal information, access to which would enable targeted advertising especially likely to threaten minors' privacy and wellbeing. Its prohibitions and exceptions are both targeted to protect minors' online safety and wellbeing and materially further that end.

Plus, the advertising regulation is not more extensive than necessary. For one, there's no obvious alternative to mitigating this harm besides preventing minors' exposure to it. And limiting the types of information social media platforms can collect and use to generate targeted ads is a light touch in pursuit of that goal. For another, at least some of NetChoice's members already have that exact policy—suggesting it's a far cry from being overly burdensome or speech-restrictive. Meta, for example, "restricts the options advertisers have to reach teens, as well as the information [it] uses to show advertisements to teens." Doc. 5-4 at 20. To that end, "[a]ge and location are the only two pieces of information about a teen that Meta uses to show them advertisements." *Id.*

With no daylight between Meta's policy and SB 351's requirements, the latter is hardly more restrictive than necessary.

### 3.    SB 351 is not unconstitutionally vague.

NetChoice contends that SB 351's definition of "social media platform" is unconstitutionally vague. Br. at 32–33. Of course, despite this contention, NetChoice is not only claiming associational standing based on its purported injury but can even identify which of its members SB 351 regulates. Br. at 4, 7; *see also* Br. at 3 ("Nextdoor is covered, but not if it limits discussion to 'public safety.'"). This alone is sufficient to show they have "fair notice of conduct that is forbidden," but, at a minimum, it shows they cannot satisfy the preliminary injunction standard for likelihood of success on the merits. *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012).

NetChoice also relies on an injunction entered against an Arkansas law, contending that the Arkansas law relied on "identical terms." Br. at 33. Not so. First, the Arkansas summary judgment decision primarily found fault with that law's use of "primary purpose." *NetChoice, LLC v. Griffin*, 2025 U.S. Dist. LEXIS 61278, at *44 (W.D. Ark. Mar. 31, 2025). Second, and more importantly, SB 351's exceptions are broader and more clearly defined than Arkansas's. *Compare* O.C.G.A. 39-6-1(6)(B), (F), (G), (H), (I), (J), (L), (M), (R), (S), (T), and (U), *with* Ark. Code Ann. § 4-88-1401. In short, NetChoice and LinkedIn may wish there was confusion about if LinkedIn is a social

media platform or a professional networking site, but there is no real risk of arbitrary enforcement.

And if SB 351 is as vague as NetChoice claims to believe, it can't seriously claim it can bring this suit without its individual members' participation, *supra* at 10-11; *see also* Mot. at 32–33, or that the Court has *any way* of knowing that SB 351's purported unconstitutional applications "swamp" its constitutional applications, *United States v. Hansen*, 599 U.S. 762, 774 (2023). Either SB 351 sweeps in so much protected expression that it can't be constitutionally applied to NetChoice's members or anyone else *or* NetChoice doesn't know who it applies to. It can't be both. And, in fact, it's neither. *See supra* at 25 (cite tailoring arguments above). SB 351's scope is clear: between its clear definition of "social media platform" and clarifying exceptions, there's an obvious set of core applications—as NetChoice's general counsel acknowledged. Doc. 5-3 at 14 ("[E]ach covered NetChoice member's website is what is commonly referred to as a "social media" website."); *see also Grayned v. City of Rockford*, 408 U.S. 104, 110 (1972) (despite possible vague applications, "[i]t is clear what the ordinance as a whole prohibits"). That's enough to defeat NetChoice's vagueness challenge. That there might be edge cases where SB 351's application is unclear isn't a constitutional problem—it's an unavoidable feature of every law.[7]

---

[7] NetChoice makes a bizarre argument that one subsection of SB 351, O.C.G.A. § 39-6-3(1), is preempted by 47 U.S.C. § 230. Br. at 33–34.

**B.    NetChoice cannot prove entitlement to a facial remedy for what are, at bottom, fact-specific, as-applied claims.**

When, as here, a plaintiff brings a facial challenge to a state statute, it has an extraordinary burden. *Moody*, 603 U.S. at 721. Claims of facial invalidity "often rest on speculation about the law's coverage [and] threaten to short circuit the democratic process by preventing duly enacted laws from being implemented in constitutional ways." *Id.* at 723 (internal citations omitted). Thus, to obtain a preliminary injunction, the movant has the burden of showing that a "substantial number of the law's applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Id.* at 723. NetChoice has not carried its burden under *Moody*. To carry this burden, "[t]he first step in the proper facial analysis is to assess the state laws' scope. What activities, by what actors, do the laws prohibit or otherwise regulate?" 603 U.S. at 724. Second, the analysis requires the trial court to "decide which of the laws' applications violate the First Amendment, and to measure them against the rest." *Id.* at 725.

Without any meaningful factual development—much less factual development with respect to specific companies' specific products *see* Mot. at

---

Section 230 says that "interactive computer services," like the social media platforms here, "shall [not] be treated as the publisher or speaker of any information provided by" a third party. 47 U.S.C. § 230(c)(1). But O.C.G.A. § 39-6-3(1) doesn't treat NetChoice's members like publishers. It just prohibits targeted advertising based on minors' personal information besides their age and location. O.C.G.A. § 39-6-3(1).

11–12—there's no way to identify all of the relevant applications, much less balance the theoretical unconstitutional applications against the constitutional ones. It is not enough for NetChoice to *say* that SB 351's facial unconstitutionality is "plain from the face of the law," Mot. at 11 (quotation omitted), and simply ignore the differences among NetChoice members and the factually-intensive applications of SB 351.

For example, SB 351 does not require the same type of age verification with respect to every social media platform. Instead, by its express language, "[t]he provider of a social media platform shall make *commercially reasonable efforts* to verify the age of account holders with a *level of certainty appropriate to the risks* that arise from the social media platform's information management practices." O.C.G.A. § 39-6-2(a) (emphasis added). For example, if a platform has a child-specific product, the risks are likely to be greatly reduced.

Likewise, SB 351 excludes from its definition of "social medial platforms" a service that "does not permit minors to use the platform and utilizes commercially reasonable age assurance mechanisms to deter minors from becoming account holders." At least conceivably, some of NetChoice's members already have such mechanisms in place. Reddit, for example, requires any account holder to be old enough "to form a binding contract with Reddit, or, if you are ... under the age of majority in your jurisdiction, that your legal guardian has reviewed and agrees to these terms." Nelson Aff. at

31

C-8. Similarly, YouTube's terms provide that "[i]f you are under 18, you represent that you have your parent or guardian's permission to use the Service. Please have them read this Agreement with you." Nelson Aff. at C-5. Thus, at the very least, there are factual questions about constitutional applications of SB 351—even as to members NetChoice identifies. Compl. at ¶ 16.

Circuit courts have vacated or stayed injunctions after district courts failed to follow *Moody*. For example, the Fifth Circuit vacated an injunction of a similar Texas law because the district court did not conduct the *Moody* analysis. *NetChoice, L.L.C. v. Fitch*, 134 F.4th 799 (5th Cir. 2025) ("a factual inquiry remains"). On remand, the Fifth Circuit instructed the trial court to "determine to whom the Act applies the activities it regulates, and then weigh violative applications of the Act against non-violative applications." *Id*. at 16–17. The Sixth Circuit pointed to the lack of factual development to stay an injunction of a similar Tennessee law. *Free Speech Coal., Inc. v. Skrmetti*, No. 24-6158, 2025 U.S. App. LEXIS 771, at *5-8 (6th Cir. Jan. 13, 2025). NetChoice has not carried its burden at this preliminary phase to show that the unconstitutional applications outweigh the constitutional applications of SB 351, so the Court must deny its motion for preliminary injunction.

Indeed, NetChoice does not engage in the *Moody* analysis at all. It mentions the test once, Mot. at 11, and then declines to engage it. NetChoice just *says* that "no factual development" would be helpful because "SB 351 is

unconstitutional in all conceivable applications." Br. at 11–12 (quoting *Griffin II*, 2025 WL 978607, at \*7) (cleaned up). But quoting another district court's decision to not engage with the required *Moody* analysis of a different law is not sufficient for NetChoice to carry its burden here.

### III.   NetChoice cannot show that it will be irreparably harmed.

The Court need not actually dive into any of the foregoing. "A showing of irreparable harm is the *sine qua non* of injunctive relief." *Northeastern Florida Chapter of Ass'n of General Contractors v. Jacksonville*, 896 F.2d 1283, 1285 (11th Cir. 1990). And the irreparable harm must be "imminent," because the "very idea of a *preliminary* injunction is premised on the need for speedy and urgent action to protect a plaintiff's rights before a case can be resolved on its merits." *Wreal*, 840 F.3d at 1248. But NetChoice's immense delay in bringing this action fatally undercuts its alleged need for urgency (not to mention the social media giants' unwillingness to actually litigate).

The Georgia General Assembly passed SB 351 in its final form on March 28, 2024, and the Governor signed the legislation on April 23, 2024. *See* 2024 Ga. Laws 298, § 4-2 at 317. NetChoice waited over *a year* before moving for a preliminary injunction in May 2025. Both the Eleventh Circuit and courts from around the country regularly deny preliminary injunctions for delays of similar periods. *Wreal*, 840 F.3d at 1248-49 (five month delay too long to establish irreparable harm); *Citibank, N.A. v. Citytrust*, 756 F.2d 273, 277 (2d Cir. 1985) (nine months); *Hotchkiss v. Cedar Rapids Community Sch. Dist.*,

115 F4th 889, 892 (8th Cir. 2024) (affirming denial of preliminary injunction claiming first amendment violation filed sixteen months after alleged violation); *Kohls v. Ellison*, Case No. 24-cv-3754, 2025 WL 66765 (D. Minn. Jan. 25, 2025) (denying preliminary injunction challenging statute prohibiting "deep fakes" on first amendment grounds where suit was brought sixteen months after signing of legislation).

NetChoice's members are among the largest and wealthiest technology companies in the world. Rather than litigating this matter in the normal course over the past year, it waited until mere weeks before the law goes into effect and filed hundred of pages of pleadings and declarations, without offering any explanation whatsoever for the delay. The motion for a preliminary injunction should, therefore, be denied for failing to establish irreparable harm. This is particularly true where, as here, NetChoice is pursuing a facial challenge, which is "strong medicine that has been employed by the Court sparingly and only as a last resort." *United States v. Ostrander*, 114 F.4th 1348, 1362 (2024).

## IV.  The balance of equities weigh against granting an injunction.

The balance of equities and public interest, *Otto*, 981 F.3d at 860, disfavors an injunction here, where NetChoice waited over a year to challenge SB 351. *See Benisek v. Lamone*, 585 U.S. 155, 159 (2018) (citations omitted). That is, even if the Court is not persuaded in irreparable harm, NetChoice's unjustifiable delay still weighs the balance against relief. That is especially true since NetChoice has challenged numerous other laws in a timelier

manner. *See, e.g., NetChoice, LLC v. Fitch*, 738 F. Supp. 3d 753, 761, 763 (S.D. Miss. 2024) (noting that Mississippi's similar law was signed April 30, 2024 and challenged June 7, 2024) (vacated on other grounds).

And the public interest also disfavors an injunction, regardless of NetChoice's timing problems. *See Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) ("[A]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury."); *Abbott v. Perez*, 585 U.S. 579, 602 n.17 (2018). Social media platforms continually and knowingly market products with severe health and safety risks for minor users. *Supra* at 7. And they resist every effort at regulation, expecting to be able to profit off their users without any oversight. They would prefer to forgo the time and effort necessary to verify that their products are being used only by those old enough to do so.

And their crying "free speech" doesn't change anything. SB 351 does not change what NetChoice's members say or how they say it: their feigned concern about protected expression is a red herring. The Court should deny the motion.

## Conclusion

For the reasons set out above, this Court should deny the motion for preliminary injunction.

Respectfully submitted this 16th day of May, 2025.

|  |  |
|---|---|
| CHRISTOPHER M. CARR | 112505 |
| Attorney General | |
| /s/Logan B. Winkles | |
| LOGAN B. WINKLES | 136906 |
| Deputy Attorney General | |
| CHARLES K. THIMMESCH | 322197 |
| Senior Assistant Attorney General | |
| RILEY B. LIU | 879655 |
| Assistant Attorney General | |

*Attorneys for Christopher M. Carr*

## CERTIFICATE OF COMPLIANCE

The undersigned hereby certifies that this memorandum has been prepared using Microsoft Office version 2505 (2025) and Times New Roman 14-point font in accordance with Local Civil Rules 5.1(C) and 7.1(D).

/s/ *Logan B. Winkles*
LOGAN B. WINKLES

## CERTIFICATE OF SERVICE

I hereby certify that on May 16, 2025, I served this brief by electronically filing it with this Court's ECF system, which constitutes service on all attorneys who have appeared in this case and are registered to use the ECF system.


/s/ *Logan B. Winkles*
Logan B. Winkles