IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

|  |  |  |
|---|---|---|
| NETCHOICE, | : | |
| | : | |
| Plaintiff | : | CIVIL ACTION NO. |
| | : | 1:25-cv-2422-AT |
| v. | : | |
| | : | |
| CHRISTOPHER M. CARR, | : | |
| | : | |
| Defendant. | : | |

## OPINION & ORDER

"This case presents a conflict between one of society's most cherished rights—freedom of expression—and one of government's most profound obligations—the protection of minors." *Am. Booksellers v. Webb*, 919 F.2d 1493, 1495 (11th Cir. 1990) (quoting *Am. Booksellers Ass'n v. Webb,* 643 F.Supp. 1546, 1547 (N.D. Ga. 1986)). The Supreme Court has long affirmed that the First Amendment carries no age limit. Rather, the "scrupulous protection of Constitutional freedoms of the individual" is vital "if we are not to strangle the free mind at its source and teach youth to discount important principles of our government as mere platitudes." *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 637 (1943). This lofty ideal is particularly potent in the digital age, as people of diverse backgrounds and viewpoints—and of all ages—have instant access to each other's ideas.

Still, that digital interconnectivity also poses new risks: the flood of information on social media can turn into an overwhelming tidal wave, particularly for young people in the midst of immense social and emotional development. "The novel services [social media platforms] offer make our lives better, and make them worse—create unparalleled opportunities and unprecedented dangers." *Moody v. NetChoice, LLC*, 603 U.S. 707, 716 (2024).

The Protecting Georgia's Children on Social Media Act of 2024[1] is undoubtedly aimed at protecting young people from these dangers. In attempting to do so, it also implicates at least three distinct First Amendment interests: (1) it restricts the rights of Georgia's minors to access a vital forum of information and conversation; (2) it chills the rights of all Georgians to engage in anonymous speech online; and (3) it impedes social media platforms' ability to communicate with their users.[2] Those burdens cannot comport with the First Amendment.

This Court takes seriously the acute harm that social media may potentially cause young people. Young people's pervasive exposure to social media has also been accompanied by escalating mental health challenges. That said, the core

---

[1] "This lawsuit only challenges Section 3-1 of the Act (enacting §§ 39-6-1 to -5), and thus all references to 'the Act' or 'SB351' refer only to the challenged Section 3-1." (Compl., Doc. 1 ¶ 3 n.1).

[2] The Supreme Court has long held that the First Amendment protects both the right to speak and the "right to receive information and ideas." *Stanley v. Georgia*, 394 U.S. 557, 564 (1969); *see also Griswold v. Connecticut*, 381 U.S. 479, 482 (1965) ("[T]he State may not, consistently with the spirit of the First Amendment, contract the spectrum of available knowledge."); *Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 867 (1982) ("[T]he right to receive ideas follows ineluctably from the *sender's* First Amendment right to send them[.]").

principles of the First Amendment constitute a vital shield protective of the constitutional rights of both adults and youth. "Even where the protection of children is the object, the constitutional limits on governmental action apply." *Brown v. Ent. Merchants Ass'n*, 564 U.S. 786, 804–805 (Scalia, J.).

Here, the State's proposed solution is constitutionally infirm. The State seeks to erect barriers to speech that cannot withstand the rigorous scrutiny that the Constitution requires, and the inapt tailoring of the law—which is rife with exemptions that undermine its purpose—dooms its constitutionality and calls into question its efficacy. For these reasons, the Plaintiff's Motion for a Preliminary Injunction [Doc. 5] is **GRANTED.**

## I.    BACKGROUND

### A. Social Media & Children

"Social-media platforms . . . have gone from unheard-of to inescapable. They structure how we relate to family and friends, as well as to businesses, civic organizations, and governments." *Moody*, 603 U.S. at 716. Social media's omnipresence is acutely felt by young Americans. "Up to 95% of youth ages 13–17 report using a social media platform, with more than a third saying they use social media 'almost constantly.'" Off. of the Surgeon Gen., *Social Media and Youth Mental Health: The U.S. Surgeon General's Advisory* 4 (2023), https://perma.cc/K5AC-55HG.

To be sure, the benefits of social media for both children and adults are myriad—including remaining connected to friends and family and engaging in

political and artistic discourses with a global reach. For teens who feel isolated or marginalized, online communities provide a possibility of connection not feasible in their physical space. Nevertheless, serious and urgent concerns remain about the effects of social media on young people's mental well-being. As the State represents, "[t]he link between [negative mental health] outcomes and social media appears to be causal." (Declaration of Kristopher E. Kaliebe, M.D. ("Kaliebe Decl."), Doc. 23-1 ¶ 29; *see also id.* ¶ 80 ("A longitudinal cohort study of U.S. adolescents aged 12 to 15 showed that adolescents who spent more than 3 hours on social media faced double the risk of experiencing poor mental-health outcomes, including symptoms of depression and anxiety.")).[3] Social media platforms also provide a convenient vehicle for predators to victimize children and teens in new and disturbing ways.[4] In short, despite the connectivity, community, and discourse that social media platforms foster, the data also makes clear that there are serious social harms potentially associated with its prolonged use.

---

[3] Dr. Kaliebe, who submitted a declaration on behalf of the State, is a professor at the University of South Florida, where he is a supervising physician at the Outpatient Clinic and Silver Child Development Center. He is board-certified in Psychiatry, Child and Adolescent, and Forensic Psychiatry. (Declaration of Kristopher E. Kaliebe, M.D. ("Kaliebe Decl."), Doc. 23-1 ¶¶ 4–17).

[4] *See, e.g.*, Jennifer Valentino-DeVries & Michael H. Keller, *The Men Who Use Instagram to Groom Child Influencers*, N.Y. Times (Dec. 30, 2024), https://www.nytimes.com/2024/12/30/us/child-influencers-photographers-abuse.html; *see also* Off. of the Surgeon Gen., *Social Media and Youth Mental Health: The U.S. Surgeon General's Advisory* 9 (2023), https://perma.cc/K5AC-55HG ("Nearly 6-in-10 adolescent girls say they've been contacted by a stranger on certain social media platforms in ways that make them feel uncomfortable.").

**B. SB 351**

In April 2024, Governor Brian Kemp signed into law the Protecting Georgia's Children on Social Media Act of 2024 ("SB 351" or "the Act"). The legislation made sweeping changes to the way minors can interact with social media companies, created new regulations affecting how those companies may serve minors, and implemented robust educational requirements about social media. Most relevant here, however, are three provisions that comprise the heart of Section 3-1—the section Plaintiff is challenging. O.C.G.A. §§ 39-6-1 *et seq.*

First, the Act requires that "[t]he provider of a social media platform shall make commercially reasonable efforts to verify the age of account holders with a level of certainty appropriate to the risks that arise from the social media platform's information management practices or shall apply the special conditions applied to minors [under age 16] to all account holders." O.C.G.A. § 39-6-2(a) (the "Age Verification Provision"). Second, the Act requires that "[n]o provider of a social media platform shall permit a minor to be an account holder unless such provider obtains the express consent of such minor's parent or guardian." *Id.* § 39-6-2(c) (the "Parental Consent Provision"). Third, the Act bars "[t]he display of any advertising in the minor account holder's account based on such minor account holder's personal information, except age and location." *Id.* § 39-6-3(1) (the "Advertising Provision").

The Act is enforceable exclusively by Defendant, the Georgia Attorney General, who may seek up to $2,500 for each uncured violation of the law. O.C.G.A.

§ 39-6-4(a), (c). It also contains a "safe harbor" provision, which indicates that, before initiating an enforcement action, the Attorney General will identify the at-issue violation and give the entity 90 days to cure it. *Id.* § 39-6-4(d).

The provisions at issue all hinge on the statute's definition of a "social media platform." SB 351 defines a "social media platform" as "an online forum that allows an account holder to create a profile, upload posts, view and listen to posts, form mutual connections, and interact publicly and privately with other account holders and users." O.C.G.A. § 39-6-1(6). But the Act excludes from its scope websites with the "predominant or exclusive function" of email; streaming; news, sports, or entertainment; online shopping; interactive gaming; photo editing; public safety community groups; business-to-business software; teleconferencing; cloud storage; shared document collaboration; academic, scholarly, or genealogical research; career development opportunities; and more. In other words, the Act defines both what *is* and what *is not* a social media platform.

### C. Concomitant Litigation

Georgia is hardly the first state to attempt the thorny task of regulating minors' social media use, and this Court is not the first to consider such legislation. A handful of states have enacted similar laws aimed at protecting minors online, often by requiring some form of age verification and/or parental consent for minors seeking to use social media. NetChoice has challenged at least eight other state laws—in Texas, Ohio, Arkansas, California, Utah, Florida, Mississippi, and

Tennessee. Nearly all of those state laws are currently enjoined on a preliminary or permanent basis.[5]

### D. Procedural History

Plaintiff NetChoice filed suit on May 1, 2025, and moved for a preliminary injunction that day. (Docs. 1; 5). The State filed its opposition to the preliminary injunction on May 16, and Plaintiff filed its reply on May 23. (Docs. 23; 26). On June 3, the Court held a hearing on Plaintiff's Motion, where both parties presented argument. (Doc. 27). The Court also stayed deadlines for Defendant's responsive pleadings pending the outcome of Plaintiff's Motion. (Doc. 21).

## II.    STANDING

The Court first addresses the threshold issue of Plaintiff's standing. "[T]he core component of standing is an essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan v. Defs. of Wildlife*, 504 U.S. 555,

---

[5] *See Comput. & Commc'ns Indus. Ass'n v. Paxton*, 747 F. Supp. 3d 1011 (W.D. Tex. 2024) (preliminarily enjoining provisions of Texas's HB 18 that required websites to "monitor and filter" certain categories of content for known minor users), *appeal docketed* No. 24-50721 (5th Cir. Sept. 13, 2024); *NetChoice, LLC v. Yost*, 2025 WL 1137485 (S.D. Ohio Apr. 16, 2025) (permanently enjoining Ohio's Parental Notification by Social Media Operators Act), *appeal docketed* No. 25-3371 (6th Cir. May 13, 2025); *NetChoice, LLC v. Griffin*, 2025 WL 978607 (W.D. Ark. Mar. 31, 2025) (permanently enjoining Arkansas's Social Media Safety Act), *appeal docketed* No. 25-1889 (8th Cir. May 2, 2025); *NetChoice, LLC v. Bonta*, 770 F.Supp.3d 1164 (N.D. Cal. 2025) (preliminarily enjoining California's Age-Appropriate Design Code Act), *appeal docketed* No. 25-2366 (9th Cir. Apr. 11, 2025); *NetChoice, LLC v. Reyes*, 748 F. Supp. 3d 1105 (D. Utah 2024) (preliminarily enjoining Utah's Minor Protection in Social Media Act), *appeal docketed NetChoice, LLC v. Brown*, No. 24-4100 (10th Cir. Oct. 11, 2024); *Comput. & Commc'ns Indus. Ass'n v. Uthmeier*, 2025 WL 1570007 (N.D. Fla. June 3, 2025), *appeal docketed* 25-11881 (11th Cir. June 5, 2025); *NetChoice, LLC v. Fitch*, 2025 WL 1709668 (S.D. Miss. June 18, 2025) (preliminarily enjoining law as applied to eight covered platforms). *But see NetChoice v. Skrmetti*, 2025 WL 1710228 (M.D. Tenn. July 18, 2025) (denying preliminary injunction).

560 (1992) ("*Lujan II*"). NetChoice bears the burden of demonstrating its standing to sue. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 430–31 (2021) (citing *Lujan II*, 504 U.S. at 561). To do so, NetChoice asserts two theories of standing: (1) associational standing to assert the rights of its members (i.e., regulated social media platforms) and (2) standing to assert the First Amendment rights of those platforms' users. (Mot. for PI, Doc. 5-1 at 17–18). The State contends that neither "Rube-Goldberg-esque theory" holds water given the purported distance between NetChoice and the injury it asserts. (Opp'n, Doc. 23 at 16).

### A. Associational Standing

NetChoice's first theory of standing is associational standing to sue on behalf of its members. *Baughcum v. Jackson*, 92 F.4th 1024, 1031 (11th Cir. 2024). To benefit from associational standing, an organization must establish that: (1) the organization's members would otherwise have standing to sue, (2) the interests the lawsuit seeks to protect are germane to the organization's purpose, and (3) the claims can be resolved and the requested relief granted without the participation of individual members. *Id.*

### 1. Members' Standing to Sue

The Court must start by determining whether NetChoice's members would independently have standing to sue. To demonstrate standing, a plaintiff must show (1) that he suffered an injury in fact that is "concrete, particularized, and actual or imminent;" (2) that the injury is traceable to—i.e., likely caused by—the defendant; and (3) that the injury would likely be redressed by the judicial relief

sought. *Ramirez*, 594 U.S. at 423 (citing *Lujan II*, 504 U.S. at 560–61). When a plaintiff seeks prospective injunctive relief, he must demonstrate a "'real and immediate threat' of future injury." *Focus on the Fam. v. Pinellas Suncoast Transit Auth.*, 344 F.3d 1263, 1274–75 (11th Cir. 2003) (citing *City of Los Angeles v. Lyons*, 461 U.S. 95 (1983)).

*First,* NetChoice's members could easily establish the requirement of injury-in-fact. As a "trade association for internet companies" NetChoice members include social media platforms like Meta (parent company of Facebook and Instagram), Pinterest, Reddit, X, YouTube, and Dreamwidth. (Compl., Doc. 1 ¶¶ 12, 16). These members are "social media platforms" regulated by SB 351, as they are online fora that allow account holders "to create a profile, upload posts, view and listen to posts, form mutual connections, and interact publicly and privately with other account holders and users." O.C.G.A. § 39-6-1(6). Indeed, the State has acknowledged that some of these member companies are covered by the Act. (*See, e.g.*, Opp'n, Doc. 23 at 26–27;[6] *see also* Hearing Tr., Doc. 29 at 12:24–13:3 (discussing potential compliance efforts of Google and Facebook)).

As covered "social media platforms," these companies face imminent harm from the enforcement of the Act. "[T]he law is aimed directly at [these companies], who, if their interpretation of the statute is correct, will have to take significant and

---

[6] "SB 351 defines 'social media platform' based on *how* a platform enables users to interact with each other. O.C.G.A. § 39-6-1(6). At least some of the social media platform's terms of use match that definition." (Opp'n, Doc. 23 at 26–27 (citing Facebook's and Snapchat's terms of service)).

costly compliance measures or risk [civil liability]." *Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 392 (1988) (holding booksellers' organization and two bookstores had standing to assert First Amendment rights of both themselves and their customers). Since NetChoice's member platforms have "an actual and well-founded fear that the law will be enforced against them," *id.* at 393, Plaintiff has established a concrete, particularized harm to support standing.

In addition to their "well-founded fear" of economic harm, NetChoice's members are likely to suffer an independent harm to their speech rights. "[T]o determine whether a First Amendment plaintiff has standing, we simply ask whether the operation or enforcement of the government policy would cause a reasonable would-be speaker to self-censor—even where the policy falls short of a direct prohibition against the exercise of First Amendment rights." *Speech First, Inc. v. Cartwright*, 32 F.4th 1110, 1120 (11th Cir. 2022) (cleaned up). And the Supreme Court has affirmed that "the First Amendment offers protection when an entity [is] engaging in expressive activity, including compiling and curating others' speech." *Moody*, 603 U.S. at 731. Here, the Act threatens social media platforms' ability to communicate with young audiences and burdens their ability to communicate with adults. Those burdens constitute First Amendment injuries. *See, e.g.*, *Comput. & Commc'ns Indus. Ass'n v. Uthmeier*, 2025 WL 1570007, at *8 n.8 (N.D. Fla. June 3, 2025) ("In addition to the economic cost, these compliance measures impose a First Amendment cost on YouTube by 'hinder[ing] YouTube's

ability to communicate with its users.'"). Facing these two distinct harms, NetChoice's members could establish the necessary injury-in-fact.

*Second*, there is no dispute that the traceability requirement is met. After all, the Act states that it may only be enforced by Defendant, the Georgia Attorney General. O.C.G.A. § 39-6-4.

*Third*, the redressability element is met, as a court order enjoining enforcement of the Act (whether universally or against specific NetChoice members) would shield the members from the relevant compliance costs and from chilling of their First Amendment rights. Defendant argues that "even if SB 351 were unconstitutional as to some NetChoice members . . . there would be no way to properly tailor relief to redress that theoretical harm." (Opp'n, Doc. 23 at 18). But this contention rests on the flawed proposition that this suit requires individual platforms' participation one by one. *See infra* at 12–13. It is also irrelevant, as today the Court issues a Preliminary Injunction based primarily on Plaintiff's facial challenge to the law—meaning that the injunction bars the State from enforcing the Act against all covered platforms.

The State also contends that NetChoice's members lack standing because it is the platform *users'* First Amendment interests—rather than their own—that are under threat. (Opp'n, Doc. 23 at 18–21). This position ignores the full scope of the law's effect. NetChoice's members will suffer a concrete and particularized economic harm and will have their own ability to communicate with their users chilled. Those harms—distinct from the First Amendment burdens inflicted on

social media users—establish the platforms' standing in this suit. And, as discussed *infra* at 13–15, NetChoice is properly positioned to assert the interests of platforms' users independent of its associational standing to assert its members' interests.

### 2. Germane Interests

Having established that NetChoice's members would otherwise have standing to sue, the Court turns to the other two elements of associational standing. As to the second element, the interests this suit seeks to protect are certainly germane to NetChoice's central organizational purpose. "NetChoice's mission is to promote online commerce and speech and to increase consumer access and options via the internet, while minimizing burdens that could prevent businesses from making the internet more accessible and useful." (Compl., Doc. 1 ¶ 12). Given the potential for this law to burden both minors' and adults' access to major online forums through age verification and parental consent, as well as the compliance burdens it threatens to place on social media platforms, this challenge precisely aligns with NetChoice's core purpose.

### 3. Participation of Members

Finally, the constitutionality of SB 351 can be determined without the participation of NetChoice's individual members, particularly in the context of Plaintiff's facial challenge.[7] The State contends that the Court is unable to grant the

---

[7] As discussed *infra* at 16–17, the nature of NetChoice's associational standing, combined with the pre-enforcement challenge at issue, makes an as-applied challenge to the Act infeasible at this juncture. There is simply no application of the law, at this point, for the Court to evaluate.

requested relief without the participation of NetChoice's individual members, as the law will apply to each platform differently. (Hearing Tr., Doc. 29 at 19:22–20:7). This notion both ignores the facial nature of Plaintiff's challenge and underscores the disparate application that renders the Act so problematic. NetChoice seeks systemic relief: a declaration that the law is unconstitutional. Given the plainly systemic nature of the relief sought, the State's contention is without merit.

### B. Standing on Behalf of Users

Based on its associational standing established above, NetChoice has met the Article III requirement to bring suit herein. There is also, however, the issue of NetChoice's appropriate capacity to assert the interests of not only its own members, but also its members' *users*—i.e., the children and adults whose speech rights will be individually impacted by the Act. "[V]endors and those in like positions have been uniformly permitted to resist efforts at restricting their operations by acting as advocates of the rights of third parties who seek access to their market or function." *Craig v. Boren*, 429 U.S. 190, 195 (1976) (holding licensed beer vendor had standing to assert constitutional interests of men under 21, who were barred from buying low-alcohol beer). That is the situation here: NetChoice acts on behalf of its members, who—in this case—are appropriately positioned to represent the interests of users "who seek access to their . . . function." *Id.*; *see also NetChoice, LLC v. Yost*, 2025 WL 1137485, at *13 (S.D. Ohio Apr. 16, 2025) ("Paradoxically, it is precisely NetChoice members' financial

incentive to keep minors on their platforms that suggests that they are 'fully, or very nearly, as effective a proponent' of the minors' rights to access the platforms." (quoting *Singleton v. Wulff*, 428 U.S. 106, 115 (1976) (affirming abortion providers' standing to challenge restriction on procedure on behalf of patients))).

NetChoice's ability to assert the rights of users is distinct given the nature of its claims. "[I]n First Amendment cases we have relaxed our rules of standing without regard to the relationship between the litigant and those whose rights he seeks to assert precisely because application of those rules would have an intolerable, inhibitory effect on freedom of speech." *Eisenstadt v. Baird*, 405 U.S. 438, 446 n.5 (1972) (holding advocate who distributed contraception had standing to challenge contraceptive restriction on behalf of unmarried people who were targeted by the law); *see also Uthmeier*, 2025 WL 1570007, at *9 ("When a plaintiff has standing and a cause of action to assert its own First Amendment rights, it can also raise the rights of third parties to support its merits arguments." (citing *Warth v. Seldin*, 422 U.S. 490, 501 (1975))).

At oral argument, the State asserted that "the alleged constitutional harm [to users] is just too far removed" for NetChoice to assert. (Hearing Tr., Doc. 29 at 26:8). The State relies on *Mata Chorwadi, Inc. v. City of Boynton Beach*, 66 F.4th 1259 (11th Cir. 2023), where the Eleventh Circuit held that a hotel that was compelled to put up "chronic nuisance" signs could not assert the First Amendment rights of its guests, who it alleged were discouraged from calling 911. But there, the hotel was not able to assert its patrons' rights because there was no

"causal connection between their injury and the third parties' injuries." *Mata Chorwadi*, 66 F.4th at 1266. Conversely, in cases like *Craig v. Boren*, 429 U.S. 190 (1976); *Eisenstadt v. Baird*, 405 U.S. 438 (1972); and here, "the statutory provision at issue imposed a duty on the [plaintiff] and the [plaintiff's] compliance with that duty indirectly violated third parties' rights." *Mata Chorwadi*, 66 F.4th at 1266. As such, in addition to its associational standing, NetChoice may assert the First Amendment interests of its members' users.

## III.    PRELIMINARY INJUNCTION

Having recognized Plaintiff's standing to bring suit, the Court turns to the merits of the pending Motion for a Preliminary Injunction [Doc. 5]. "To receive a preliminary injunction, the plaintiff must clearly establish the following requirements: '(1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury; (3) that the threatened injury to the plaintiff outweighs the potential harm to the defendant; and (4) that the injunction will not disserve the public interest.'" *Keister v. Bell*, 879 F.3d 1282, 1287 (11th Cir. 2018) (quoting *Palmer v. Braun*, 287 F.3d 1325, 1329 (11th Cir. 2002)). "A preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly establishes the burden of persuasion as to the four requisites." *Id.* (quoting *ACLU of Fla., Inc. v. Miami–Dade Cnty. Sch. Bd.*, 557 F.3d 1177, 1198 (11th Cir. 2009)). "At the preliminary injunction stage, a district court may rely on affidavits and hearsay materials which would not be admissible evidence for a permanent injunction, if the evidence is 'appropriate given the

character and objectives of the injunctive proceeding.'" *Levi Strauss & Co. v. Sunrise Int'l Trading Inc.*, 51 F.3d 982, 985 (11th Cir. 1995).

## A. Substantial Likelihood of Success on the Merits

The Court's analysis focuses on Plaintiff's likelihood of success on the merits. "If the movant is unable to establish a likelihood of success on the merits, a court need not consider the remaining conditions prerequisite to injunctive relief." *Johnson & Johnson Vision Care, Inc. v. 1-800 Contacts, Inc.*, 299 F.3d 1242, 1247 (11th Cir. 2002). "When a plaintiff brings multiple claims, a reviewing court must consider the plaintiff's likelihood of success on each claim in deciding a plaintiff's motion for preliminary injunction. . . . However, a plaintiff need only demonstrate a substantial likelihood of success on one of its claims to obtain a preliminary injunction." *HOA Franchising, LLC v. MS Foods, LLC*, 2023 WL 9692401, at *8 (N.D. Ga. Dec. 20, 2023) (cleaned up). The Court thus considers each of Plaintiff's claims in turn.

### 1. First Amendment Challenge

#### a. Facial vs. As-Applied Challenge

Plaintiff primarily contends that SB 351 violates the First Amendment. Plaintiff brings both facial and as-applied First Amendment challenges to the Act. (Mot. for PI, Doc. 5-1 at 18). However, the Court finds that an as-applied challenge is premature in this context. While "it is possible to bring an as-applied challenge in a pre-enforcement review of a statute that has yet to be applied . . . there are few situations where that type of challenge would prevail." *GeorgiaCarry.Org, Inc. v.*

*Georgia*, 687 F.3d 1244, 1255 n.20 (11th Cir. 2012). An as-applied challenge "necessarily requires the development of a factual record for the court to consider," which does not exist in the pre-enforcement context. *Harris v. Mexican Specialty Foods, Inc.*, 564 F.3d 1301, 1308 (11th Cir. 2009). The Court thus focuses on Plaintiff's facial challenge to the Act.

In First Amendment facial challenges, "[t]he question is whether 'a substantial number of [the law's] applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep.'" *Moody*, 603 U.S. at 723 (quoting *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 615 (2021)). In *Moody*, the Plaintiff here challenged two state laws that dictated how social media platforms could engage in content moderation. There, the Supreme Court laid out a two-step analysis to evaluate such challenges:

> When considering a facial challenge under the First Amendment, we must first "determine what the law covers." Next, we must "decide which of the laws' applications violate the First Amendment, and . . . measure them against" those that do not. In so doing, we "must explore the laws' full range of applications—the constitutionally impermissible and permissible both—and compare the two sets."

*Singleton v. City of Montgomery*, 2025 WL 1042101, at *2 (11th Cir. Apr. 8, 2025) (quoting *Moody*, 603 U.S. at 725–26) (citations omitted). The Supreme Court remanded the consolidated cases in *Moody*, finding that neither the district nor appellate courts below properly applied this inquiry. *Moody*, 603 U.S. at 743 ("[O]n remand, each court must evaluate the full scope of the law's coverage. It must then decide which of the law's applications are constitutionally permissible and which are not, and finally weigh the one against the other.").

17

As such, the Court first evaluates the scope of the law. NetChoice argues that "[a]ll aspects of the Act's speech regulations, 'in every application to a covered social media company, raise the same First Amendment issues'" by "'impos[ing] a platform-wide burden on users' right to engage in that speech' that does not 'differ between the platforms regulated.'" (Mot. for PI, Doc. 5-1 at 18–19 (quoting *X Corp. v. Bonta*, 116 F.4th 888, 899 (9th Cir. 2024); *NetChoice, LLC v. Griffin*, 2025 WL 978607, at *7 (W.D. Ark. Mar. 31, 2025))). The State maintains its position that a facial challenge is inapposite here, and that "[w]ithout any meaningful factual development—much less factual development with respect to specific companies' specific products—there's no way to identify all of the relevant applications[.]" (Opp'n, Doc. 23 at 37–38 (citations omitted)). But, as explained in recognizing NetChoice's associational standing, *see supra* at 12–13, "[t]he questions this Court must answer—whether the challenged law implicates the First Amendment, whether it is content based or content neutral, and whether it is narrowly tailored to further a significant government interest—can all be answered without reference to the intricacies of each individual platform's operation . . . ." *Uthmeier*, 2025 WL 1570007, at *9.

Next, the Court must "explore the law['s] full range of applications—the constitutionally impermissible and permissible both—and compare the two sets." *Moody*, 603 U.S. at 726. But because the Act raises the same First Amendment issues in each application, the "full range of [the Act's] applications" are those "constitutionally impermissible" ones. *See, e.g.*, *Yost*, 2025 WL 1137485, at *14

(holding all regulated platforms "are under the same statutory obligation to block access to unemancipated Ohio minors absent parental consent"). Having concluded that a facial challenge is the appropriate vehicle here, and that the law's constitutionality hinges on the same analysis in each application, the Court will now turn to that constitutional analysis.

### b. Standard of Review

The Court must determine the level of First Amendment review to apply to the provisions at issue. Laws subject to intermediate scrutiny "must be 'narrowly tailored to serve a significant governmental interest, and . . . leave open ample alternative channels for communication of the information.'" *LaCroix v. Town of Fort Myers Beach*, 38 F.4th 941, 950 (11th Cir. 2022) (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)). Strict scrutiny, conversely, "requires the Government to prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest." *Reed v. Town of Gilbert*, 576 U.S. 155, 171 (2015) (quoting *Ariz. Free Enter. Club's Freedom Club PAC v. Bennett,* 564 U.S. 721, 734 (2011)). Strict scrutiny is "the most demanding test known to constitutional law." *City of Boerne v. Flores*, 521 U.S. 507, 534 (1997).

"[T]he first question we need to consider is whether the ordinances are content-based regulations. If they are, we analyze them under strict scrutiny; if not, they receive the lighter touch of intermediate scrutiny . . . ." *Otto v. City of Boca Raton*, 981 F.3d 854, 861 (11th Cir. 2020). "Government regulation of speech is content based if a law applies to particular speech because of the topic discussed

or the idea or message expressed." *Reed*, 576 U.S. at 163 (citing *Sorrell v. IMS Health, Inc.*, 564 U.S. 552 (2011)). Furthermore, laws that are "facially content neutral[] will be considered content-based regulations of speech [if they] cannot be 'justified without reference to the content of the regulated speech.'" *Id.* at 164 (striking down as content-based restriction a provision that barred outdoor signs with various exemptions for political, religious, and other signs) (quoting *Ward*, 491 U.S. at 791).

NetChoice argues that the Act's central definition of "social media platforms" is a content-based restriction, "rendering all of the Act's speech regulations," which are dependent on that definition, "content-based." (Mot. for PI, Doc. 5-1 at 30). As a reminder, the Act defines a "social media platform" as an "online forum that allows an account holder to create a profile, upload posts, view and listen to posts, form mutual connections, and interact publicly and privately with other account holders and users." O.C.G.A. § 39-6-1(6). At first glance, that definition does not appear to reference the content of these platforms. The Act's primary downfall, however, is its exemptions—which are so voluminous that they are worth reproducing in full.

> Such term shall not include an online service, website, or application where the predominant or exclusive function is any of the following:
>
> (A) Email;
>
> (B) A service that, pursuant to its terms of use, does not permit minors to use the platform and utilizes commercially reasonable age assurance mechanisms to deter minors from becoming account holders;

(C) A streaming service that provides only licensed media that is not user generated in a continuous flow from the service, website, or application to the end user and does not obtain a license to the media from a user or account holder by agreement to its terms of service;

(D) News, sports, entertainment, or other content that is preselected by the provider and not user generated, and any chat, comment, or interactive functionality that is provided incidental to or directly or indirectly related to such content;

(E) Online shopping or ecommerce, if the interaction with other users or account holders is generally limited to the ability to upload a post and comment on reviews, the ability to display lists or collections of goods for sale or wish lists, and other functions that are focused on online shopping or ecommerce rather than interaction between users or account holders;

(F) Interactive gaming, virtual gaming, or an online service, website, or application that allows the creation and uploading of content for the purpose of interactive gaming, educational entertainment, or associated entertainment, and communications related to that content;

(G) Photograph editing that has an associated photograph hosting service if the interaction with other users or account holders is generally limited to liking or commenting;

(H) Single-purpose community groups for public safety if the interaction with other users or account holders is limited to that single purpose and the community group has guidelines or policies against illegal content;

(I) Business-to-business software;

(J) Teleconferencing or videoconferencing services that allow reception and transmission of audio and video signals for real-time communication;

(K) Cloud storage;

(L) Shared document collaboration;

(M) Cloud computing services, which may include cloud storage and shared document collaboration;

(N) Providing access to or interacting with data visualization platforms, libraries, or hubs;

(O) Permitting comments on a digital news website if the news content is posted only by the provider of the digital news website;

(P) Providing or obtaining technical support for a platform, product, or service;

(Q) Academic, scholarly, or genealogical research where the majority of the content is created or posted by the provider of the online service, website, or application and the ability to chat, comment, or interact with other users is directly related to the provider's content;

(R) Internet access and broadband service;

(S) A classified advertising service in which the provider of the online service, website, or application is limited to all of the following:

(i) Permitting only the sale of goods;

(ii) Prohibiting the solicitation of personal services;

(iii) Posting or creating a substantial amount of the content; and

(iv) Providing the ability to chat, comment, or interact with other users only if it is directly related to the provider's content;

(T) An online service, website, or application that is used by or under the direction of an educational entity, including a learning management system, student engagement program, or subject- or skill-specific program, where the majority of the content is created or posted by the provider of the online service, website, or application and the ability to chat, comment, or interact with other users is directly related to the provider's content;

(U) Peer-to-peer payments, provided that interactions among users or account holders are generally limited to the ability to send, receive, or request funds; like or comment on such transactions; or other functions related to sending, receiving, requesting, or settling payments among users or account holders; or

(V) Career development opportunities, including professional networking, job skills, learning certifications, and job posting and application services.

O.C.G.A. § 39-6-1(6). In summary, the Act excludes from regulation, among many other things, news, sports, and entertainment sites; interactive gaming platforms; streaming services; public safety community groups; and professional networking sites. In this way, the exemptions create a complicated web of what is (and is not) subject to the law.

The Act's exhaustive list of exemptions—which, under this Court's plain reading, would exempt everything from The Atlanta Journal-Constitution to Barstool Sports to Discord—belies the State's assertion that the law can be implemented "without reference to the content of the regulated speech." *Reed*, 576 U.S. at 164 (quoting *Ward*, 491 U.S. at 791). "Some facial distinctions based on a message are obvious, defining regulated speech by particular subject matter, and others are more subtle, defining regulated speech by its function or purpose. Both are distinctions drawn based on the message a speaker conveys, and, therefore, are subject to strict scrutiny." *Id.* at 163–64. In this vein, it is inexplicable how the State plans to determine which platforms serve a "predominant or exclusive function" of news, sports, entertainment, gaming, career development, academic research, or public safety without looking to the content of those websites, and the posts on them, and making highly discretionary calls about that content.[8] *See, e.g.*, *NetChoice, LLC v. Fitch*, 2025 WL 1709668, at *8 (S.D. Miss. June 18, 2025) (holding equivalent law content-based because it "specifically excludes from its reach certain providers based upon the primary purpose or subject matter of their service").

The State provides two rejoinders to the idea that the Act is a content-based regulation. First, it argues that "SB 351 does not regulate speech—it regulates the extent to which children can contract to become account holders on social media

---

[8] As discussed *infra* at 43–44, the Act's numerous exemptions also implicate serious vagueness concerns.

platforms." (Opp'n, Doc. 23 at 9). But the notion that regulations of speech can withstand strict scrutiny when disguised as regulations of contract—even if those contracts are being entered into by minors—has been rejected by the Supreme Court. *See, e.g.*, *Brown v. Ent. Merchants Ass'n*, 564 U.S. 786 (Scalia, J.) (striking down prohibition on sale of violent video games to minors as content-based speech restriction). That idea has also been rejected by peer district courts in this exact context. *See, e.g.*, *Yost*, 2025 WL 1137485, at *16 (enjoining Ohio's Parental Notification by Social Media Operators Act) ("[A] law prohibiting minors from contracting to access [] a plethora of protected speech cannot be reduced to a regulation of commercial conduct.").

In a similar vein, Defendant likens the Act to permissible ordinances restricting minors' access to specific "adult" spaces, including bars and strip clubs. (Opp'n, Doc. 23 at 23–24 (citing *Indigo Room, Inc. v. City of Fort Myers*, 710 F.3d 1294 (11th Cir. 2013) (upholding ordinance that barred individuals under 21 from entering bars without a parent); *Wacko's Too, Inc. v. City of Jacksonville*, 134 F.4th 1178 (11th Cir. 2025) (upholding ordinance that barred individuals under 21 from performing in strip clubs))). Both of these cases are distinguishable. In *Indigo Room*, the Eleventh Circuit specifically held that the ordinance "[did] not infringe on Appellants' speech in the first instance." 710 F.3d at 1300. That idea—that the law does not sufficiently implicate speech rights to invoke First Amendment protections—is inapplicable to SB 351, which regulates a primary forum of speech. In *Wacko's Too*, meanwhile, the Eleventh Circuit made clear that it found the

24

ordinance content-neutral *specifically and only because* it regulated adult-entertainment venues:

> To be sure, the ordinance's age restriction *feels* content-based. . . .
> [But] when the purpose of an adult entertainment ordinance is to
> ameliorate the secondary effects of adult businesses, intermediate
> scrutiny applies. . . . "[A]lthough these ordinances are not strictly
> content-neutral, they are simply *treated as such*."

*Wacko's Too*, 134 F.4th at 1186 (emphasis in original) (quoting *Zibtluda, LLC v.
Gwinnett County*, 411 F.3d 1278, 1285 (11th Cir. 2005)). That exception does not
apply here because, simply stated, SB 351 is not in the business of regulating adult
entertainment venues.

Defendant further defends the Act by arguing that the law regulates based
on the *creator* of a platform's content, rather than the *substance* of that content.
As the State indicated at oral argument, "[w]hat Senate Bill 351 does with these
exceptions is not discriminating based on content[,] but whether or not the *user* or
the *provider* is providing the content. And that is a really important narrowly
tailoring feature to this statute." (Hearing Tr., Doc. 29 at 69:23–70:3; Opp'n, Doc.
23 at 25–26). For example, SB 351 would presumably apply to the Georgia
Bulldogs Reddit forum, which features user-generated content. But it would
exempt Barstool Sports, which features provider-generated content. It would apply
to news coverage posted by users on X, but not news coverage posted by The New
York Times to its own liveblog.

The State is correct that several of the Act's exemptions explicitly draw a dividing line based on who is generating a platform's content.[9] But, as Plaintiff points out, many do not.[10] Moreover, this distinction is merely a different flavor of content-based regulation because it distinguishes speech based on the speaker—the platform versus the user. *See, e.g.*, *Sorrell*, 564 U.S. at 564 (striking down law that restricted disclosure of pharmacy records because "statute disfavor[ed] specific speakers"); *Citizens United v. FEC*, 558 U.S. 310, 365 (2010) ("[T]he Government may not suppress political speech on the basis of the speaker's corporate identity."). In short, whichever way the State frames it, the Act is a content-based regulation, invoking strict scrutiny.

Of the district courts to have considered state laws regulating minors' social media access, the majority have agreed with this Court that the laws are content-based restrictions subject to strict scrutiny. *See Yost*, 2025 WL 1137485, at *17–20; *Griffin*, 2025 WL 978607, at *7–10; *Fitch*, 2025 WL 1709668, at *8; *Comput. & Commc'ns Indus. Ass'n v. Paxton*, 747 F. Supp. 3d 1011, 1032–34 (W.D. Tex. 2024); *NetChoice, LLC v. Bonta*, 770 F.Supp.3d 1164, 1185–92 (N.D. Cal. 2025); *NetChoice, LLC v. Reyes*, 748 F. Supp. 3d 1105, 1121–24 (D. Utah 2024). But one— our sister court in the Northern District of Florida—found that state's law likely to

---

[9] *See, e.g.*, O.C.G.A. § 39-6-1(6)(D) ("News, sports, entertainment, or other content that is preselected by the provider and not user generated"); (Q) ("Academic, scholarly, or genealogical research where the majority of the content is created or posted by the provider").

[10] *See, e.g.*, O.C.G.A. § 39-6-1(6)(F) ("Interactive gaming [and] virtual gaming"); (V) ("Career development opportunities").

be a content-neutral regulation subject to intermediate scrutiny. *See Uthmeier*, 2025 WL 1570007, at \*11–14.[11] Importantly, however, the Florida law does not contain the same plethora of exemptions as the Georgia law—which are significant parts of the central definition, dictate the Act's scope, and reveal SB 351's content-based framework. *Compare* Fla. Stat. §§ 501.1736 *et seq*, *with* O.C.G.A. §§ 39-6-1 *et seq*. Florida's law instead defines "social media platforms" by the demographics of their users, their use of selective algorithms, and their deployment of "addictive features." Fla. Stat. § 501.1736(1)(e). Given this key difference between the two laws, this Court's determination that the Georgia law is content-based and subject to strict scrutiny is easily reconcilable with the decision in the Florida district court.

### c. Survival Under Strict Scrutiny

Because all of Section 3-1 relies on the Act's definition of "social media platforms," it is intrinsically content based, including each of the three key provisions. *See* O.C.G.A. §§ 39-6-2(a) (Age Verification Provision); 39-6-2(c) (Parental Consent Provision); 39-6-3(1) (Advertising Provision). Thus, taking into account both the content-based definition of "social media platforms" and the burdens imposed by these provisions, the Court proceeds to evaluate whether the Act can survive strict scrutiny.

This Court does not intend to minimize either the established detriments of social media or the State's legitimate interest in protecting young people. Nor is

---

[11] The Court notes that the Northern District of Florida found the law "not sufficiently tailored even under intermediate scrutiny" and thus that "it would also necessarily fail if the appropriate standard were strict scrutiny." *Uthmeier*, 2025 WL 1570007, at \*14 n.21.

such an analysis necessary herein. "[L]aws abridging First Amendment rights must be sufficiently precise," as "[p]recision of regulation must be the touchstone in an area so closely touching our most precious freedoms.'" *HM Fla.-ORL, LLC v. Governor of Fla.*, 137 F.4th 1207, 1225 (11th Cir. 2025) (citing *NAACP v. Button*, 371 U.S. 415, 438 (1963)). Because of the enormous burdens imposed on the First Amendment rights of children, adults, and social media platforms—along with the significant tailoring issues inherent in the law—even the State's serious interest here cannot justify SB 351 under the First Amendment's rigorous standards. *See Uthmeier*, 2025 WL 1570007, at *15 ("Even assuming the significance of the State's interest in limiting the exposure of youth to websites with 'addictive features,' the law's restrictions are an extraordinarily blunt instrument for furthering it.").

### i. Burdens on Speech

*First*, and most crucially, the Parental Consent Provision (which, itself, relies on the operation of the Age Verification Provision) would dramatically curb minors' ability to speak and access to speech. The Supreme Court has, for decades, affirmed the importance of the First Amendment rights of young people. *See, e.g.*, *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969) (holding students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate"). But the Act would create a significant—and, for at least some young people, insurmountable—barrier to entry for online speech. The internet broadly—and social media specifically—represents "the most important place[] . . . for the exchange of views." *Packingham v. North Carolina*, 582 U.S. 98,

104 (2017). For this reason, "the right of parents to enlist the aid of the state to shield their children from ideas of which the parents disapprove cannot be plenary []." *Am. Amusement Mach. Ass'n v. Kendrick*, 244 F.3d 572, 577 (7th Cir. 2001) (Posner, J.).

*Brown* made this more than clear. There, the Supreme Court considered—and struck down—a California law that prohibited the sale or rental of "violent video games" to minors. The court understood the law as a content-based regulation subject to strict scrutiny, and found it insufficiently tailored to meet that rigorous standard.[12] *Brown*, 564 U.S. at 786. In short, *Brown* held that a state may not "prevent children from hearing or saying anything without their parents' prior consent." *Id.* at 795 n.3. Defendant has not explained how SB 351 is distinct, merely saying that *Brown* addressed a "facially content-based restriction" while the Act merely "prohibits minors from forming an account on certain sites . . . ." (Opp'n, Doc. 23 at 26). But as the Court has already explained *supra* at 23–24, disguising a speech regulation as a commercial regulation does not exempt it from First Amendment scrutiny—as the *Brown* court's invalidation of a commercial regulation makes clear. In short, the Supreme Court has explicitly held that regulations so severely burdening young people's First Amendment rights cannot withstand strict scrutiny. Defendant has not rebutted that principle.

---

[12] The serious tailoring issues that doomed the state law in *Brown* are nearly identical to those here, as discussed *infra* at 37–38.

*Second*, in addition to curbing children's speech rights, the law's Age Verification Provision would also impose an invasive burden on *all* Georgians' online speech by requiring their submission of personal information to access any social media platforms. The government undoubtedly has an interest in protecting children from harmful content, but it may not vindicate that interest by "suppress[ing] a large amount of speech that adults have a constitutional right to receive and to address to one another." *Reno v. ACLU*, 521 U.S. 844, 846, 874 (1997) (holding provision that barred transmission of "obscene or indecent" content to minors was "unacceptably heavy burden on protected speech"). On its face, the Act's Age Verification Provision merely requires platforms to "make commercially reasonable efforts to verify the age of account holders." O.C.G.A. § 39-6-2(a). But the possibility that Georgians would have to submit government-issued identification to access a central forum for speech is of grave concern to the Court, and is thus worth discussing in some detail.

"[I]s the age verification going to require government identification?  [T]he answer to that is clearly no," according to the State. (Hearing Tr., Doc. 29 at 11:20–12:2). But that conclusion is not so clear.[13] (*See, e.g.*, Declaration of Alexandra N. Veitch ("Veitch Decl."), Doc. 5-5 ¶ 45 ("[G]iven the lack of clarity regarding what level of certainty would be appropriate and the lack of a meaningful safe harbor with respect to age verification, businesses will be incentivized or even compelled

---

[13] This contradiction is also central to the Court's vagueness concerns. *See infra* at 42–44, Section III.A.2.

to resort to more intrusive methods of age verification—such as using facial recognition matching against government-issued IDs before any user can create an account—to protect themselves against potential liability.") (Director of Public Policy for the Americas, YouTube); Declaration of Denise Paolucci ("Paolucci Decl."), Doc. 5-6 ¶ 22 ("There is no age-verification system that is not also a deanonymization and identity-verification system.") (co-owner, Dreamwidth Studios, LLC)).

The Court agrees that, given the Act's novelty and lack of clarity, the Age Verification Provision would incentivize social media platforms to err toward the side of caution to avoid liability. The most cautious option, it seems, would be to collect government-issued identification. And the State's own admission that the Act would be applied disparately implies that for *some* companies, collecting identification would be expected as a "commercially reasonable" compliance mechanism. (Hearing Tr., Doc. 29 at 19:23–20:2 ("[T]he truth is, as this statute might get applied, there is a conceivable world where what is commercially reasonable for Facebook, you know, one of the largest corporations in the world, might be different than what is commercially reasonable for Dreamwidth.") (counsel for the State)).

Even the State's own expert indicates that "[a]ge verification and age inference can be achieved by, among other methods, reference to drivers' licenses, passports, electoral rolls, credit reports, cellphone-network records, banking, and credit-card records" or by "creat[ing] a digital identity." (Declaration of Tony Allen

("Allen Decl."), Doc. 23-2 ¶ 32).[14] "Age estimation, on the other hand, can be achieved by analyzing facial images, voiceprints, or other personalized evidence." *Id.* ¶ 33. SB 351 requires social media platforms to "make commercially reasonable efforts to *verify* the age of account holders." O.C.G.A. § 39-6-2(a) (emphasis added). This distinction, thus, supports the Court's finding that social media platforms will be either required or incentivized to collect government-issued identification. And the fact that the Parental Consent Provision explicitly lists the collection of government-issued identification or financial information as one way to confirm a parent's relationship and consent further exacerbates the legitimate concern that such a mechanism is the expectation for age verification. *See id.* § 39-6-2(c)(4).

"Even when a statute only indirectly limits protected adult speech—such as by making it more difficult for adults to access . . . the law still must do so narrowly and in proportion to the government's interest in shielding children . . . ." *HM Fla.-ORL, LLC.*, 137 F.4th at 1230. The Age Verification Provision, by contrast, imposes a sweeping burden on adults' access to speech by requiring "commercially reasonable" age verification mechanisms for *all* users, creating a broad-reaching chilling effect. *See, e.g., Griffin*, 2025 WL 978607, at *8. "That's how age verification works," the State maintains. (Opp'n, Doc. 23 at 31–32). But that wide

---

[14] Mr. Allen, who submitted a declaration on behalf of the State, is a Global Subject Matter Expert on Age Assurance Systems and Founder and Executive Director of the Age Check Certification Scheme. (Declaration of Tony Allen ("Allen Decl."), Doc. 23-2 ¶¶ 4–7).

sweep is precisely the problem, and it cannot comport with the narrow tailoring strict scrutiny requires.

The Act's Age Verification and Parental Consent Provisions also create serious data privacy vulnerabilities by requiring social media platforms to collect immense amounts of personal data—whether it be government identification, or photos and recordings for biometric verification. The Parental Consent Provision, for example, contemplates confirming parental consent by "[c]ollecting information related to the minor's parent's or guardian's government issued identification or financial or payment card information and deleting such information after confirming the identity of the parent or guardian." O.C.G.A. § 39-6-2(c)(4). In other words, "websites will be required to obtain and store sensitive personal identifying information about minors and their parents or guardians. This will significantly amplify the risks of data security breaches, necessitating even more investment in heightened cybersecurity measures." (Declaration of Bartlett Cleland ("Cleland Decl."), Doc. 5-3 ¶ 26 (general counsel, NetChoice)); *see also Bonta*, 770 F. Supp. 3d at 1202; *Griffin*, 2025 WL 978607, at *8. Those cybersecurity risks further deter users from social media platforms, creating an independent chilling effect on their speech and access to information.

At oral argument, the State pointed out that the Act requires platforms to delete government identification or financial information. (*See* Hearing Tr., Doc. 29 at 29:17–24 (citing O.C.G.A. § 39-6-2(c)(4))). Notably, however, that provision appears to apply *only* to information collected to confirm parental consent—not

government identification that platforms may have to collect from *all* users to comply with the Age Verification Provision. Furthermore, that requirement risks being unworkable for regulated entities by making it difficult for them to establish to the State that they have complied with SB 351's requirements. (*See, e.g.*, Veitch Decl., Doc. 5-5 ¶ 49 ("[I]t would be difficult to prove the parent-child relationship by relying only on 'government-issued identification' . . . [a]nd it would be difficult to later prove compliance to Defendant if YouTube is required to 'delet[e] that information' afterwards." (Director of Public Policy for the Americas, YouTube))).

Separately, but equally important, a universal age verification requirement for Georgians using social media would potentially all but kill anonymous speech online. The Supreme Court has long recognized that "an author's decision to remain anonymous, like other decisions concerning omissions or additions to the content of a publication, is an aspect of the freedom of speech protected by the First Amendment." *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 342 (1995); *see also Talley v. California*, 362 U.S. 60, 64 (1960) ("Anonymous pamphlets, leaflets, brochures and even books have played an important role in the progress of mankind."). "Age-verification schemes . . . 'are not only an additional hassle,' but 'they also require that website visitors forgo the anonymity otherwise available on the internet.'" *Griffin*, 2025 WL 978607, at *8 (quoting *Am. Booksellers Found. v. Dean*, 342 F.3d 96, 99 (2d Cir. 2003)); *see also ACLU of Ga. v. Miller*, 977 F. Supp. 1228, 1235 (N.D. Ga. 1997) (preliminarily enjoining state law barring individuals from "falsely identify[ing]" themselves online, which "induced self-

34

censorship"). In short, requiring users to tie their online views to their identity would undoubtedly chill speech—and, likely, would disproportionately chill speech on the most controversial issues.[15]

*Third*, the Act would also impose significant compliance costs upon social media platforms, threatening their ability or willingness to access audiences. The Eleventh Circuit has explicitly recognized the chilling effect of compliance costs—even to the point of silencing speakers altogether. *HM Fla.-ORL, LLC*, 137 F.4th at 1239 ("Whether online or not, age-verification requirements 'impose costs' on speakers or the venues that host them: the costs of checking the identification of those who have it and keeping out those who don't. This cost would, on the margin, make some performances financially nonviable." (citations omitted)). That risk of financial nonviability—though it may seem implausible for those social media platforms operated by billion-dollar technology companies—poses a real threat for smaller platforms like Dreamwidth, which represents that "[t]he ongoing support burden the Act would impose upon us would also be impossible for us to meet at

---

[15] *See, e.g.*, Declaration of Denise Paolucci ("Paolucci Decl."), Doc. 5-6 ¶ 18 ("Because of our strong commitment to privacy and anonymity, a large percentage of our account holders consists of marginalized people who experience heightened personal security concerns online. A nonexhaustive list of these groups include: (a) Russian or Chinese activists protesting their government's human rights abuses, who are comfortable using our site because we do not cooperate with their government's mandated censorship and do not require them to provide us personally identifying information that may be discoverable by their government [and] (b) disabled people who are looking for community or seeking to share information on their conditions, who are comfortable using our site because we do not require them to provide us personally identifying information that may be used against them by doctors, insurance companies, employers, etc. . . .") (co-owner, Dreamwidth Studios, LLC).

our current level of staffing, and we do not have the financial capabilities to add more staff." (Paolucci Decl., Doc. 5-6 ¶ 13 (co-owner, Dreamwidth Studios, LLC)). And bigger companies may simply choose to stop operating in Georgia, rather than face the compliance costs. (*See, e.g.*, Mot. for PI, Doc. 5-1 at 42). In this way, the burden on platforms creates an additional, independent chilling effect on online speech.

In addition to these significant burdens on the First Amendment rights of social media platforms, young people, and all users, SB 351 would also create practical difficulties for parents in Georgia. As the Court expressed at oral argument, the law will require parents to expend time and effort to provide consent for each and every social media platform a young person wants to use. (Hearing Tr., Doc. 29 at 64:4–65:20). Based on the acceptable mechanisms outlined in the Act, some platforms may require only a signed form or phone call; others may require a video call, or provision of government-issued identification or financial information. This is not an insignificant request of parents—especially when multiplied by the number of various social media platforms a young person may cycle through.

Perhaps more concerning, however, is the imposition of state requirements on how parents raise their children. "Th[e] primary role of the parents in the upbringing of their children is now established beyond debate as an enduring American tradition." *Wisconsin v. Yoder*, 406 U.S. 205, 232 (1972) (striking down law mandating public school attendance). But the Act creates a level of state

supervision over the parent–child relationship, necessarily dictating how parents should interact with their children and supervise their children's online lives— keeping in mind, of course, that some of these children are closer to young adults. "While some of the legislation's effect may indeed be in support of what some parents . . . actually want, its entire effect is only in support of what the State thinks parents *ought* to want." *Brown*, 564 U.S. at 804. Indeed, the law's requirement of parental oversight creates constraints on how to parent and, in doing so, risks disrupting parents' relationships with their children. Though not a First Amendment interest, this impact merits consideration.

### ii. Tailoring Concerns

Weighing these significant burdens on speech, the Court finds that the Act suffers from serious tailoring issues that doom its ability to survive strict scrutiny. "When the Government restricts speech, the Government bears the burden of proving the constitutionality of its actions." *FEC v. Cruz*, 596 U.S. 289, 305 (2022) (quoting *McCutcheon v. FEC*, 572 U.S. 185, 210 (2014)). And to survive the rigors of strict scrutiny, "the Government [must] prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest." *Reed*, 576 U.S. at 171. Narrow tailoring requires the government to employ the least restrictive alternative to further its interests. *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 813 (2000).

As Justice Scalia potently articulated in *Brown*, laws that face tailoring issues on both ends of the spectrum rarely survive strict scrutiny:

California's legislation straddles the fence between (1) addressing a
serious social problem and (2) helping concerned parents control
their children. Both ends are legitimate, but when they affect First
Amendment rights they must be pursued by means that are neither
seriously underinclusive nor seriously overinclusive. As a means of
protecting children from portrayals of violence, the legislation is
seriously underinclusive, not only because it excludes portrayals other
than video games, but also because it permits a parental or avuncular
veto. And as a means of assisting concerned parents it is seriously
overinclusive because it abridges the First Amendment rights of
young people whose parents (and aunts and uncles) think violent
video games are a harmless pastime. And the overbreadth in achieving
one goal is not cured by the underbreadth in achieving the other.
Legislation such as this, which is neither fish nor fowl, cannot survive
strict scrutiny.

*Brown*, 564 U.S. at 805 (citations omitted). The Act is similarly flawed: it is both

overinclusive and underinclusive.

"Underinclusiveness raises serious doubts about whether the government is

in fact pursuing the interest it invokes[.]" *Brown*, 564 U.S. at 802. Perhaps the

most blatant way in which the Act is underinclusive is its 22 exemptions. O.C.G.A

§ 39-6-1(6)(A)–(V). In carving out nearly two dozen exceptions to the law, the State

belies its purported aim to prevent minors from "entering binding contracts with

multinational technology companies." (Opp'n, Doc. 23 at 9). Under the Act, a 14-

year-old would be able to enter into a binding contract to use Gmail without

parental consent, but not YouTube—even though both are owned by Google. More

to the point, if the aim of the law is to restrict minors' access to the harmful effects

of addictive online social forums, the Act contains a number of loopholes that

reveal its under-inclusiveness and the disparities in its requirements. For example,

the law exempts "interactive gaming" and "virtual gaming" platforms from

regulation, even though such platforms represent massive online communities with, presumably, significant young populations. *See, e.g.*, *About Discord*, Discord, https://discord.com/company (representing a user base of "over two hundred million people"). In this way, the Act's copious exemptions create serious and fatal tailoring issues and inconsistencies in legal treatment.

In the same vein, the law's "commercially reasonable" standard of enforcement—though apparently designed to ease compliance burdens—only further reveals its fatal under-inclusiveness. Again, SB 351 mandates that "[t]he provider of a social media platform shall make commercially reasonable efforts to verify the age of account holders with a level of certainty appropriate to the risks that arise from the social media platform's information management practices." O.C.G.A. § 39-6-2(a). But as the State's counsel highlighted at oral argument, the ambiguity of the "commercially reasonable" standard is likely to result in disparate enforcement:

> [T]he truth is, as this statute might get applied, there is a conceivable world where what is commercially reasonable for Facebook, you know, one of the largest corporations in the world, might be different than what is commercially reasonable for Dreamwidth. And the way I understand Dreamwidth, you know, I think they have three employees and several hundred volunteers compared to a company that has a market cap of over a trillion dollars. What is commercially reasonable for those two could be different.

(Hearing Tr., Doc. 29 at 19:23–20:7).

In the first instance, the State's self-professed disparate enforcement invites selective regulation of social media platforms, rendering it unconstitutional. *See Bell v. City of Winter Park*, 745 F.3d 1318, 1324 (11th Cir. 2014) ("A grant of

unrestrained discretion to an official responsible for monitoring and regulating First Amendment activities is facially unconstitutional."). Moreover, as it relates to the Act's tailoring issues, the disparate application to companies of different sizes again reveals how the law is underinclusive. Under the State's own example, Facebook and Dreamwidth would face different levels of rigor in verifying users' ages, even though both require users to agree to terms of service; both have a minimum age of 13 years old; and both could potentially contain content harmful to young people. (*See* Opp'n, Ex. C, Doc. 23-3 at 4 (Facebook Terms of Service), 169 (Dreamwidth Terms of Service)).[16] In short, the inconsistent application of the law to social media platforms that pose the same dangers to young people underscores the flawed tailoring of the Act.

Furthermore, the State's own acknowledgement regarding the potentially lax enforcement of the Parental Consent Provision—including the requirement of only one parent's consent and the laissez-faire approach to confirming the parental

---

[16] Defendant also appeared to imply during oral argument that, because the Act merely regulates social media platforms' contract relationships with minors, those companies could sidestep this regulation by removing their terms of service. (*See* Hearing Tr., Doc. 29 at 39:1–9 ("[S]o if Facebook or YouTube or Snapchat wants to open up all of its content to the whole world without having someone sign up for an account, they can do that. So it is not the content of the speech that is at issue. But they don't do that. They require anyone who wants to look at the content or post content sign up for a contract. And that is what is problematic with what social media does.")). The idea that social media would be safer for children if companies imposed fewer guardrails on engagement both defies logic and emphasizes under-inclusion concerns. (*See id.* at 74:17–19 ("[I]f Meta became 4Chan tomorrow that would be far worse for the nation's youth than what defendant says is true today.") (counsel for NetChoice)).

relationship via self-attestation—further "raises serious doubts about whether the government is in fact pursuing the interest it invokes." *Brown*, 564 U.S. at 802.

> [A]s it relates to NetChoice's obligation, I think by the plain language the consent of a single parent is sufficient. . . . You also asked, as I understand, well, what level of certainty do we have to be sure of that the parent—the person is who they say they are? . . . I think there is a way to read the statute that self-attestation of a parent is likely sufficient to accomplish those goals. Again, the statute talks about what is commercially reasonable. I don't think anyone expects a social media provider to have a 100 percent accuracy. I mean, I think we can all conceive of, you know, an older brother or a friend who may, you know, try to do something like that. But I don't think the statute requires absolute accuracy. I think it requires what is commercially reasonable. And if someone attests to being a parent, I think there is at least a solid argument that that satisfies the obligations of parental consent contained therein.

(Hearing Tr., Doc. 29 at 16:4–24 (counsel for the State)). In *Brown*, Justice Scalia found nearly identical elements of the law to be indicative of serious, fatal tailoring issues:

> The California Legislature is perfectly willing to leave this dangerous, mind-altering material in the hands of children so long as one parent (or even an aunt or uncle) says it's OK. And there are not even any requirements as to how this parental or avuncular relationship is to be verified; apparently the child's or putative parent's, aunt's, or uncle's say-so suffices. That is not how one addresses a serious social problem.

*Brown*, 564 U.S. at 802.

On the other end of the spectrum, the Act also poses overinclusion issues, "encompass[ing] more protected [expression] than necessary to achieve its goal." *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 578 (1993) (Blackmun, J., concurring). Most notably, the Act's Age Verification Provision imposes severe burdens on *all* Georgians' use of social media, in an effort to "aid

parents in protecting children." (Opp'n, Doc. 23 at 9); *see Reyes*, 748 F. Supp. 3d at 1129 ("Defendants have not identified why the Act's scope is not constrained to social media platforms with significant populations of minor users, or social media platforms that use the addictive features fundamental to Defendants' well-being and privacy concerns."). "As in *Brown*, the State has presented no evidence that the Act 'meet[s] a substantial need of parents who wish to restrict their children's access to [social media] but cannot do so.'" *Griffin*, 2025 WL 978607, at *14 (citing *Brown*, 564 U.S. at 803).

Given the scope of these burdens, the Act is hardly the "least restrictive" solution, as strict scrutiny requires. The Court need not look hard to find alternative tools to assist parents in managing their children's social media use:

> Even setting aside the parental control and supervision tools offered by the websites themselves, parents can determine whether and when to let their children use internet-connected devices, they can utilize device-level settings to limit how long their children use them, or they can block specific websites from their children's devices at the network level through their internet router.

*Uthmeier*, 2025 WL 1570007, at *18. (*See also* Veitch Decl., Doc. 5-5 ¶¶ 11–16 (explaining platform's built-in tools to protect minors) (Director of Public Policy for the Americas, YouTube)). Again, the Court does not doubt the dangers posed by young people's overwhelming exposure to social media. But, in its effort to aid parents, the Act's solution creates serious obstacles for all Georgians, including teenagers, to engage in protected speech activities and would highly likely be unconstitutional. Plaintiff has thus shown a substantial likelihood of prevailing on the merits of its First Amendment claim.

### 2. Void for Vagueness

In addition to its First Amendment challenge, NetChoice also contends that SB 351 is unconstitutionally vague. "The void-for-vagueness doctrine reflects the principle that 'a statute which either forbids or requires the doing of an act in terms so vague that [persons] of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process of law.'" *Harris v. Mexican Specialty Foods, Inc.*, 564 F.3d 1301, 1310 (11th Cir. 2009) (quoting *Roberts v. U.S. Jaycees,* 468 U.S. 609, 629 (1984)). "Vagueness within statutes is impermissible because such statutes fail to put potential violators on notice that certain conduct is prohibited, inform them of the potential penalties that accompany noncompliance, and provide explicit standards for those who apply the law." *Id.* at 1311 (quoting *Grayned v. City of Rockford,* 408 U.S. 104, 108–109 (1972)). Moreover, if "the law interferes with the right of free speech or of association, a more stringent vagueness test should apply." *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 499 (1982).

While NetChoice's vagueness argument is centered on the law's definition of "social media platforms," (Mot. for PI, Doc. 5-1 at 39–40), the Court is more concerned about the Act's amorphous requirement of "commercially reasonable" age verification efforts. The State has made clear that, in its view, a "commercially reasonable" age verification effort would not always require a user to submit a government-issued identification, suggesting facial recognition as a feasible alternative. (*See* Hearing Tr., Doc. 29 at 11:20–12:19). At the risk of repeating itself,

the Court again underscores the State's disparate enforcement plan as a central and fatal source of vagueness in the law. (*See id*. at 19:23–20:2 ("[T]he truth is, as this statute might get applied, there is a conceivable world where what is commercially reasonable for Facebook, you know, one of the largest corporations in the world, might be different than what is commercially reasonable for Dreamwidth.")). This hardly "provide[s] explicit standards for those who apply the law." *Harris*, 564 F.3d at 1311. Thus, Plaintiff is likely to succeed in establishing that the Age Verification Provision—arguably the lynchpin of the Act—is void-for-vagueness.

### 3. Section 230 Preemption

Independent of its constitutional challenges, NetChoice also contends that the Advertising Provision is pre-empted by Section 230 of the Communications Decency Act, 47 U.S.C. § 230. (Mot. for PI, Doc. 5-1 at 40–41). The Court has already found that the Advertising Provision is facially unconstitutional because of its dependence on the Act's content-based definition of "social media platforms." It will thus address the preemption argument only briefly.

Section 230 provides that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230. In other words, "'lawsuits seeking to hold a service provider liable for its exercise of a publisher's traditional editorial functions—such as deciding whether to publish, withdraw, postpone or alter content—are barred' by the CDA." *Hopkins v. Doe*, 2011 WL 5921446, at *1

(N.D. Ga. Nov. 28, 2011) (quoting *Zeran v. Am. Online, Inc.,* 129 F.3d 327, 330 (4th Cir. 1997)). "The [Communications Decency Act] also preempts any inconsistent state law causes of action[.]" *Dowbenko v. Google Inc.*, 582 F. App'x 801, 804 (11th Cir. 2014).

SB 351 requires that social media platforms prohibit "[t]he display of any advertising in the minor account holder's account based on such minor account holder's personal information." O.C.G.A. § 39-6-3(1). But that requirement "would ultimately [result in] liability 'for decisions relating to the monitoring, screening, and deletion of content from its network—actions quintessentially related to a publisher's role.'. . . In such a case, section-230 immunity would likely attach." *A.B. v. Salesforce, Inc.*, 123 F.4th 788, 798 (5th Cir. 2024) (quoting *Doe v. MySpace, Inc.*, 528 F.3d 413, 420 (5th Cir. 2008)). Plaintiff is thus likely to succeed on the merits of its Section 230 challenge to the Advertising Provision, which would impose liability on social media platforms for their decisions (or lack thereof) on "whether to publish, withdraw, postpone or alter" specific advertisements to young users.

### B.  Irreparable Injury

"Because the plaintiff[] ha[s] shown a likelihood of success on the merits, the remaining requirements necessarily follow." *Honeyfund.com Inc. v. Governor of Fla.*, 94 F.4th 1272, 1283 (11th Cir. 2024). The Court briefly turns to the remaining three preliminary injunction factors.

Plaintiff asserts two irreparable injuries: the harm to platforms' and users' First Amendment rights, and the compliance costs anticipated by platforms. (Mot. for PI, Doc. 5-1 at 42). "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion); *accord Honeyfund.com*, 94 F.4th at 1283. Moreover, regulated social media platforms would have to incur significant compliance costs to avoid liability—including, potentially, in advance of the law's July 1 effective date.[17] "[U]nrecoverable monetary loss is an irreparable harm." *Georgia v. President of the United States*, 46 F.4th 1283, 1302 (11th Cir. 2022). *Contra NetChoice v. Skrmetti*, 2025 WL 1710228, at *12–14 (M.D. Tenn. July 18, 2025). This fast-approaching threat of unrecoverable major economic harm thus represents a distinct irreparable injury.

Defendant puts forth two rejoinders to Plaintiff's assertion of irreparable injury. First, the State alleges that "NetChoice's immense delay in bringing this action fatally undercuts its alleged need for urgency[.]" (Opp'n, Doc. 23 at 40). It is true, as Defendant says, that NetChoice waited roughly a year after the passage of SB 351 to bring suit, filing its challenge just 60 days before the law went into

---

[17] *See, e.g.*, Veitch Decl., Doc. 5-5 ¶ 37 ("[C]ompliance with the Act would be enormously difficult and burdensome, requiring large upfront investments and continuing maintenance in terms of time, engineering, and operations resources.") (Director of Public Policy for the Americas, YouTube); Paolucci Decl., Doc. 5-6 ¶ 13 ("The changes the Act would require us to make . . . would take months, if not years, of work at our current development capacity. The ongoing support burden the Act would impose upon us would also be impossible for us to meet at our current level of staffing, and we do not have the financial capabilities to add more staff.") (co-owner, Dreamwidth Studios, LLC).

effect. At oral argument, NetChoice indicated that the delay in its litigation was, at least in part, due to its hope that the Act might be amended or repealed during the 2024–2025 state legislative session, which adjourned on April 4, 2025. (*See* Hearing Tr., Doc. 29 at 58:1–15). Though it is true that "[a] delay in seeking a preliminary injunction . . . militates against a finding of irreparable harm," *Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244, 1248 (11th Cir. 2016), that consideration is not dispositive given NetChoice's reasonable explanation and the vital constitutional interests at issue. *Georgia ex rel. Ga. Vocational Rehab. Agency v. United States ex rel. Shanahan*, 398 F. Supp. 3d 1330, 1347 (S.D. Ga. 2019) (finding delay in filing did not undermine irreparable harm where plaintiff filed with two months before expiration of current contract); *Wood v. Fla. Dep't of Educ.*, 729 F. Supp. 3d 1255, 1288 (N.D. Fla. 2024) (finding delay in filing did not undermine irreparable injury given "justifications for the delay" and the "direct penalization of protected speech" at issue). NetChoice's litigation choices do not change the fact that there is a concrete risk of harm to the First Amendment rights of users and platforms. The Court thus does not find that the delay in Plaintiff's filing negates the irreparable injury at issue.

At oral argument, the State also asserted that the law's "safe harbor" provision undermines Plaintiff's assertion of irreparable harm. (Hearing Tr., Doc. 29 at 34:9–35:1). As a reminder, this portion of SB 351 requires the Attorney General to provide entities with notice of their alleged violation and allow 90 days during which to cure it. O.C.G.A. § 39-6-4. But the 90-day lag in enforcement does

not actually assist social media platforms, which will incur substantial costs *before* the Act goes into effect to bring their practices into compliance—nor does it mitigate the speech-chilling effect that the threat of enforcement will necessarily impose. Plaintiff's established irreparable injuries thus support a preliminary injunction.[18]

### C. Balance of Equities & Public Interest[19]

"No long string of citations is necessary to find that the public interest weighs in favor of having access to a free flow of constitutionally protected speech." *ACLU of Ga. v. Miller*, 977 F. Supp. 1228, 1235 (N.D. Ga. 1997). Though there is certainly a public interest in recognizing and addressing the detriments of social media, the serious tailoring issues present in the Act render it an inappropriate vehicle by which to do so. "[The government has 'no legitimate interest' in enforcing an unconstitutional law" and "a preliminary injunction is not contrary to

---

[18] The Court is aware that one district court has denied NetChoice's motion for a preliminary injunction on the basis that it is not facing an irreparable injury, and credited a similar argument that enforcement in the short-term—and thus imminent harm to Plaintiff's members—is unlikely. *See Skrmetti*, 2025 WL 1710228, at *11 ("Plaintiff's members would be subject to enforcement of the Act prior to the conclusion of litigation only *if* Defendant makes a policy decision to enforce the Act prior to the termination of the instant litigation while the Act's constitutionality is in question . . . and *if* Defendant actually institutes a legal proceeding against one or more of Plaintiff's members while this litigation is proceeding."). But the mere belief that the State will not enforce its own laws does not seriously mitigate the threat of irreparable injury. Moreover, this position does not account for the reality that liability-averse platforms are likely to chill their speech in anticipation of the law's enforcement.

[19] "[W]here the government is the party opposing the preliminary injunction, its interest and harm merge with the public interest," meaning the two factors may be considered together. *Swain v. Junior*, 958 F.3d 1081, 1091 (11th Cir. 2020) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)).

the public interest because it is in the public interest to protect First Amendment rights." *Honeyfund.com Inc.*, 94 F.4th at 1283.

### D. Requirement of Bond

"The court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). "[I]t is well-established that the amount of security required by the rule is a matter within the discretion of the trial court." *BellSouth Telecomms., Inc. v. MCIMetro Access Transmission Servs., LLC*, 425 F.3d 964, 971 (11th Cir. 2005) (cleaned up). But because constitutional rights are at issue—and Defendant risks no monetary loss from complying with the preliminary injunction—the Court will waive the bond requirement. *See Mama Bears of Forsyth Cnty. v. McCall*, 642 F. Supp. 3d 1338, 1361 (N.D. Ga. 2022) (waiving bond requirement where "[t]here is no evidence of risk of monetary loss to Defendants" and "the preliminary injunction protects First Amendment rights and vindicates the public interest").

### IV.    CONCLUSION

As our sister court in the Northern District of Florida wrote, the Court "does not doubt that parents and legislators in the state have sincere concerns about the effects that social media use may have on youth, nor does it render parents or the State powerless to address those concerns." *Uthmeier*, 2025 WL 1570007, at *1. This Court recognizes the serious social media issues that impact young people. It

is precisely for that reason that the Act's flawed tailoring—much of which raises questions about its efficacy—is of such great concern.

SB 351 purports to regulate minors' social media use for their own good. But the State has carved out dozens of arbitrary exemptions and, in oral argument, downplayed the rigor of its parental consent requirements. The State certainly has the authority and ability to provide children and parents with education, resources, and tools to understand the detriments of social media and engage with the internet in a healthier and more productive way. But the challenged portions of SB 351 do not do so. Instead, the Act curbs the speech rights of Georgia's youth while imposing an immense, potentially intrusive burden on all Georgians who wish to engage in the most central computerized public fora of the twenty-first century. This cannot comport with the free flow of information the First Amendment protects. For the foregoing reasons, the Plaintiff's Motion for a Preliminary Injunction [Doc. 5] is **GRANTED.**

**IT IS SO ORDERED** this 26th day of June, 2025.

**Honorable Amy Totenberg**
**United States District Judge**

50